**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------------ X
)
)
ALLSTATE INSURANCE COMPANY, ALLSTATE PROPERTY & )          15-cv-7149
CASUALTY INSURANCE COMPANY, ALLSTATE FIRE & )               (SJ) (CLP)
CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY )
COMPANY AND ALLSTATE NORTHBROOK INDEMNITY )
COMPANY, )
)
)                                              **DECLARATION**
PLAINTIFFS, )                                  **OF DANIEL S.**
)                                              **MARVIN**
-AGAINST- )
)
HARVEY FAMILY CHIROPRACTIC, PHYSICAL THERAPY & )
ACUPUNCTURE, PLLC, RICHARD HARVEY, D.C., JIN HWANGBO, )
L.Ac., and BERVIN NELSON BRUAL, P.T. )
)
DEFENDANTS. )
------------------------------------------------------------------------------ X

     **DANIEL S. MARVIN** declares, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

     1.    I am a Partner with the firm of Stern & Montana, LLP, attorneys for Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Indemnity Company and Allstate Northbrook Indemnity Company ("Plaintiffs" or "Allstate") in the above-entitled action, and I am fully familiar with all the facts and circumstances in this matter.

     2.    I submit this declaration in support of Allstate's Motion pursuant to Rule 65 of the Federal Rules of Civil Procedure seeking a Temporary Restraining Order ("TRO") and Order temporarily staying all No-fault collection proceedings currently pending between Allstate and Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC ("Harvey FCPTA"), by enjoining Harvey FCPTA from (i) proceeding with any No-fault collection actions currently

pending between Harvey FCPTA (the "Underlying Actions") and Allstate until the resolution of the instant matter; and (ii) filing any new arbitration proceeding or civil actions seeking the collection of No-fault benefits from Allstate until the resolution of the instant matter.

3. For the reason set forth herein, and in the accompanying Memorandum of Law ("Memo), the relief requested must be granted because (i) there are sufficiently serious questions going to the merits of this action to make them a fair ground for litigation; (ii) the balance of hardships tips decidedly in Plaintiffs' favor; and (iii) irreparable harm and immediate loss or damage will result to Plaintiffs without interim injunctive relief.

4. By way of brief background, on December 16, 2015, Plaintiffs commenced this action alleging, *inter alia*, violations of RICO, 18 U.S.C. § 1961 *et seq*., and New York State common law. The Complaint alleges, among other things, that Defendants Richard Harvey, D.C. ("Harvey"), presided over an enterprise that systematically stole hundreds of thousands of dollars from automobile insurance companies, including Allstate, via the submission of fraudulent claims for chiropractic, acupuncture, and physical therapy services submitted by Harvey FCPTA, an entity formed and operated in violation of Article 12 of the New York State Limited Liability Company Law ("LLC"), Articles 136 and 160 of the Education Law, and the implementing regulations promulgated by the New York State Department of Financial Services concerning the eligibility requirements of health care providers seeking reimbursement under the No-fault law. Complaint, Doc. No. 1 ("Compl.") ¶ 1.

5. In violation of Article 12 of the LLC, Defendant Harvey, a licensed chiropractor, purchased or was otherwise permitted to use the name and license of Defendants Jin Hwangbo ("Hwangbo") and Bervin Nelson Brual ("Brual") (hereinafter referred to as the "Paper Owners"), to fraudulently organize, own, control and/or operate Harvey FCAPT, a professional limited

liability company that was used to bill insurance companies, in general, and Plaintiffs in particular. *Id.* at ¶ 2, 11. As described in the Complaint, which is incorporated herein by this reference, upon the organization of Harvey FCPTA, its Paper Owners were divested of any and all attributes of ownership and control, which were diverted to Harvey, to facilitate the fraudulent scheme and maintain control over Harvey FCPTA. *Id.* at ¶ 87.

6.     As alleged in the Complaint, Defendant Brual testified on April 10, 2014, at an examination under oath ("EOU"), that despite being listed on the articles of organization as a member/owner of Harvey FCPTA, he:

- considers himself an "employee" of Harvey FCPTA, *see* Transcript of EUO of Bervin Brual on April 10, 2014, 54:5-7, *In the Matter of the Claim of Dr. Richard G. Harvey/Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC, et al.*, relevant excerpts annexed hereto as Exhibit "C" (hereinafter referred to as "Brual EUO");

- earns a salary of $30.00 per hour, an amount which was set by Defendant Harvey, *see id.* at 18:15-19:5;

- has never received any compensation based upon his purported ownership interest, *id.* at 32:4-7;

- does not know if any of the other members, including Harvey, receives a salary, *id.* at 29:9-16;

- is unaware of any of Harvey FCPTA's employees' salaries, *id.* at 43:15-17; did not contribute any capital to buy into Harvey FCPTA, *id.* at 31:3-13;

- is not aware of Harvey FCPTA's overall revenues or net income, *id.* at 32:10-21;

- does not know the amount of Harvey FCPTA's monthly billing to insurance companies for the physical therapy services which Harvey FCPTA, through Brual, purportedly provides, *id.* at 79:7-22;

- does not know Harvey FCPTA's revenue for the physical therapy services which Harvey FCPTA, through Brual, purportedly provides, *id.*;

- is not aware how Harvey FCPTA's lease is paid, *id.* at 32:22-25;

- is not a signatory on Harvey FCPTA's bank account, *id.* at 33:2-8;

- has never discussed the daily operation of Harvey FCPTA with Defendant Harvey, *id.* at 32:13-16, 43:20-44:10;

-  did not interview or hire any of Harvey FCPTA's professional and/or non-professional employees, including but not limited to its Physical Therapy Assistant, who was interviewed and hired solely by Defendant Harvey, *id.* at 43:11-14, 36:10-37:17;

- is not aware of Harvey FCPTA's billing procedure, *id.* at 44:15-17;

- has never seen any of Harvey FCPTA's tax returns, *id.* at 51:17-19;

- does not know the attorneys that Harvey FCPTA uses, *id.* at 51:11-14; and

- does not know who is responsible for Harvey FCPTA's payroll. *Id.* at 51:21-23.

7.     Similarly, the Complaint alleges that Defendant Hwangbo, in the same EOU, acknowledged that that despite being listed on the articles of organization as a member/owner of Harvey FCPTA, he:

- is paid a salary, by Defendant Harvey, of $35.00 per hour, *see* Transcript of EUO of Jin Hwangbo, April 3, 2014, 31:16-21, *In the Matter of the Claim of Dr. Richard G. Harvey/Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC, et al.*, relevant excerpts annexed hereto as Exhibit "D" (hereinafter referred to as "Hwangbo EUO");

- is not a signatory on Harvey FCPTA's bank account, *id.* at 40:20-25;

- has never participated in a meeting of the members of Harvey FCPTA, 44:13-25;

- is unaware of any rights he has under the Operating Agreement which bears his signature, *id.* at 41:23-4, 45:14;21;

- does not possess a key to gain entry to the facility, *id.* at 48:18-19;

- does not have any knowledge concerning Harvey FCPTA's revenue, *id.* at 55:2-4;

- has never received any dividends from Harvey FCPTA, *id.* at 38:18-40:12, 55:8-18;

- is not aware of the amount of Harvey FCPTA's payroll or how it is handled, *id.* at 56:15-19, 73:17-18;

- is not aware how much revenue Harvey FCPTA generates from acupuncture service he purportedly provides, *id.* at 71:24-72:12;

- does not know who the accountant is that prepares Harvey FCPTA's tax returns, *id.* at 72:13-16;

- does not review Harvey FCPTA's tax returns before, or even know if, they are filed, *id.* at 72:25-73:5;

- is unaware of any of the finances of Harvey FCPTA, other than the salary he receives, *id.* at 82:17-83:13; and

- (xiii) is not aware of Harvey FCPTA's weekly and/or monthly income. *Id.* at 83:4-6.

8.     Against the foregoing backdrop, it is respectfully submitted that the Complaint sets forth sufficiently serious questions going to the merits to make them fair grounds for litigation, as it raises serious questions regarding the ownership of Harvey FCPTA, which operated as an enterprise that systematically stole hundreds of thousands of dollars from automobile insurance companies, including Allstate.

9.     The Complaint details how the Paper Owners of Harvey FCPTA were divested of any and all attributes of ownership and control, which was diverted to Harvey.  Plaintiffs have also particularized the fraudulent statements made by Defendants within the body of the Complaint, as well as in the Exhibits and Predicate Act tables, which are annexed thereto, which identify, among other things, representative fraudulent mailings to each of the Plaintiffs by or on behalf of Harvey FCPTA, including claim numbers, claimant initials and dates of service.

10.     Moreover, the transcripts of the EUOs of Defendants Hwangbo and Brual and Harvey FCPTA's Operating Agreement, the latter of which is annexed hereto as Exhibit "B," overwhelmingly support Plaintiffs' claims that Defendant Harvey exclusively owned, operated, controlled and managed Harvey FCPTA, in violation of Article 12 of the LLC Law.

11.     As detailed in the Memorandum of Law accompanying this Motion, if this Court were to ultimately grant a declaratory judgment in Plaintiffs' favor and find that Harvey FCPTA is not properly licensed and therefore ineligible for reimbursement, to the extent that any arbitration or court decisions resulted in contrary conclusions, they would likely be unenforceable, thereby causing irreparable harm to Plaintiffs.

12.     In addition, there are sufficiently serious questions going to the merits to make them fair grounds for litigation. The Complaint raises serious questions regarding the ownership of Harvey FCPTA, and Plaintiffs have particularized the fraudulent statements made by Defendants within the body of the Complaint, as well as in numerous Exhibits and Predicate Act tables, which are annexed thereto. To the extent that Harvey FCPTA represented to Plaintiffs, though the submission of claims, that it is properly licensed, and to the extent Harvey FCPTA disputes the well-pled allegations of the Complaint, there is no doubt that Plaintiffs have raised serious questions going to the merits of this matter to make them fair grounds for litigation. *See* Memo at 22-24.

13.     Moreover, the balance of hardships tips decidedly in Allstate's favor, as the requested relief is not granted, not only will Plaintiffs face the irreparable harm of having the equitable relief sought in the Complaint placed in jeopardy, but Allstate will also be required, in the context of civil court litigations, to undertake significant time and expense to litigate hundreds of related matters while the instant declaratory judgment is pending. Allstate will be made to make repetitious arguments in these matters, which could ultimately result in unenforceable and likely inconsistent decisions. *See* Memo at 24-25.

## CERTIFICATION PURSUANT TO FED.R.CIV.P. 65(b)

14.     Pursuant to Fed. R. Civ. P. 65(b)(1)(B), the undersigned certifies that Louis F. Chisari, Esq. of Marcote & Associates, P.C., counsel of record for Harvey FCPTA has been orally notified of the instant application and is being served with the same via Electronic Case filing.

## RELEVANT EXHIBITS

15.     Exhibit "A" annexed hereto is a true and correct copy of the April 14, 2015, Order of Judge Johnson in *Allstate Ins. Co. v. Tvildiani*, 14-CV-7328 (SJ)(RLM).

16.     Exhibit "B" annexed hereto is a true and correct copy of Harvey FCPTA's Operating Agreement with Amendments produced by the Defendants in connection with *In the Matter of the Claim of Dr. Richard G. Harvey/Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC*.

17.     Exhibit "C" annexed hereto is a true and correct copy of excerpts, with confidential patient information redacted, of the Transcript of the Examination Under Oath ("EUO") of Defendant Bervin Brual held on April 10, 2014, *In the Matter of the Claim of Dr. Richard G. Harvey/Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC, et al.*

18.     Exhibit "D" annexed hereto is a true and correct copy of excerpts, with confidential patient information redacted, of the Transcript of the Examination Under Oath ("EUO") of Defendant Jin Hwangbo held on April 3, 2014, *In the Matter of the Claim of Dr. Richard G. Harvey/Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC, et al.*

19.     Exhibit "E" annexed hereto is a true and correct copy of the January 4, 2011 Order of Judge Townes in *Government Employees Insurance Co., et al. v. Damien, et al.*, Docket No. CV 10-5409 (SLT)(JMA).

## DECLARATION

20.     I declare under penalties of perjury that the foregoing is true and correct.


**WHEREFORE**, Plaintiffs respectfully request that Plaintiffs' Motion be granted in its

entirety.


Dated: January 4, 2016
      New York, NY

                             Daniel S. Marvin, Esq. (DM-7106)

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ALLSTATE INSURANCRE COMPANY,
and ALLSTATE PROPERTY & CASUALTY
INSURANCE COMPANY,

            Plaintiff,                             14 CV 7328 (SJ) (RLM)

            v.

                                          **ORDER ENTERING
                                          PRELIMINARY
                                          INJUNCITON**


DIMITRY TVILDIANI, DEVINENI
RATNAM, AIM 4 LIFE MEDICAL
DIAGNOSTICS, PC, ADVANCED
MEDICAL DIAGNOSTICS OF QUEENS,
PC, SPRINGFIELD RADIOLOGY
IMAGING, PC ,KISSENA MEDICAL
IMAGING, PC, LAWRENCE DIAMON,
M.D., NORADI MIKHEILASHVILI, M.D.,
AYOOB KHODADADI, M.D., MEDEQ
INTERNATIONAL, LLC, IMAGE PRO,
LLC, IBERIA MANAGEMENT, LLC,
HOLLY, INC., JOHN DOES 1 THROUGH
20 and ABC CORPORATIONS 1 THROUGH
20,
            Defendants.

-----------------------------------------------------X
A P P E A R A N C E S
STERN & MONTANA LLP
115 Broadway
New York, NY 10006
By:    Sandra Patricia Burgos
        Daniel Scott Marvin
        John Paul Mulvaney
        Robert Allan Stern
        Alex B. Silverman
*Attorneys for Plaintiffs*

1

LAW OFFICE OF DAVID CLIFFORD HOLLAND, PC
419 Park Avenue South
16th Floor
New York, NY 10016
By:     David Clifford Holland
*Attorney for Defendant Dimitry Tvildiani,*
*AIM 4 Life Medical Diagnostics, PC,*
*Advanced Medical Diagnostics of Queens, PC,*
*Springfield Radiology Imagine, PC,*
*Ayoob Khododadi, Medeq International, LLC,*
*Iberia Management, LLC, Image Pro, LLC*

MICHAEL T. MULLEN, PC
24 West 40th Street
17th Floor
New York, NY 10018
By:     Michael Mullen
*Attorney for Defendant Dimitry Tvildiani,*
*AIM 4 Life Medical Diagnostics, PC,*
*Advanced Medical Diagnostics of Queens, PC,*
*Springfield Radiology Imagine, PC,*
*Ayoob Khododadi, Medeq International, LLC,*
*Iberia Management, LLC, Image Pro, LLC*

RUSKIN MOSCOU FALTISCHEK PC
East Tower, 15th Floor
1425 RXR Plaza
Uniondale, NY 11556
By:     E. Christopher Murray
        Jennifer Leigh Hartmann
*Attorneys for Defendants Devineni Ratnam,*
*Holly Inc.,*

HARRIS, O'BRIEN, ST. LAURENT & HOUGHTELING LLP
111 Broadway
Suite 1502
New York, NY 10006
By:     James M. Kennedy
*Attorney for Defendants Kissena Medical Imaging, PC,*
*Lawrence Diamond, Noradi Mikhelashvili*
**JOHNSON, U.S.D.J.:**

2

Having reviewed the record in this Civil RICO action, including (1) the complaint by Allstate Insurance Company and Allstate Property Casualty Insurance Company ("Allstate" or "Plaintiffs") against defendants Dimitry Tvildiani, Devineni Ratnam, AIM 4 Life Medical Diagnostics, PC, Advanced Medical Diagnostics of Queens, PC, Springfield Radiology Imaging, PC, Kissena Medical Imaging, PC, Lawyrence Diamond, M.D., Noradi Mikhelashvili, M.D., Ayoob Khododadi, M.D., Medeq International, LLC, Image Pro, LLC, Iberia Management, LLC, and Holly, Inc. ("Defendants"), alleging that the individual defendants owned and operated the corporate defendants and used the entities to systematically bill Plaintiffs for claims that violate New York State's No Fault Insurance system; (2) Plaintiffs' Amended Motion for a Temporary Restraining Order and Preliminary Injunction, and Defendants' Oppositions thereto; and (3) applicable legal authorities; and having heard the parties' arguments before this Court on April 13, 2015, the Court hereby enters a preliminary injunction against Defendants for the following reasons:

Plaintiffs have demonstrated that they face irreparable harm absent the award of a preliminary injunction and that there exists sufficient serious questions going to the merits to make them a fair ground for litigation. See Allstate Ins. Co v. Elzanaty, 929 F. Supp. 2d 199, 222 (E.D.N.Y. 2013) ("[A]llowing a large number of proceedings to be heard by a mix of arbitrators, each of whom will likely come to their own independent and potentially contradictory conclusions will result in harm to Allstate from which it cannot recover.").

The balance of hardships also tips in favor of staying arbitration. Litigating hundreds of arbitrations concurrent to this litigation would be inefficient and unwise.  See id. (referring to the "large volume of arbitrations and inconsistent judgments" as "gradually culminating in a procedural and substantive train wreck."); see also Liberty Mut. Ins. Co. v. Excel Imaging, P.C., 879 F. Supp. 2d 243, 263-264 (E.D.N.Y. 2012).  Allegations of fraud on our health care system generally, and even the specific Civil RICO scheme alleged in the complaint, have become too common.  There have been dozens of cases brought in this district alleging the same misuse of New York's No Fault Insurance law.  Justice would be better administered with the fewest number of fora hearing the issues presented herein.

Accordingly, it is

ORDERED that any and all pending No Fault arbitrations commenced on behalf of any defendant against either plaintiff, including but not limited to those

P-049

attached hereto, are stayed pending the disposition of Allstate's declaratory judgment claim in this action;

IT IS FURTHER ORDERED that Defendants may not commence any new arbitrations against either plaintiff pending the disposition of Allstate's declaratory judgment claim in this action.

**SO ORDERED.**

Dated: April 14, 2015
   Brooklyn, NY

HON. STERLING JOHNSON, JR.
Senior United States District Judge

4

# EXHIBIT B



EXHIBIT

F

1/31/13   Pf

### SECOND AMENDED
### OPERATING AGREEMENT
### OF
### HARVEY FAMILY CHIROPRACTIC,
### PHYSICAL THERAPY & ACUPUNCTURE, PLLC

Upon valuable consideration, the persons named below as "Members" hereby covenant and agree to be bound to the following as their PROFESSIONAL SERVICES LIMITED LIABILITY COMPANY OPERATING AGREEMENT, effective as of the 8/9 day of August 2012 (this "Operating Agreement"), for Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC, a professional services limited liability company organized under the laws of the State of New York:

### ARTICLE I

### DEFINITIONS

As used in this Operating Agreement, the following terms are to have the meaning as stated below:

"the PLLC" means HARVEY FAMILY CHIROPRACTIC, PHYSICAL THERAPY & ACUPUNCTURE, PLLC.

"PLLC Units" or "Units" means measures of ownership in the PLLC. The capital structure of the PLLC shall consist of Units all of the same class with equal rights for all purposes under this Operating Agreement.

"PLLC Member" or "PLLC Members" means a member or members of the PLLC.

"PLLC Unit Percentage" means, with respect to a member of the PLLC, the percentage derived from the following fraction: number of PLLC Units held by such Member divided by the total number of PLLC Units held by all Members (and, thereafter, multiplying said fraction by 100 to arrive at a percentage).

"State Law" means the laws of the State of New York.

"The Profession" means licensed professionals practicing chiropractic, acupuncture and physical therapy.

"Vote in interest of PLLC members" means a vote of the PLLC members in which each member of the PLLC shall have one vote per PLLC Unit possessed; for example, a member possessing 150 PLLC Units would have 150 votes in interest.

"Supermajority vote in interest of PLLC members" means a vote of the PLLC members in which each member shall have one vote per PLLC Unit possessed and the

number of affirmative votes for any resolution before the members shall be more than 66% of the outstanding PLLC Units. For example, if there are 1000 outstanding PLLC Units, 667 affirmative votes are required to achieve a Supermajority vote in interest upon a resolution before the members.

## ARTICLE II

## GENERAL PROVISIONS

**Section 2.1.** Formation. Articles of Organization either already have been filed with the appropriate State office or shall shortly be done so. The Members shall execute or cause to be executed all other instruments, certificates, notices and documents as may now or hereafter be required for the formation, valid existence and, when appropriate, termination of the PLLC as a professional services limited liability company under the laws of the State of New York.

**Section 2.2.** Company Name. The name of the PLLC is "HARVEY FAMILY CHIROPRACTIC, PHYSICAL THERAPY & ACUPUNCTURE, PLLC" or such other name or names as may be selected by the Members from time to time, and its business shall be carried on in such name with such variations and changes as the Members deem prudent.

**Section 2.3.** Purpose of the PLLC. The purpose of the PLLC is to engage in The Profession and, also, activities complimentary to rendering professional services within The Profession which are lawful for professional services limited liability companies organized under the laws of the State of New York.

**Section 2.4.** Place of Business. The business address of the PLLC shall be determined by the Members. The PLLC may from time to time have such other place or places of business, within or without the State of New York, as the Members may decide.

**Section 2.5.** Registered Agent. The registered agent of the PLLC shall be determined by the Members who shall also possess the power to remove or replace a currently serving PLLC registered agent.

**Section 2.6.** Business Transactions of a Member with the Company. A Member may lend money to, borrow money from, act as surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for, and transact other business with the PLLC and, subject to applicable law, shall have the same rights and obligations with respect to any such matter as a Person who is not a Member.

**Section 2.7.** Company Property. No real or other property of the PLLC shall be deemed to be owned by any Member individually, but shall be owned by and title shall be vested solely in the PLLC.

2

**Section 2.8.** No Term To Existence. The PLLC's existence shall commence on the date of the filing of the Article of Organization with the appropriate state office and, thereafter, the PLLC's existence shall be perpetual without term.

**Section 2.9.** Accounting Period. The close of the PLLC's year for financial statement and federal income tax purposes shall be as determined by the Members.

## ARTICLE III

## MEMBERS

**Section 3.1.** Members. The name, PLLC Units and PLLC Unit Percentage of the Members are set forth in the below table, which shall be amended from time to time to reflect the admission of new Members.

| Member Name | PLLC Units | PLLC Unit % |
|---|---|---|
| Richard G. Harvey, D.C. | 970 | 97 |
| Bervin Nelson D. Brual | 20 | 2 |
| Mun S. Shieh | 10 | 1 |

**Section 3.2.** Admission of New Members. New members may be admitted to the PLLC by an affirmative Supermajority vote in interest of PLLC members.

**Section 3.3.** Liability of Members. All debts, obligations and liabilities of the PLLC, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the PLLC, and no member shall be obligated personally for any such debt, obligation or liability of the PLLC solely by reason of being a member. However, to the extent applicable law makes a member of this PLLC personally liable for any negligence or misconduct committed by him or her in a professional capacity or by any person rendering professional services under the member's supervision or control, said member shall be so liable. Members of the PLLC do not agree to accept or share the professional liable of other members beyond their investment in the PLLC. This section does not prevent a PLLC member, should he or she so choose, from separately agreeing to guaranty or otherwise become liable for a debt which is also one of the PLLC.

**Section 3.4.** Access to Books and Records of PLLC. Each PLLC member shall have the right to inspect the books and records of the PLLC during normal business hours after the giving of reasonable notice of this intent to the PLLC custodian of said documents and information; however, each member gaining access to the books and records of the PLLC shall hold this information confidential and only use PLLC information for the furtherance of PLLC business and interests or for making investment decisions regarding the member's PLLC interest. Upon withdrawal or departure as a member of a PLLC, a member shall deliver all PLLC books and records in his or her possession to the remaining PLLC members or managers.

3

**Section 3.5. Actions by the Members; Meetings; Quorum.** The PLLC members may take any action at a meeting in person, by proxy, or without a meeting by written resolution in accordance with Section 3.5(d). Meetings of PLLC members may be conducted in person or by telephone conference. A voting proxy given by an PLLC Member to another person must be in writing.

**Voting.** Each PLLC member shall be entitled to vote upon all matters for which PLLC members have the right to vote. All PLLC member votes shall be tallied by interest under which each member shall be entitled to one vote for each PLLC Unit possessed (for example, a member possessing 150 PLLC Units shall be entitled to 150 votes upon any matter submitted to the PLLC Members for a vote). Each vote per PLLC Unit shall carry the same weight and have the same value, for voting purposes, as every other PLLC Unit. Should state law create statutory situations where PLLC member votes are to be taken on a one vote per member basis, votes per member (as opposed to per PLLC Unit interest) shall be limited to those specific circumstances under which state law requires such a vote.

Unless another percentage is given elsewhere in this operating agreement or by state law, all PLLC member votes on any matter shall require an affirmative vote in interest by PLLC members of PLLC Unit in excess of 50% of the outstanding total to pass or approve the motion, resolution, or otherwise take action by the PLLC members. For example, if there are 1000 PLLC Units outstanding, a vote of 501 PLLC Units in favor of a resolution is required for its passage unless the resolution involves a matter for which this operating agreement or state law requires a higher percentage. Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting if Members with the percentage of votes (per PLLC units) sufficient to approve the action pursuant to the terms of this Agreement resolve thereto in writing and the writing or writings are filed with the PLLC records of actions taken by Members. In no instance where action is authorized by written resolution shall it be required that a meeting of Members be called or notice be given; however, upon passage, a copy of the action taken by written resolution of the members shall be sent promptly to all PLLC members.

Meetings of Members may be called by any PLLC member, or members, collectively holding 25% or more of the outstanding PLLC Units upon seven (7) days written notice to the other PLLC members. Notice of a meeting called for hereunder may be made by standard U.S. mail, electronic mail, or facsimile transmission and shall contain the time, place, and purpose of such meeting. A quorum for any action to be taken at a meeting of PLLC members shall be PLLC members present (in person, via telephone, or by proxy) holding more than 50% of the PLLC Units. Any Member may through a written instrument waive the right to receive prior notice of a meeting of the Members as described herein.

Notwithstanding any other provision of this Agreement, the following actions shall require a Supermajority vote in interest of the PLLC Members:

i. any merger, consolidation or other business combination;

4

ii. sale or other disposition of substantially all the assets of the PLLC;

iii. filing of a petition or commencing other proceedings seeking reorganization, liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;

iv. the amendment or modification of any provision of this Agreement; the issuance of additional PLLC Units (other than those issued pursuant to the founding of the PLLC as set forth in Section 3.1 of this operating agreement) to any Member or other person;

v. the removal of any Member;

vi. the decision to appoint managers for the PLLC under Article IV hereof.

**Section 3.6.** Power to Bind the PLLC. No PLLC member or group of members acting in their individual capacity—separate and apart from action as PLLC members pursuant to this operating agreement—shall have any authority to bind the PLLC to any third party with respect to any matter.

**Section 3.7.** Members who are not individuals. Each Member who is an artificial entity or otherwise not an individual hereby represents and warrants to the PLLC and each Member that such Member is: (a) duly incorporated or formed (as the case may be), (b) validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, and (c) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

**Section 3.8.** Tax Matters Partner. Richard G. Harvey is hereby designated as the PLLC's "Tax Matters Partner" under Section 6231(a)(7) of the Internal Revenue Code of 1986, as amended (the "Code"), and shall have all the powers and responsibilities of such position as provided in the Code and the Treasury Regulations thereunder. The PLLC members may remove or replace the Tax Matters Partner by a vote of the majority in interest.

**Section 3.9. Members To Be Licensed.** Every member of the PLLC shall be licensed and in good standing with the professional body which licenses practicioners of The Profession in New York. Any member who's license to practice in New York shall be suspended or revoked by the licensing body for The Professional shall withdraw from the PLLC once all appeal rights have been exhausted both administratively and through the court system.

5

## ARTICLE IV

## MANAGEMENT

**Section 4.1.** Management of the PLLC. This PLLC shall be managed collectively by its members; however, the PLLC members reserve the right to appoint managers, who may also be members, at a later date.

## ARTICLE V

## CAPITAL STRUCTURE

**Section 5.1.** Capital Structure. The capital structure of the PLLC shall consist of one class of PLLC Units each having equal rights under all provisions of this operating agreement.

**Section 5.2.** PLLC Units. 1000 PLLC Units shall be issued to the Members, as set forth in Section 3.1 hereof, as part of the initial funding of the PLLC; however, additional PLLC units may be issued pursuant to a Supermajority Vote in interest of PLLC Members.

**Section 5.3.** Capital Contributions. Each Member shall contribute or shall have contributed, as an initial capital contribution ("Initial Capital Contribution") to the PLLC the amounts set forth below. The break-down between cash and non-cash contributions by the Members is set forth as follows:

**Member Name Initial Capital Contribution**
Richard G. Harvey, $58,500.00, adequacy of which is fully acknowledged herein, pursuant to Purchase Agreement between Richard G. Harvey and Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC dated April __, 2011.

Bervin Nelson D. Brual, $1,000.00.

Mun S. Shieh, $500.00.

The Members shall complete their initial capital contributions to the PLLC within 20 days of the date of this agreement unless another date is agreed upon in writing by all PLLC Members. Any Member who fails to make the required initial capital contribution as set forth in this paragraph shall indemnify all other Members of the PLLC for any losses or expenses (including reasonable attorneys fees) that are caused by the failure to make the initial capital contribution as set forth herein. Interest shall accrue against a member upon any unpaid capital contribution at a rate of 7% per annum, compounded annually, commencing from the due date of the initial capital contribution.

**Section 5.4.** Additional Capital Contributions. Members may make additional capital contributions but shall not be required to do so.

6

Case 1:15-cv-07149-SJ-CLP   Document 10-1   Filed 01/04/16   Page 21 of 83 PageID #: 410

**Section 5.5.** Raising Additional Capital. Additional capital may be raised by the PLLC through sales of new PLLC Units pursuant to an affirmative Supermajority Vote of PLLC Members, see Section 5.2 above. Any Member resolution authorizing the raising of additional capital through the sale of PLLC Units shall state, in reasonable detail, the purposes and uses of such additional capital and the amounts of additional capital required.

**Section 5.6.** No Withdrawal of Capital Contributions. Except upon the dissolution and liquidation of the PLLC as set forth herein, no Member shall have the right to withdraw his or her capital contributions. Furthermore, no interest shall be paid upon any member's capital account.

**Section 5.7.** Maintenance of Capital Accounts. An individual capital account shall be maintained for each PLLC Member consisting of the member's capital contributions and (1) increased by that member's share of PLLC profits, (2) decreased by that member's share of PLLC losses, and (3) further adjusted as required or allowed by the Internal Revenue Code (Title 26 of the United States Code) and / or all published Treasury Regulations (Title 26 of the Code of Federal Regulations). In all cases, the capital accounts of the members shall be accounted for in accordance with the Internal Revenue Code (Title 26 of the United States Code) and or all published Treasury Regulations (Title 26 of the Code of Federal Regulations).

**Section 5.8.** Negative Capital Account. If any Member's capital account shows a negative balance at the close of an accounting year, said Member shall contribute sufficient sums of cash to the PLLC to wipe out the Member's negative capital balance within forty five (45) days of receipt of the PLLC's annual financial statements reflecting a negative balance. If the Member fails to make up the negative capital balance to the PLLC within the 45 allotted days, interest shall begin to run on the negative balance at a rate of 8% per annum, compounded annually. The remedy of the PLLC against any member for collection of any debt accruing under this Section 5.8 for failure to repay a negative capital account shall be collectable only against the member's interest in the PLLC and not against any other assets of the PLLC member. The PLLC shall have the right to sell a member's PLLC interest to satisfy any debt accruing under this Section 5.8 free and clear without restriction despite any provision in this operating agreement to the contrary.

## ARTICLE VI

## ALLOCATIONS AND DISTRIBUTIONS

**Section 6.1.** Allocation of Profit, Loss and other items to Members. Net profits, net losses, and other allocable items of income, gain, loss, deduction or credit of the PLLC shall be annually allocated among the Members ratably in proportion to each Member's PLLC Unit Percentage. For example, if a Member has a PLLC Unit Percentage of 45%, he or she shall be allocated 45% of all profits or losses (and other allocation items) for any given tax year.

7

**Section 6.2. Tax Allocations.** In the case of any special tax allocations allowed under the Internal Revenue Code or Treasury Regulations, the method of allocation and formula determined by the Tax Matters Partner shall be followed so long as it complies with state law, the Internal Revenue Code, the Treasury Regulations, and fairly treats each Member. The method of tax allocation selected by the Tax Matters Partner shall be presumed to be "fair to all the members" and any Member or party challenging said allocation on these grounds shall bear the burden of proof.

**Section 6.3. Distributions.** Distributions to the Members shall only be made pursuant to an affirmative vote in interest of the PLLC Members. The resolution attesting to the affirmative vote in interest of the PLLC Members shall state the amounts and dates of distribution to each member; however, no distribution shall be declared or made if, after giving it effect, the PLLC would not be able to pay its debts as they become due in the usual course of business or the PLLC's total assets would be less than the sum of its total liabilities.

## ARTICLE VII

### TRANSFERS OF UNITS; WITHDRAWAL, DEATH, REMOVAL OF MEMBER

**Section 7.1. Transfer of PLLC Units.** No Member shall have the right to sell, convey, assign, transfer, pledge, grant a security interest in or otherwise dispose of all or any part of its PLLC Units other than as follows: Only upon the following conditions may an PLLC Member assign, pledge or grant a security interest in its PLLC Units: (a) the assignment, pledge or security interest shall not entitle the assignee, pledge or security interest holder to participate in the management and affairs of the PLLC, to become a Member, nor to vote the Member's PLLC Units and (b) such assignee, pledgee, or security interest holder is only entitled to receive the distributions the Member would otherwise be entitled to absent the assignment, pledge, or security interest.

To another PLLC Member. Members may freely sell, convey or otherwise transfer their PLLC Units to another Member without prior approval of the PLLC through a vote of the PLLC Members.

To non–LLC Members. Subject to the other provisions of this section, no Member shall be entitled to sell, convey or otherwise transfer its PLLC Units to a non–LLC Member without a prior affirmative Supermajority vote in interest of PLLC Members. Prior to the vote of PLLC Members upon a proposed sale, the Member seeking authorization of the sale or transfer of its PLLC Units shall provide all other PLLC Members with written documents detailing the exact terms of the proposed sale.

Creditors and Spouses of Member. Creditors of a member cannot vote a member's PLLC units nor in any way assume ownership or management rights of a member in the PLLC. At most, a creditor of a member is entitled to seek a court order attaching distributions made by the PLLC on account of the member's PLLC membership interest. A spouse or

8

former spouse of a member stands in the same position as a creditor of a member under this agreement meaning that the former spouse may not vote a member's PLLC units nor in any way assume ownership or management rights.

Section 7.2. Withdrawal of Member.
Members shall have the unilateral right to resign or withdraw at any time from the PLLC. A Member is required to give sixty (60) days written notice to each of the other PLLC Members to initiate a withdrawal. In this notice, the withdrawing Member shall state an effective date for his or her withdraw and said date must be at least sixty (60) days after delivery of notice to all other PLLC members and be the last day of a month (i.e., the 30th or the 31st). Upon receipt of said notice, the PLLC Members shall promptly take any vote required under this agreement for withdrawal of a Member and, if the vote is in a sufficient affirmative percentage as called for under this agreement, the remaining PLLC members shall cause a reasonably prompt preparation of financial statements for the PLLC as of the effective date of withdrawal for said Member.

Upon withdrawal, the withdrawing Member shall receive, in exchange for his or her PLLC Units, the Withdrawal Compensation Amount to be paid within 1 year of the effective date of the Member's withdrawal.

The "Withdrawal Compensation Amount" is defined herein as 100% of the withdrawing member's capital account, such amount is either the initial investment plus nine percent (9%) calculated per annum or $1,000.00, whichever is greater.

Any withdrawing PLLC member possessing a negative capital account upon the effective date of withdrawal shall have a duty to repay the negative balance of his or her capital account to the PLLC upon withdrawal.

Should the PLLC fail to perform upon its obligation under this section to make payments when due, in addition to any other remedies possessed, the PLLC shall be liable to the withdrawing Member for interest upon the amount of any deficiency at the rate of 7% per annum (compounded annually) computed from the date that said deficient payment was due under this agreement.

Upon withdrawal, the withdrawing Member shall take all reasonable steps necessary for the prompt and efficient transfer of patients under the Member's care to the other professionals employed by the PLLC as directed by the PLLC. For a period of thirty (30) days after the effective day of withdrawal, the Member shall continue to take such actions as are reasonably necessary to ensure that patients continue to receive effective professional care.

Upon withdrawal, the withdrawing Member shall deliver all property (including keys, records, notes, data, memoranda, models and equipment) that is in the Member's possession or under the Member's control which is the PLLC's property or related to the PLLC's business.

9

For a period of two (2) years after withdrawal, the Member shall continue to cooperate fully and assist the PLLC in the collection of any and all accounts receivable for services performed by the Member while employed by the PLLC, at the expense of the PLLC. Further, the withdrawing Member agrees to notify the PLLC, in writing, of any change of address of the Member's business or residence during said two (2) year period. The terms and conditions of this provision shall survive termination of this Agreement.

A withdrawing Member shall retain the right to vote as an PLLC member up until the effective date of his or her withdrawal, at which time, the withdrawing Member's PLLC Units shall be considered transferred back to the PLLC and the person who has withdrawn shall no longer be considered a member of the PLLC. If a withdrawing Member was also a "manager" of the LLC, the withdrawing Member shall resign as a manager immediately upon giving notice of to the other PLLC members of his or her intent to withdraw.

### Section 7.3. Death of Member.
Upon the death of a Member, the remaining PLLC members shall cause a prompt preparation of financial statements for the PLLC as of the end of the month in which the Member died which shall be the date of death for the deceased Member for accounting purposes under this agreement. For purposes of this section, if PLLC Units are titled in the name of a revocable trust, the trustee of said revocable trust shall be treated as the Member.

The estate of the deceased Member (or his revocable trust if the PLLC Units were so titled) shall receive, in exchange for his or her PLLC Units, the Withdrawal Compensation Amount to be paid within 2 years of the date of the Member's death. The payments shall be made in two equal installments payable at the annual anniversary of the date of death with no interest being due nor owing upon the outstanding amount.

Should the PLLC fail to perform upon its obligation under this section to make payments when due, in addition to any other remedies possessed, the PLLC shall be liable to the deceased Member's estate or revocable trust (as the case may be) for interest upon the amount of any deficiency at the rate of 7% per annum (compounded annually) computed from the date that said deficient payment was due under this agreement.

Upon death, the estate of the deceased Member (or his or her revocable trust, as the case may be) shall have no continuing obligations to the PLLC other than pursuant to state law, this Agreement or other applicable laws or such obligations as expressly assumed by said Member.

### Section 7.4. Removal of Member.
A Member may be involuntarily removed from the PLLC only under either of the following circumstances: (1) the Member is required to provide services to the PLLC (as reflected in this agreement), said Member is not substantially performing the promised services, and a Supermajority in interest of PLLC Members vote for removal, or (2) the

Member has defaulted upon its obligations under this agreement to make capital contributions (or loans) to the PLLC.

In the case of a removal for failure to perform required services, 60 days prior to any vote to remove, the other PLLC Members shall cause a notice to be issued to the Member in question stating that they shall bring to a vote of the PLLC Members a motion to remove said Member within 60 days for unsatisfactory performance of required services and detail specific instances or tasks that were allegedly not satisfactorily performed. The other PLLC Members shall then give the Member in question a good faith opportunity to cure the deficiencies in performance of services prior to the vote of removal. The period of this good faith opportunity to cure need not extend beyond 60 days. If the Member in question completes a cure within 60 days of receiving the aforementioned notice, then the motion pending before the PLLC Members for removal shall be withdrawn.

In the case of a removal for failure to make required capital contributions, 30 days prior to any vote to remove, the other PLLC Members shall cause a notice to be issued to the Member in question stating that they shall bring to a vote of the PLLC Members a motion to remove said Member within 30 days for non-payment of required capital contributions. The Member in question shall then have 30 days within which to cure the default which shall consist of making all required capital contributions plus 7% per annum interest (compounded annually) upon the amount of any deficiency computed from the date said contribution was due to be made to the PLLC. If the Member in question completes this cure within 30 days of receiving the aforementioned notice, then the motion pending before the PLLC Members for removal shall be withdrawn and the Member in question shall, henceforth, be consider in good standing. If, however, the 30 day cure period expires and the Member in question fails to make a required capital contribution plus interest on the deficiency, then this Member shall be barred from voting on the motion for removal. If, after complying with the above notice and cure provisions, an affirmative Supermajority vote in interest of PLLC Members is made to remove the Member in question, then, as of that moment, this person shall no longer be entitled to exercise any rights, powers or privileges of a Member and his or her PLLC Units shall be considered redeemed by the PLLC. In the case of removal for failure to make require capital contributions, the Supermajority in interest shall be determined without regard to the PLLC interest of the member to be removed. For example, if the member to be removed holds a 20% interest, only a Supermajority percentage of the remaining 80% PLLC interest is required to effect removal.

Upon the affirmative Supermajority vote in interest of PLLC Members to remove a Member, the remaining PLLC members shall cause a prompt preparation of financial statements for the PLLC as of the end of the month in which the resolution was passed by the PLLC Members removing said Member and this shall be the effective date of removal for the Member for accounting purposes only under this agreement.

The removed Member shall receive in exchange for his or her PLLC Units the Withdrawal Compensation Amount to be paid within one (1) year of the effective date of the Member's removal.

11

Should the PLLC fail to perform upon its obligation under this section to make payments when due, in addition to any other remedies possessed, the PLLC shall be liable to the removed Member for interest upon the amount of any deficiency at the rate of 7% per annum (compounded annually) computed from the date that said deficient payment was due under this agreement.

## ARTICLE VIII

### DISSOLUTION OF THE COMPANY

**Section 8.1. Dissolution.** The PLLC shall be dissolved upon the occurrence of the following event (hereinafter, a "Liquidation Event"): a Supermajority vote in interest by the PLLC Members to dissolve the PLLC. Despite any provision of state law to the contrary, no other event—including (but not limited to) the withdrawal, removal, death, insolvency, liquidation, expulsion, bankruptcy, or physical or mental incapacity of a Member shall cause the existence of the PLLC to terminate or dissolve, lacking super majority vote.

**Section 8.2. Liquidation.**
In addition to a supermajority vote of the members to dissolve per Section 8.1 above, the death of all PLLC members or a court order that the PLLC be dissolved shall constitute Liquidating Events.

Should a Liquidation Event occur, the PLLC shall then be liquidated and its affairs shall be wound up—including preparation of final financial statements and an accounting—by (or at the direction of) the PLLC Members. All proceeds from the liquidation shall be distributed in accordance with state law, and all PLLC Units shall, thereafter, be canceled. Distributions to the Members shall be made in accordance, and proportion, with the Members' relative Capital Account balances.

Final distributions to Members shall not be made until all liabilities have been satisfied and any contingent claims against the PLLC have been resolved. Upon the completion of the liquidation and distribution of the PLLC's assets, the PLLC shall be terminated and the Managers shall cause the Company to execute and file a certificate of cancellation in accordance with state law.

## ARTICLE IX

### MISCELLANEOUS

**Section 9.1. Amendment of Operating Agreement.** This Agreement may be amended by, and only by, a written resolution setting forth in detail the amendment and signed by sufficient Members to reflect a Supermajority vote interest of PLLC Members in favor of said amendment.

12

Case 1:15-cv-07149-SJ-CLP   Document 10-1   Filed 01/04/16   Page 27 of 83 PageID #: 416

**Section 9.2. Successors.** This Agreement shall be binding as upon all successors in interest of the Members which includes, but is not limited to, executors, personal representatives, estates, trustees, heirs, beneficiaries, assignees, nominees, and creditors of the Members.

**Section 9.3. Counterparts.** This Agreement may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

**Section 9.4. Equitable Remedy in Event of Material Breach.** Each member agrees that the other members (if any) would be irreparable damaged with no adequate remedy available at law by the material breach of any provision in this operating agreement. Thus, in the event of a material breach of this agreement by a member, any other non-breaching member shall be entitled to enjoin and restrain the breaching member from continued violation this agreement. This equitable remedy shall be in addition to (and not supersede by) any other remedy, such as an action at law for damages, that the PLLC or non-breaching members may have.

**Section 9.5. Indemnification of Attorneys Fees and Out-of-Pocket Costs.** The prevailing party in any lawsuit for an injunction or damages against a member for breach of this agreement shall be indemnified by the losing party for its reasonable attorneys' fees and out-of-pocket costs which in any way relate to, or were precipitated by, the breach that was the subject of the lawsuit.

**Section 9.6. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Each Member, by signing this agreement, hereby submits to personal and subject matter jurisdiction in the State of New York of any dispute between or among the Members, the PLLC, and the PLLC Managers connected to or regarding the business of, or investment in, the PLLC.

**Section 9.7. Severability; Standard for Interpretation.** If it shall be determined by a court or other competent body that any provision or wording of this Agreement shall be invalid or unenforceable under state or other applicable law, such invalidity or unenforceability shall not invalidate the entire Agreement. Whenever two or more interpretations of the provisions or wording of this Agreement shall be possible, the interpretation or construction which leads to the enforcement and validity of any provision of this Agreement shall be favored and deemed to be the intended interpretation of the parties to this Agreement.

IN WITNESS WHEREOF, the undersigned have duly executed this Operating Agreement as members on the date first written above:

**MEMBER**                    **MEMBER**                    **MEMBER**

_____              _____              _____
Richard G. Harvey, D.C.       Bervin Nelson D. Brual        Mun S. Shieh

13

### THIRD AMENDED
### OPERATING AGREEMENT
### OF
### HARVEY FAMILY CHIROPRACTIC,
### PHYSICAL THERAPY & ACUPUNCTURE, PLLC

Upon valuable consideration, the persons named below as "Members" hereby covenant and agree to be bound to the following as their PROFESSIONAL SERVICES LIMITED LIABILITY  COMPANY OPERATING AGREEMENT, effective as of  the 1st day of November 2012 (this "Operating Agreement"), for Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC, a professional services limited liability company organized under the laws of the State of New York:

### ARTICLE I

### DEFINITIONS

As used in this Operating Agreement, the following terms are to have the meaning as stated below:

**"the PLLC"** means HARVEY FAMILY CHIROPRACTIC, PHYSICAL THERAPY & ACUPUNCTURE, PLLC.

**"PLLC Units" or "Units"** means measures of ownership in the PLLC. The capital structure of the PLLC shall consist of Units all of the same class with equal rights for all purposes under this Operating Agreement.

**"PLLC Member" or "PLLC Members"** means a member or members of the PLLC.

**"PLLC Unit Percentage"** means, with respect to a member of the PLLC, the percentage derived from the following fraction: number of PLLC Units held by such Member divided by the total number of PLLC Units held by all Members (and, thereafter, multiplying said fraction by 100 to arrive at a percentage).

**"State Law"** means the laws of the State of New York.

**"The Profession"** means licensed professionals practicing chiropractic, acupuncture and physical therapy.

**"Vote in interest of PLLC members"** means a vote of the PLLC members in which each member of the PLLC shall have one vote per PLLC Unit possessed; for example, a member possessing 150 PLLC Units would have 150 votes in interest.

**"Supermajority vote in interest of PLLC members"** means a vote of the PLLC members in which each member shall have one vote per PLLC Unit possessed and the



number of affirmative votes for any resolution before the members shall be more than 66% of the outstanding PLLC Units. For example, if there are 1000 outstanding PLLC Units, 667 affirmative votes are required to achieve a Supermajority vote in interest upon a resolution before the members.

## ARTICLE II

## GENERAL PROVISIONS

**Section 2.1.** Formation. Articles of Organization either already have been filed with the appropriate State office or shall shortly be done so. The Members shall execute or cause to be executed all other instruments, certificates, notices and documents as may now or hereafter be required for the formation, valid existence and, when appropriate, termination of the PLLC as a professional services limited liability company under the laws of the State of New York.

**Section 2.2.** Company Name. The name of the PLLC is "HARVEY FAMILY CHIROPRACTIC, PHYSICAL THERAPY & ACUPUNCTURE, PLLC" or such other name or names as may be selected by the Members from time to time, and its business shall be carried on in such name with such variations and changes as the Members deem prudent.

**Section 2.3.** Purpose of the PLLC. The purpose of the PLLC is to engage in The Profession and, also, activities complimentary to rendering professional services within The Profession which are lawful for professional services limited liability companies organized under the laws of the State of New York.

**Section 2.4.** Place of Business. The business address of the PLLC shall be determined by the Members. The PLLC may from time to time have such other place or places of business, within or without the State of New York, as the Members may decide.

**Section 2.5.** Registered Agent. The registered agent of the PLLC shall be determined by the Members who shall also possess the power to remove or replace a currently serving PLLC registered agent.

**Section 2.6.** Business Transactions of a Member with the Company. A Member may lend money to, borrow money from, act as surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for, and transact other business with the PLLC and, subject to applicable law, shall have the same rights and obligations with respect to any such matter as a Person who is not a Member.

**Section 2.7.** Company Property. No real or other property of the PLLC shall be deemed to be owned by any Member individually, but shall be owned by and title shall be vested solely in the PLLC.

**Section 2.8**. No Term To Existence. The PLLC's existence shall commence on the date of the filing of the Article of Organization with the appropriate state office and, thereafter, the PLLC's existence shall be perpetual without term.

**Section 2.9**. Accounting Period. The close of the PLLC's year for financial statement and federal income tax purposes shall be as determined by the Members.

### ARTICLE III

### MEMBERS

**Section 3.1**. Members. The name, PLLC Units and PLLC Unit Percentage of the Members are set forth in the below table, which shall be amended from time to time to reflect the admission of new Members.

| Member Name | PLLC Units | PLLC Unit % |
| --- | --- | --- |
| Richard G. Harvey, D.C. | 960 | 96 |
| Bervin Nelson D. Brual | 20 | 2 |
| Mun S. Shieh | 10 | 1 |
| Jin Hwangbo | 10 | 1 |

**Section 3.2**. Admission of New Members. New members may be admitted to the PLLC by an affirmative Supermajority vote in interest of PLLC members.

**Section 3.3**. Liability of Members. All debts, obligations and liabilities of the PLLC, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the PLLC, and no member shall be obligated personally for any such debt, obligation or liability of the PLLC solely by reason of being a member. However, to the extent applicable law makes a member of this PLLC personally liable for any negligence or misconduct committed by him or her in a professional capacity or by any person rendering professional services under the member's supervision or control, said member shall be so liable. Members of the PLLC do not agree to accept or share the professional liable of other members beyond their investment in the PLLC.  This section does not prevent a PLLC member, should he or she so choose, from separately agreeing to guaranty or otherwise become liable for a debt which is also one of the PLLC.

**Section 3.4**. Access to Books and Records of PLLC. Each PLLC member shall have the right to inspect the books and records of the PLLC during normal business hours after the giving of reasonable notice of this intent to the PLLC custodian of said documents and information; however, each member gaining access to the books and records of the PLLC shall hold this information confidential and only use PLLC information for the furtherance of PLLC business and interests or for making investment decisions regarding the member's PLLC interest. Upon withdrawal or departure as a member of a PLLC, a member shall deliver all PLLC books and records in his or her possession to the remaining PLLC members or managers.

**Section 3.5.** Actions by the Members; Meetings; Quorum. The PLLC members may take any action at a meeting in person, by proxy, or without a meeting by written resolution in accordance with Section 3.5(d). Meetings of PLLC members may be conducted in person or by telephone conference. A voting proxy given by an PLLC Member to another person must be in writing.

Voting. Each PLLC member shall be entitled to vote upon all matters for which PLLC members have the right to vote. All PLLC member votes shall be tallied by interest under which each member shall be entitled to one vote for each PLLC Unit possessed (for example, a member possessing 150 PLLC Units shall be entitled to 150 votes upon any matter submitted to the PLLC Members for a vote). Each vote per PLLC Unit shall carry the same weight and have the same value, for voting purposes, as every other PLLC Unit. Should state law create statutory situations where PLLC member votes are to be taken on a one vote per member basis, votes per member (as opposed to per PLLC Unit interest) shall be limited to those specific circumstances under which state law requires such a vote.

Unless another percentage is given elsewhere in this operating agreement or by state law, all PLLC member votes on any matter shall require an affirmative vote in interest by PLLC members of PLLC Unit in excess of 50% of the outstanding total to pass or approve the motion, resolution, or otherwise take action by the PLLC members. For example, if there are 1000 PLLC Units outstanding, a vote of 501 PLLC Units in favor of a resolution is required for its passage unless the resolution involves a matter for which this operating agreement or state law requires a higher percentage. Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting if Members with the percentage of votes (per PLLC units) sufficient to approve the action pursuant to the terms of this Agreement resolve thereto in writing and the writing or writings are filed with the PLLC records of actions taken by Members. In no instance where action is authorized by written resolution shall it be required that a meeting of Members be called or notice be given; however, upon passage, a copy of the action taken by written resolution of the members shall be sent promptly to all PLLC members.

Meetings of Members may be called by any PLLC member, or members, collectively holding 25% or more of the outstanding PLLC Units upon seven (7) days written notice to the other PLLC members. Notice of a meeting called for hereunder may be made by standard U.S. mail, electronic mail, or facsimile transmission and shall contain the time, place, and purpose of such meeting. A quorum for any action to be taken at a meeting of PLLC members shall be PLLC members present (in person, via telephone, or by proxy) holding more than 50% of the PLLC Units. Any Member may through a written instrument waive the right to receive prior notice of a meeting of the Members as described herein.

Notwithstanding any other provision of this Agreement, the following actions shall require a Supermajority vote in interest of the PLLC Members:

i. any merger, consolidation or other business combination;

4

ii. sale or other disposition of substantially all the assets of the PLLC;

iii. filing of a petition or commencing other proceedings seeking reorganization, liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;

iv. the amendment or modification of any provision of this Agreement; the issuance of additional PLLC Units (other than those issued pursuant to the founding of the PLLC as set forth in Section 3.1 of this operating agreement) to any Member or other person;

v. the removal of any Member;

vi. the decision to appoint managers for the PLLC under Article IV hereof.

**Section 3.6.** Power to Bind the PLLC. No PLLC member or group of members acting in their individual capacity—separate and apart from action as PLLC members pursuant to this operating agreement—shall have any authority to bind the PLLC to any third party with respect to any matter.

**Section 3.7.** Members who are not individuals. Each Member who is an artificial entity or otherwise not an individual hereby represents and warrants to the PLLC and each Member that such Member is: (a) duly incorporated or formed (as the case may be), (b) validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, and (c) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

**Section 3.8.** Tax Matters Partner. Richard G. Harvey is hereby designated as the PLLC's "Tax Matters Partner" under Section 6231(a)(7) of the Internal Revenue Code of 1986, as amended (the "Code"), and shall have all the powers and responsibilities of such position as provided in the Code and the Treasury Regulations thereunder. The PLLC members may remove or replace the Tax Matters Partner by a vote of the majority in interest.

**Section 3.9. Members To Be Licensed.** Every member of the PLLC shall be licensed and in good standing with the professional body which licenses practicioners of The Profession in New York. Any member who's license to practice in New York shall be suspended or revoked by the licensing body for The Professional shall withdraw from the PLLC once all appeal rights have been exhausted both administratively and through the court system.

## ARTICLE IV

## MANAGEMENT

**Section 4.1**. Management of the PLLC. This PLLC shall be managed collectively by its members; however, the PLLC members reserve the right to appoint managers, who may also be members, at a later date.

## ARTICLE V

## CAPITAL STRUCTURE

**Section 5.1**. Capital Structure. The capital structure of the PLLC shall consist of one class of PLLC Units each having equal rights under all provisions of this operating agreement.

**Section 5.2**. PLLC Units. 1000 PLLC Units shall be issued to the Members, as set forth in Section 3.1 hereof, as part of the initial funding of the PLLC; however, additional PLLC units may be issued pursuant to a Supermajority Vote in interest of PLLC Members.

**Section 5.3**. Capital Contributions.  Each Member shall contribute or shall have contributed, as an initial capital contribution ("Initial Capital Contribution") to the PLLC the amounts set forth below. The break-down between cash and non-cash contributions by the Members is set forth as follows:

**Member Name Initial Capital Contribution**
Richard G. Harvey, $58,500.00, adequacy of which is fully acknowledged herein, pursuant to Purchase Agreement between Richard G. Harvey and Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC dated April __, 2011.

Bervin Nelson D. Brual, $1,000.00.

Mun S. Shieh, $500.00.

Jin Hwangbo, $500.00

The Members shall complete their initial capital contributions to the PLLC within 20 days of the date of this agreement unless another date is agreed upon in writing by all PLLC Members. Any Member who fails to make the required initial capital contribution as set forth in this paragraph shall indemnify all other Members of the PLLC for any losses or expenses (including reasonable attorneys fees) that are caused by the failure to make the initial capital contribution as set forth herein. Interest shall accrue against a member upon any unpaid capital contribution at a rate of 7% per annum, compounded annually, commencing from the due date of the initial capital contribution.

6

**Section 5.4**. Additional Capital Contributions. Members may make additional capital contributions but shall not be required to do so.

**Section 5.5**. Raising Additional Capital. Additional capital may be raised by the PLLC through sales of new PLLC Units pursuant to an affirmative Supermajority Vote of PLLC Members, see Section 5.2 above. Any Member resolution authorizing the raising of additional capital through the sale of PLLC Units shall state, in reasonable detail, the purposes and uses of such additional capital and the amounts of additional capital required.

**Section 5.6**. No Withdrawal of Capital Contributions. Except upon the dissolution and liquidation of the PLLC as set forth herein, no Member shall have the right to withdraw his or her capital contributions. Furthermore, no interest shall be paid upon any member's capital account.

**Section 5.7**. Maintenance of Capital Accounts. An individual capital account shall be maintained for each PLLC Member consisting of the member's capital contributions and (1) increased by that member's share of PLLC profits, (2) decreased by that member's share of PLLC losses, and (3) further adjusted as required or allowed by the Internal Revenue Code (Title 26 of the United States Code) and / or all published Treasury Regulations (Title 26 of the Code of Federal Regulations). In all cases, the capital accounts of the members shall be accounted for in accordance with the Internal Revenue Code (Title 26 of the United States Code) and or all published Treasury Regulations (Title 26 of the Code of Federal Regulations).

**Section 5.8**. Negative Capital Account. If any Member's capital account shows a negative balance at the close of an accounting year, said Member shall contribute sufficient sums of cash to the PLLC to wipe out the Member's negative capital balance within forty five (45) days of receipt of the PLLC's annual financial statements reflecting a negative balance. If the Member fails to make up the negative capital balance to the PLLC within the 45 allotted days, interest shall begin to run on the negative balance at a rate of 8% per annum, compounded annually. The remedy of the PLLC against any member for collection of any debt accruing under this Section 5.8 for failure to repay a negative capital account shall be collectable only against the member's interest in the PLLC and not against any other assets of the PLLC member. The PLLC shall have the right to sell a member's PLLC interest to satisfy any debt accruing under this Section 5.8 free and clear without restriction despite any provision in this operating agreement to the contrary.

## ARTICLE VI

## ALLOCATIONS AND DISTRIBUTIONS

**Section 6.1**. Allocation of Profit, Loss and other items to Members. Net profits, net losses, and other allocable items of income, gain, loss, deduction or credit of the PLLC shall be annually allocated among the Members ratably in proportion to each Member's PLLC Unit Percentage. For example, if a Member has a PLLC Unit Percentage of 45%,

he or she shall be allocated 45% of all profits or losses (and other allocation items) for any given tax year.

**Section 6.2.** Tax Allocations. In the case of any special tax allocations allowed under the Internal Revenue Code or Treasury Regulations, the method of allocation and formula determined by the Tax Matters Partner shall be followed so long as it complies with state law, the Internal Revenue Code, the Treasury Regulations, and fairly treats each Member. The method of tax allocation selected by the Tax Matters Partner shall be presumed to be "fair to all the members" and any Member or party challenging said allocation on these grounds shall bear the burden of proof.

**Section 6.3.** Distributions. Distributions to the Members shall only be made pursuant to an affirmative vote in interest of the PLLC Members. The resolution attesting to the affirmative vote in interest of the PLLC Members shall state the amounts and dates of distribution to each member; however, no distribution shall be declared or made if, after giving it effect, the PLLC would not be able to pay its debts as they become due in the usual course of business or the PLLC's total assets would be less than the sum of its total liabilities.

## ARTICLE VII

## TRANSFERS OF UNITS; WITHDRAWAL, DEATH, REMOVAL OF MEMBER

**Section 7.1.** Transfer of PLLC Units. No Member shall have the right to sell, convey, assign, transfer, pledge, grant a security interest in or otherwise dispose of all or any part of its PLLC Units other than as follows: Only upon the following conditions may an PLLC Member assign, pledge or grant a security interest in its PLLC Units: (a) the assignment, pledge or security interest shall not entitle the assignee, pledge or security interest holder to participate in the management and affairs of the PLLC, to become a Member, nor to vote the Member's PLLC Units and (b) such assignee, pledgee, or security interest holder is only entitled to receive the distributions the Member would otherwise be entitled to absent the assignment, pledge, or security interest.

To another PLLC Member. Members may freely sell, convey or otherwise transfer their PLLC Units to another Member without prior approval of the PLLC through a vote of the PLLC Members.

To non—LLC Members. Subject to the other provisions of this section, no Member shall be entitled to sell, convey or otherwise transfer its PLLC Units to a non—LLC Member without a prior affirmative Supermajority vote in interest of PLLC Members. Prior to the vote of PLLC Members upon a proposed sale, the Member seeking authorization of the sale or transfer of its PLLC Units shall provide all other PLLC Members with written documents detailing the exact terms of the proposed sale.

Creditors and Spouses of Member. Creditors of a member cannot vote a member's PLLC units nor in any way assume ownership or management rights of a member in the PLLC.

At most, a creditor of a member is entitled to seek a court order attaching distributions made by the PLLC on account of the member's PLLC membership interest. A spouse or former spouse of a member stands in the same position as a creditor of a member under this agreement meaning that the former spouse may not vote a member's PLLC units nor in any way assume ownership or management rights.

**Section 7.2**. Withdrawal of Member.

Members shall have the unilateral right to resign or withdraw at any time from the PLLC. A Member is required to give sixty (60) days written notice to each of the other PLLC Members to initiate a withdrawal. In this notice, the withdrawing Member shall state an effective date for his or her withdraw and said date must be at least sixty (60) days after delivery of notice to all other PLLC members and be the last day of a month (i.e., the 30th or the 31st). Upon receipt of said notice, the PLLC Members shall promptly take any vote required under this agreement for withdrawal of a Member and, if the vote is in a sufficient affirmative percentage as called for under this agreement, the remaining PLLC members shall cause a reasonably prompt preparation of financial statements for the PLLC as of the effective date of withdrawal for said Member.

Upon withdrawal, the withdrawing Member shall receive, in exchange for his or her PLLC Units, the Withdrawal Compensation Amount to be paid within 1 year of the effective date of the Member's withdrawal.

The "Withdrawal Compensation Amount" is defined herein as 100% of the withdrawing member's capital account, such amount is either the initial investment plus nine percent (9%) calculated per annum or $1,000.00, whichever is greater.

Any withdrawing PLLC member possessing a negative capital account upon the effective date of withdrawal shall have a duty to repay the negative balance of his or her capital account to the PLLC upon withdrawal.

Should the PLLC fail to perform upon its obligation under this section to make payments when due, in addition to any other remedies possessed, the PLLC shall be liable to the withdrawing Member for interest upon the amount of any deficiency at the rate of 7% per annum (compounded annually) computed from the date that said deficient payment was due under this agreement.

Upon withdrawal, the withdrawing Member shall take all reasonable steps necessary for the prompt and efficient transfer of patients under the Member's care to the other professionals employed by the PLLC as directed by the PLLC. For a period of thirty (30) days after the effective day of withdrawal, the Member shall continue to take such actions as are reasonably necessary to ensure that patients continue to receive effective professional care.

Upon withdrawal, the withdrawing Member shall deliver all property (including keys, records, notes, data, memoranda, models and equipment) that is in the Member's

9

possession or under the Member's control which is the PLLC's property or related to the PLLC's business.

For a period of two (2) years after withdrawal, the Member shall continue to cooperate fully and assist the PLLC in the collection of any and all accounts receivable for services performed by the Member while employed by the PLLC, at the expense of the PLLC. Further, the withdrawing Member agrees to notify the PLLC, in writing, of any change of address of the Member's business or residence during said two (2) year period. The terms and conditions of this provision shall survive termination of this Agreement.

A withdrawing Member shall retain the right to vote as an PLLC member up until the effective date of his or her withdrawal, at which time, the withdrawing Member's PLLC Units shall be considered transferred back to the PLLC and the person who has withdrawn shall no longer be considered a member of the PLLC. If a withdrawing Member was also a "manager" of the LLC, the withdrawing Member shall resign as a manager immediately upon giving notice of to the other PLLC members of his or her intent to withdraw.

**Section 7.3**. Death of Member.
Upon the death of a Member, the remaining PLLC members shall cause a prompt preparation of financial statements for the PLLC as of the end of the month in which the Member died which shall be the date of death for the deceased Member for accounting purposes under this agreement. For purposes of this section, if PLLC Units are titled in the name of a revocable trust, the trustee of said revocable trust shall be treated as the Member.

The estate of the deceased Member (or his revocable trust if the PLLC Units were so titled) shall receive, in exchange for his or her PLLC Units, the Withdrawal Compensation Amount to be paid within 2 years of the date of the Member's death. The payments shall be made in two equal installments payable at the annual anniversary of the date of death with no interest being due nor owing upon the outstanding amount.

Should the PLLC fail to perform upon its obligation under this section to make payments when due, in addition to any other remedies possessed, the PLLC shall be liable to the deceased Member's estate or revocable trust (as the case may be) for interest upon the amount of any deficiency at the rate of 7% per annum (compounded annually) computed from the date that said deficient payment was due under this agreement.

Upon death, the estate of the deceased Member (or his or her revocable trust, as the case may be) shall have no continuing obligations to the PLLC other than pursuant to state law, this Agreement or other applicable laws or such obligations as expressly assumed by said Member.

**Section 7.4**. Removal of Member.
A Member may be involuntarily removed from the PLLC only under either of the following circumstances: (1) the Member is required to provide services to the PLLC (as

reflected in this agreement), said Member is not substantially performing the promised services, and a Supermajority in interest of PLLC Members vote for removal, or (2) the Member has defaulted upon its obligations under this agreement to make capital contributions (or loans) to the PLLC.

In the case of a removal for failure to perform required services, 60 days prior to any vote to remove, the other PLLC Members shall cause a notice to be issued to the Member in question stating that they shall bring to a vote of the PLLC Members a motion to remove said Member within 60 days for unsatisfactory performance of required services and detail specific instances or tasks that were allegedly not satisfactorily performed. The other PLLC Members shall then give the Member in question a good faith opportunity to cure the deficiencies in performance of services prior to the vote of removal. The period of this good faith opportunity to cure need not extend beyond 60 days. If the Member in question completes a cure within 60 days of receiving the aforementioned notice, then the motion pending before the PLLC Members for removal shall be withdrawn.

In the case of a removal for failure to make required capital contributions, 30 days prior to any vote to remove, the other PLLC Members shall cause a notice to be issued to the Member in question stating that they shall bring to a vote of the PLLC Members a motion to remove said Member within 30 days for non-payment of required capital contributions. The Member in question shall then have 30 days within which to cure the default which shall consist of making all required capital contributions plus 7% per annum interest (compounded annually) upon the amount of any deficiency computed from the date said contribution was due to be made to the PLLC. If the Member in question completes this cure within 30 days of receiving the aforementioned notice, then the motion pending before the PLLC Members for removal shall be withdrawn and the Member in question shall, henceforth, be consider in good standing. If, however, the 30 day cure period expires and the Member in question fails to make a required capital contribution plus interest on the deficiency, then this Member shall be barred from voting on the motion for removal. If, after complying with the above notice and cure provisions, an affirmative Supermajority vote in interest of PLLC Members is made to remove the Member in question, then, as of that moment, this person shall no longer be entitled to exercise any rights, powers or privileges of a Member and his or her PLLC Units shall be considered redeemed by the PLLC. In the case of removal for failure to make require capital contributions, the Supermajority in interest shall be determined without regard to the PLLC interest of the member to be removed. For example, if the member to be removed holds a 20% interest, only a Supermajority percentage of the remaining 80% PLLC interest is required to effect removal.

Upon the affirmative Supermajority vote in interest of PLLC Members to remove a Member, the remaining PLLC members shall cause a prompt preparation of financial statements for the PLLC as of the end of the month in which the resolution was passed by the PLLC Members removing said Member and this shall be the effective date of removal for the Member for accounting purposes only under this agreement.

The removed Member shall receive in exchange for his or her PLLC Units the Withdrawal Compensation Amount to be paid within one (1) year of the effective date of the Member's removal.

Should the PLLC fail to perform upon its obligation under this section to make payments when due, in addition to any other remedies possessed, the PLLC shall be liable to the removed Member for interest upon the amount of any deficiency at the rate of 7% per annum (compounded annually) computed from the date that said deficient payment was due under this agreement.

## ARTICLE VIII

## DISSOLUTION OF THE COMPANY

**Section 8.1**. Dissolution. The PLLC shall be dissolved upon the occurrence of the following event (hereinafter, a "Liquidation Event"): a Supermajority vote in interest by the PLLC Members to dissolve the PLLC.  Despite any provision of state law to the contrary, no other event——including (but not limited to) the withdrawal, removal, death, insolvency, liquidation, expulsion, bankruptcy, or physical or mental incapacity of a Member shall cause the existence of the PLLC to terminate or dissolve, lacking super majority vote.

**Section 8.2**. Liquidation.
In addition to a supermajority vote of the members to dissolve per Section 8.1 above, the death of all PLLC members or a court order that the PLLC be dissolved shall constitute Liquidating Events.

Should a Liquidation Event occur, the PLLC shall then be liquidated and its affairs shall be wound up——including preparation of final financial statements and an accounting——by (or at the direction of) the PLLC Members. All proceeds from the liquidation shall be distributed in accordance with state law, and all PLLC Units shall, thereafter, be canceled. Distributions to the Members shall be made in accordance, and proportion, with the Members' relative Capital Account balances.

Final distributions to Members shall not be made until all liabilities have been satisfied and any contingent claims against the PLLC have been resolved.  Upon the completion of the liquidation and distribution of the PLLC's assets, the PLLC shall be terminated and the Managers shall cause the Company to execute and file a certificate of cancellation in accordance with state law.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.1**. Amendment of Operating Agreement. This Agreement may be amended by, and only by, a written resolution setting forth in detail the amendment and signed by

sufficient Members to reflect a Supermajority vote interest of PLLC Members in favor of said amendment.

**Section 9.2.** Successors. This Agreement shall be binding as upon all successors in interest of the Members which includes, but is not limited to, executors, personal representatives, estates, trustees, heirs, beneficiaries, assignees, nominees, and creditors of the Members.

**Section 9.3.** Counterparts. This Agreement may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

**Section 9.4.** Equitable Remedy in Event of Material Breach. Each member agrees that the other members (if any) would be irreparable damaged with no adequate remedy available at law by the material breach of any provision in this operating agreement. Thus, in the event of a material breach of this agreement by a member, any other non-breaching member shall be entitled to enjoin and restrain the breaching member from continued violation this agreement. This equitable remedy shall be in addition to (and not supersede by) any other remedy, such as an action at law for damages, that the PLLC or non-breaching members may have.

**Section 9.5.** Indemnification of Attorneys Fees and Out-of-Pocket Costs. The prevailing party in any lawsuit for an injunction or damages against a member for breach of this agreement shall be indemnified by the losing party for its reasonable attorneys' fees and out-of-pocket costs which in any way relate to, or were precipitated by, the breach that was the subject of the lawsuit.

**Section 9.6.** Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Each Member, by signing this agreement, hereby submits to personal and subject matter jurisdiction in the State of New York of any dispute between or among the Members, the PLLC, and the PLLC Managers connected to or regarding the business of, or investment in, the PLLC.

**Section 9.7.** Severability; Standard for Interpretation. If it shall be determined by a court or other competent body that any provision or wording of this Agreement shall be invalid or unenforceable under state or other applicable law, such invalidity or unenforceability shall not invalidate the entire Agreement. Whenever two or more interpretations of the provisions or wording of this Agreement shall be possible, the interpretation or construction which leads to the enforcement and validity of any provision of this Agreement shall be favored and deemed to be the intended interpretation of the parties to this Agreement.

IN WITNESS WHEREOF, the undersigned have duly executed this Operating Agreement as members on the date first written above:

**MEMBER**          **MEMBER**                    **MEMBER**              **MEMBER**


---

Richard G. Harvey     Bervin Nelson D. Brual        Mun S. Shieh            Jin Hwangbo

14

# EXHIBIT C

Page 1

```
 1
 2   - - - - - - - - - - - - - - - - - - - - -
 3   In the Matter of the Claim of
 4   DR. RICHARD G. HARVEY / HARVEY FAMILY
     CHIROPRACTIC, PHYSICAL THERAPY &
 5   ACUPUNCTURE, PLLC
               and
 6   ALLSTATE INSURANCE COMPANY,
 7   CLAIMANT                    CLAIM #
 8                               0304949498
                                 0305763021
 9                               0302342696
                                 0305920225
10                               0302342696
                                 0302400684
11                               0302093885
                                 0303868343
12                               0302093885
                                 0306296624
13                               0310657150
                                 0312595308
14
     - - - - - - - - - - - - - - - - - - - - -
15
16                 108 New South Road
17                 Hicksville, New York
                   April 10, 2014
                   10:20 a.m.
18
19           EXAMINATION UNDER OATH of BERVIN
20   BRUAL, held at the above time and place,
21   taken before Genevieve Guilfoyle, a Notary
22   Public of the State of New York.
23
24
25
```

Page 2

1

2    APPEARANCES:

3

     MARCOTE & ASSOCIATES, P.C.
4    Attorneys for DR. RICHARD G. HARVEY/
     HARVEY FAMILY CHIROPRACTIC, PHYSICAL
5    THERAPY & ACUPUNCTURE, PLLC
     108 New South Road
6    Hicksville, New York 11801
     BY:  LOUIS F. CHISARI, ESQ.

7

8

     STERN & MONTANA, LLP
9    Attorneys for ALLSTATE INSURANCE COMPANY
     115 Broadway
10   New York, New York 10006
     BY:  DANIEL MARVIN, ESQ.

11
                    *      *      *
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                        Page 18
 1                  B. BRUAL
 2   every week?
 3        A      Every week like around --
 4   because I have child support, so it goes
 5   down.  But gross, are you asking the
 6   gross?
 7        Q      Before they take anything out,
 8   what do you get paid?
 9        A      It's like around 812, 800, 900.
10        Q      Is that in addition to the
11   2 percent?
12        A      No.  Dr. Harvey gives me around
13   like 200 a week, because that's additional
14   hours for week.
15        Q      Do you get paid per hour?
16        A      Yes, I get paid per hour.
17        Q      How much do you get paid per
18   hour?
19        A      It's like 30.
20        Q      $30 per hour?
21        A      Yeah, 31.
22        Q      How many hours a week do you
23   work?
24        A      For Dr. Harvey, it's 30 hours.
25   It's 8:30 to 7:30.
```

```
                                          Page 19
 1                    B. BRUAL
 2      Q      Monday, Wednesday, Friday?
 3      A      Monday, Wednesday, Friday.
 4      Q      That's $30 an hour?
 5      A      $30 an hour.
 6      Q      Do you earn anything in addition
 7   to that?
 8      A      The Tuesday, Thursdays, through
 9   the agency I do coverages, so that's when
10   I fill up the remaining hours.
11             MR. CHISARI:  So, on Tuesdays
12      and Thursdays, you're working
13      somewhere else?
14             THE WITNESS:  Yes.
15      Q      Did you provide a copy of your
16   physical therapist license to Dr. Harvey?
17      A      Yes.
18      Q      When was that?
19      A      It was -- the physical therapy
20   license?
21      Q      Yes?
22      A      The 2008 license.
23      Q      Did you give it to Dr. Harvey?
24      A      I gave it to Dr. Harvey.  Yeah,
25   I get a copy.
```

Page 29

1                    B. BRUAL

2      A       Uh-hum.

3      Q       And from that point forward, you

4   were getting paid from Dr. Harvey?

5      A       Yes.

6      Q       Now, does Dr. Harvey also draw a

7   salary from Harvey Family?

8      A       Say again?

9      Q       Does Dr. Harvey receive a

10  salary?

11     A       I have no idea.

12     Q       Did you ever ask?

13     A       No.

14     Q       And Mr. Hwangbo, does he receive

15  a salary?

16     A       I don't know.

17     Q       When you were presented with the

18  agreement, Exhibit F, and Dr. Harvey told

19  you that you would be a 2 percent partner,

20  did you ask him what the expected revenues

21  would be?

22     A       No.

23     Q       Did he tell you what the

24  expected revenue would be?

25     A       No.

Page 31

1                     B. BRUAL

2       A     No.

3       Q     I'm going to point you to

4   Section 5 of the agreement.  On page 6,

5   under "Capital structure," when it calls

6   for a contribution of $1,000 from you; do

7   you see that?

8       A     Uh-hum.

9       Q     Did you contribute that $1,000?

10      A     No.

11      Q     Did Dr. Harvey ever ask you for

12  the $1,000?

13      A     No.

14      Q     Did you know that?

15      A     No.

16      Q     Did you know that that provision

17  was in this agreement?

18      A     No.

19      Q     Prior to today, were you aware

20  that that capital contribution was in the

21  agreement?

22      A     No, I'm not aware.

23      Q     Did you ever receive any stock

24  certificates from Harvey Family to reflect

25  your ownership share other than the

```
                                              Page 32
 1                    B. BRUAL
 2   agreement?
 3        A     No.
 4        Q     In terms of the 2 percent share,
 5   did you ever receive any compensation
 6   based on that ownership interest?
 7        A     No.
 8        Q     Did you ever ask for it?
 9        A     No.
10        Q     What were the revenues for
11   Harvey Family in 2013?
12        A     What are the revenues?
13        Q     Yes, the revenues.
14        A     I don't know.
15        Q     I guess by "revenue," do you
16   know the gross income from Harvey Family
17   in 2013?
18        A     No, I have no idea.
19        Q     Do you know the net income for
20   2013?
21        A     No.
22        Q     The location at which Harvey
23   operates, do you know how the lease is
24   paid?
25        A     No.
```

```
 1                    B. BRUAL
 2      Q      Are you a signatory on the
 3  company's bank account?
 4      A      No.
 5      Q      Did you ever have a discussion
 6  with Dr. Harvey about becoming a signatory
 7  on the bank account?
 8      A      No discussion.
 9      Q      Has Dr. Harvey ever discussed
10  with you, in any manner, any issues
11  concerning the operation of Harvey Family?
12      A      Say it again, sorry?
13      Q      Has Dr. Harvey ever discussed
14  with you the daily operation of Harvey
15  Family?
16      A      No.
17      Q      Do you have an office in
18  Harvey Family?
19      A      Do I have an office?
20      Q      Do you have an office?
21      A      There's a room.  Yeah, I have an
22  office.
23      Q      Could you describe what the
24  office is?
25      A      It's not an office, but it's a
```

Page 36

1                        B. BRUAL

2    patients are physical therapy only?

3        Q      Do any patients come in for just

4    physical therapy?

5        A      I don't know.  But patients I

6    see, they do physical therapy.  Aside from

7    that, I don't know.

8        Q      Do you work with the physical

9    therapy assistants?

10       A      No.  But I have a certified

11   physical therapy aide.

12       Q      Who is that?

13       A      Marlon Millares.

14       Q      What are his duties?

15       A      He helps me out with prepping up

16   the heating pads and, you know, preparing

17   the folder for the notes.  And when the

18   patients are exercising, he guides them as

19   well, a little supervision while I treat

20   the other patients.

21       Q      How long has he worked at

22   Harvey Family?

23       A      I have no idea.  Like a few

24   weeks after I got there, like when I

25   started working there.

```
 1                    B. BRUAL
 2      Q      Did you hire him?
 3      A      No.
 4      Q      Who hired him.
 5      A      Dr. Harvey.
 6      Q      Did you meet with him prior to
 7  being hired?
 8              MR. CHISARI:  How about this:
 9      Was he working there before you
10      started?
11              THE WITNESS:  No.
12      Q      I think you said he came a few
13  weeks after?
14      A      After, yes.
15      Q      Did you interview him prior to
16  him beginning work there?
17      A      No.
18              MR. CHISARI:  How about this:
19      Were you a partner when he started
20      working there or were you just an
21      employee?
22              THE WITNESS:  Employee, because
23      it was after I got in.  So when I
24      started there, after a few weeks, he
25      started working because I mentioned to
```

1                    B. BRUAL

2       A       No.

3       Q       Desiree, do you know what she

4    does?

5       A       She is the one in the front

6    giving out the folders, like preparing the

7    folders.

8       Q       What folders?  What are you

9    referring to?

10      A       Physical therapy folder.

11      Q       Did you hire any of those people

12   or were they working there already when

13   you got to Harvey Family?

14      A       They were already working there.

15      Q       Do you know the salaries of any

16   of those individuals?

17      A       No.

18      Q       Have you ever asked?

19      A       No.

20      Q       Being that according to

21   Exhibit F you get 2 percent of the profits

22   of Harvey Family, have you ever had any

23   discussion with Dr. Harvey or anyone else

24   about the income being generated or the

25   money being spent by the facility?

```
                                        Page 44

 1                    B. BRUAL

 2       A       No.

 3       Q       Why is that?

 4       A       Because, like what I said, I

 5    just want to work as a physical therapist.

 6    I just want to work as physical therapist.

 7               MR. CHISARI:  You let Dr. Harvey

 8          manage it?

 9               THE WITNESS:  Correct, let him

10          manage everything.

11       Q       Are there any independent

12    contractors that work for Harvey Family

13    that you know of?

14       A       No, I don't.

15       Q       Could you describe your billing

16    procedure?

17       A       No, I don't know that.

18       Q       How do you bill?  How does

19    Harvey Family bill insurance companies?

20    For example, the claims that are the

21    subject list of your EUO, what is the

22    billing process?

23               MR. CHISARI:  What do you do to

24          bill?

25       A       I do the notes, what I do to the
```

```
                                          Page 51
 1                    B. BRUAL
 2      A      Yes, it's based on the notes.
 3      Q      You chose the codes based on the
 4  notes?
 5      A      Yes, based on what is done.
 6      Q      Did you ever take any sort of
 7  training in CPT codes or instructions on
 8  which codes to use in physical therapy?
 9      A      No.  Like formal training, no.
10      Q      How did you know what codes to
11  use for PT?
12      A      Like, you know, like what I
13  said, I was working at different
14  facilities through the agency, so I was
15  able to learn, you know, like informal
16  learning and I started myself.
17      Q      Have you ever seen any of the
18  tax returns for Harvey Family?
19      A      No.
20      Q      Have you ever asked to see those
21  tax returns?
22      A      No.
23      Q      Did Dr. Harvey ever ask to show
24  them to you?
25      A      No.
```

1                    B. BRUAL

2      Q      Have you ever signed any tax

3   returns for Harvey Family?

4      A      No.

5      Q      Do you know who the accountant

6   is for Harvey Family?

7      A      I don't.

8      Q      Other than Mr. Chisari, does

9   Harvey Family have any other attorneys?

10     A      Say again?

11     Q      Other than Mr. Chisari, does

12  Harvey Family have any attorneys that it

13  uses?

14     A      I don't know.

15     Q      Who's responsible for the

16  payroll functions at Harvey Family?

17     A      Dr. Harvey.  I don't know.

18     Q      If you don't know, you don't

19  have to guess.

20     A      Okay.  Sure.

21     Q      So do you know who is

22  responsible for payroll?

23     A      I don't know.

24     Q      Do you know how the payroll is

25  handled?

Page 54

1                    B. BRUAL

2    agreement Harvey Family entered into for

3    management at the facility?

4        A      I don't know, no.

5        Q      Do you consider yourself an

6    owner of Harvey Family?

7        A      I consider myself?

8        Q      An owner or an employee?

9        A      An employee.

10              MR. CHISARI:  Are you a partner

11       in Harvey Family?

12              THE WITNESS:  Yeah, he mentioned

13       to me.

14              MR. CHISARI:  Are you a partner

15       of Harvey Family Chiro?

16              THE WITNESS:  Am I a partner?

17              MR. CHISARI:  Yes.

18              THE WITNESS:  I signed the

19       paper, so I believe, yes.

20       Q      Other than having signed the

21   papers, is there anything else that leads

22   you to believe you're a partner in

23   Harvey Family?

24       A      No.

25              MR. MARVIN:  Let's take a break

```
                                              Page 79

 1                   B. BRUAL

 2       A      No, I don't know.

 3       Q      Have you ever asked?

 4       A      No.

 5       Q      Have you ever been told?

 6       A      Nope.

 7       Q      Do you know the monthly revenue

 8  generated by physical therapy services by

 9  Harvey Family?

10       A      No.

11       Q      Have you ever asked?

12       A      No.

13       Q      Were you ever told?

14       A      No.

15       Q      I said monthly.

16              On a weekly, monthly, or yearly

17  basis, are you aware of the physical

18  therapy billing submissions to insurance

19  companies?

20       A      No.

21       Q      Are you aware of the revenues?

22       A      No.

23       Q      With respect to the acupuncture

24  and chiropractic services, are you aware

25  of the monthly, weekly, or yearly billing
```

Page 87

                              B. BRUAL

 1

 2      Q      Sorry, was that the net or the

 3   gross?

 4      A      That's the net.

 5      Q      The net?

 6      A      Yes.

 7      Q      Do you recall what the gross is

 8   every week?

 9      A      Hum?

10      Q      The gross salary?

11      A      I don't know.

12             MR. MARVIN:  I have no further

13      question.

14             (Time Noted:  11:55 a.m.)

15

16

17      _____
                 BERVIN BRUAL

18

19   _____
     Subscribed and sworn to

20   before me this _____
     day of _____,

21   2014.

22   _____
        Notary Public

23

24

25

Page 89

1

2                       CERTIFICATION

3

4       I, Genevieve Guilfoyle, a Notary

5   Public for and within the State of New

6   York, do hereby certify:

7       That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10  record of the testimony given by said

11  witness.

12      I further certify that I am not

13  related to any of the parties to this

14  action by blood or marriage, and that I am

15  in no way interested in the outcome of

16  this matter.

17      IN WITNESS WHEREOF, I have hereunto

18  set my hand this 10th day of April, 2014.

19

20

       _____
21            Genevieve Guilfoyle

22

23           *        *        *

24

25

# EXHIBIT D

Page 1

1
2   - - - - - - - - - - - - - - - - - - - - x
3   EXAMINATION UNDER OATH
4           of
5   JIN HWANGBO/HARVEY FAMILY CHIROPRACTIC,
    PHYSICAL THERAPY & ACUPUNCTURE PLLC
6
    CARRIER:  ALLSTATE INSURANCE COMPANY
7
    SM FILE: 1280.266
8
    CLAIM NUMBERS:
9
    0304949498,
10  0305763021,
    0302342696,
11  0305920225,
    0302342696,
12  0302400684,
    0302093885,
13  0303868343,
    0302093885,
14  0306296624,
    0310657150,
15  0312595308,
    - - - - - -               - - - - - - - - x
16                  108 New South Road
                    Hicksville, New York
17
                    April 3, 2014
18                  10:23 A.M.
19
20      EXAMINATION UNDER OATH of JIN HWANGBO,
21  held at the above time and place, taken
22  before Denise Parisi, a Shorthand Reporter
23  and Notary Public of the State of New
24  York, pursuant to policy terms and
25  conditions.

Page 2

1

2   A P P E A R A N C E S:

3       STERN & MONTANA, LLP
        Attorneys for Carrier
4              115 Broadway
               Trinity Center
5              New York, New York 10006

6

        BY:   DANIEL MARVIN, ESQ.
7

8

9       MARCOTE & ASSOCIATES, P.C.
        Attorneys for Jin Hwangbo/Harvey
10      Family Chiropractic, Physical
        Therapy & Acupuncture, PLLC
11             108 New South Road
               Hicksville, New York 11801
12

        BY:   LOUIS F. CHISARI, ESQ.
13

14

15             *      *      *

16

17

18

19

20

21

22

23

24

25

                                                    Page 31

                        J. Hwangbo

1

2       Q      Did he explain what the hours

3   would be?

4       A      Tuesday, Thursday, and Saturday.

5   And Tuesday will be full day, which back

6   then was from 8:30 to 6:00 or 7:00, 6:30

7   or 7:00; and Thursday from 8:30 to 1:00,

8   but now it's two; Saturday from 8:30 to

9   11:00, but now it's sometimes 12:00 to

10  1:00 because I have a lot of patients.

11      Q      Did Dr. Harvey ask you any

12  questions during the interview?

13      A      Yes.  Where I worked and things

14  like that, but as for the specifics, it's

15  a long time ago.  I don't remember.

16      Q      In terms of compensation, what

17  was discussed?

18      A      That he will pay me $35 an hour

19  for the service that I provided, as well

20  as the partnership share of the practice,

21  yeah.

22      Q      Did you ask him how much the

23  partnership share would be?

24      A      At that point, I didn't really

25  care.  It wasn't specific.  But now I know

```
 1                    J.  Hwangbo
 2      yes?
 3                    THE  WITNESS:   Yes.   Thank you.
 4      Q      With regard to what counsel just
 5   mentioned, did Dr. Harvey tell you at that
 6   first interview that you would be a
 7   partner in Harvey Family?
 8      A      Yes.
 9      Q      What exactly did he say?
10      A      That I would get the -- some of
11   the percentage of the practice, yeah, at
12   the end of the year.
13      Q      And that was in October -- or, I
14   guess --
15      A      Yes, somewhere around there.
16      Q      -- October of 2012?
17      A      Yeah.
18      Q      So at the end of 2013, did you
19   get a percentage of the practice?
20      A      No.   Not yet.   That's actually
21   this year.   When I was -- I thought I had
22   to file something called K-1 in order to
23   file my taxes, and I was really looking
24   forward to the tax return, so I wanted to
25   file early, but he wasn't ready for it, so
```

```
                                        Page 39
 1                  J. Hwangbo
 2   I wait until March and then recently --
 3   yeah, and then in March, one of his
 4   accountants called and said there's
 5   nothing, so -- that's when I find out
 6   that --
 7           MR. CHISARI:  There were no
 8        profits, in other words, you found
 9        out?
10           THE WITNESS:  Yeah, exactly.
11        There was no profits, which was a big
12        downer.
13        Q     When was that call from his
14   accountant?
15        A     Sometime in March.
16        Q     The accountant told you there
17   was no profits of Harvey, therefore you
18   wouldn't be getting a percentage of 2013
19   profits?
20        A     Exactly.  The way he put it was
21   what I making as a W-2 -- the payroll
22   exceeds the amount of the partnership
23   share that year made, so it's a negative
24   K-1 or something, so I didn't need any
25   paper to file my tax.
```

Page 40

1                    J. Hwangbo

2        Q      Do you recall the accountant's

3    name?

4        A      I believe his name was Ray

5    Floch, but I don't know how to spell his

6    last name.

7               MR. CHISARI:  I believe

8        Dr. Harvey already provided that name

9        to you several times.

10               MR. MARVIN:  I wanted to make

11        sure it was the same accountant.

12        A      Ray Floch, F-l-o-c-h, but it's

13    kind of hard to pronounce.  I'm not sure.

14               THE WITNESS:  You know what, let

15        me look up.

16               MR. MARVIN:  You can give it to

17        us later.  It's not essential.

18        Q      Now, in terms of Harvey Family,

19    let's talk about the bank account.

20               Are you a signatory on the bank

21    account for Harvey Family?

22        A      I don't think so.  I'm not sure.

23        Q      Do you remember ever going to a

24    bank and signing a document?

25        A      No.

```
                                          Page 41
 1                   J. Hwangbo
 2       Q      Have you ever signed any checks
 3   on behalf of Harvey Family?
 4       A      Yes.  Couple times, but it was
 5   under my names, I believe, yeah.
 6              MR. CHISARI:  I don't think he's
 7       understanding.
 8              MR. MARVIN:  Let me go back.
 9       Q      Harvey Family as a company, are
10   you aware if they have a bank account?
11       A      I assume they do.
12       Q      Just for the purposes of this
13   EUO, don't assume.
14              MR. CHISARI:  You can't assume.
15              THE WITNESS:  Sorry.
16       Q      If you don't know --
17       A      I don't know.
18       Q      -- then you don't know.
19       A      Yeah.
20       Q      You don't know if Harvey Family
21   has a bank account?
22       A      No, I don't know.
23       Q      Now, let's talk again about
24   Exhibit T, which is the Amended Operating
25   Agreement, which I believe you said you
```

Page 42

                    J.  Hwangbo

1

2    think you signed in March 2013.

3        A     Yeah.  Sometime.  It has to be

4    sometime in March, yeah.

5        Q     Could you describe the

6    circumstances surrounding you signing the

7    document?

8        A     It was just any other day and

9    Dr. Harvey said there was some kind of

10   change and need my signature because I was

11   a partner and that was it.

12       Q     Did he explain to you what the

13   Operating Agreement was?

14       A     He didn't go in detail, but he

15   gave me a copy, yes.

16       Q     Did you read it prior to

17   signing?

18       A     Yes.  Ashamed, I read it, but I

19   didn't understand most of it.

20       Q     Did you seek to consult with an

21   attorney or other advisor to help you

22   understand it?

23       A     No.  At the time, I don't think

24   it really matter in what I did as an

25   acupuncturist, so I just kept it, but I

Page 44

1                    J. Hwangbo

2     talks about meetings of the members of

3     Harvey Family.  Take your time and read

4     it.  Familiarize yourself with it.

5          A      Okay.

6                  (Perusing document.)

7          A      I have to say, sir, it's almost

8     a foreign language to me.

9          Q      So in a nutshell, Section 3.5,

10    Dr. Harvey, and only Dr. Harvey, can call

11    a meeting of the members.

12         A      Okay.

13         Q      Has there ever been a meeting of

14    the members of Harvey Family called?

15         A      Not that I know of.  It's not

16    like this, not at a conference table, but

17    I meet with him when I'm working.

18         Q      In terms of meeting with the

19    members, I'm referring to a meeting of all

20    of the members of Harvey Family in terms

21    of like a management meeting or to discuss

22    the practice or anything like that?

23         A      No.  We talked, but not at the

24    presence of a physical therapist, because

25    we work on different days.  If anything is

Page 45

1                J. Hwangbo

2    discussed, it's usually, like, I discuss

3    with the office manager about some changes

4    that I need, because we share the work

5    environment for the physical therapist.

6    He's really messy, so he leave things

7    down, and I tell the office manager to

8    pass the information, and then that's

9    usually how we pass the information.

10        Q     Who is the office manager?

11        A     Her name is Kelly --

12              MR. CHISARI:  It's Kelly.

13        A     I don't know her last name.

14        Q     Are you aware of any of the

15   substantive terms of the Operating

16   Agreement?

17        A     Honestly, no.

18        Q     Are you aware of any rights that

19   you might have under the Operating

20   Agreement?

21        A     I have to honestly say no.

22        Q     Were any of the specific terms

23   of the agreement or discussed with you by

24   Dr. Harvey prior to you signing?

25        A     Not in specific, no.

Page 48

1                    J. Hwangbo
2        A      I thought American and the money
3    was something that was, like, private.
4        Q      Does Harvey Family at the
5    practice sublease space to any other
6    provider?
7        A      I do not know.
8        Q      Do you know the days that Harvey
9    Family operates, other than the days that
10   you work?
11       A      Yes.  Monday -- Monday -- yes.
12   So Monday through Saturday.
13       Q      Do you know the hours during
14   those days, other than the days that you
15   work?
16       A      It's on the business card, so
17   8:30 to 7:00, I believe.
18       Q      Do you have a key?
19       A      No, I don't have a key.
20       Q      So when you go in the morning,
21   someone is usually there already?
22       A      Yes.  Dr. Harvey or a
23   receptionist.  There's a couple people who
24   have a key, but not me.
25       Q      Who are the people that have a

Page 55

1                   J. Hwangbo

2       Q       Do you know how much revenue

3    Harvey generated in 2013?

4       A       I have no idea.

5       Q       Have you ever asked to be

6    provided that information?

7       A       No, I didn't.

8       Q       You said Harvey hadn't paid

9    dividends to you at the end of 2013,

10   Harvey Family.  Has Harvey Family ever

11   paid you any dividends?

12      A       No.  Bonus from time to time.

13      Q       What does the bonus entail?  Is

14   that like a Christmas bonus type of thing?

15      A       Yeah.

16      Q       How many times have you received

17   bonuses?

18      A       Once.  Last year.

19      Q       That was --

20      A       Actually, at the end --

21   beginning of 2013, which was for 2012, so

22   not this year, no.

23      Q       So you began working in

24   October --

25      A       Of 2012.

```
                                           Page 56
 1              J. Hwangbo
 2      Q      -- and then you received a bonus
 3  in the beginning of 2013?
 4      A      Yes.
 5      Q      Do you remember how much that
 6  was?
 7      A      I think it was, like, $500.
 8      Q      At the end of 2013, you didn't
 9  receive any bonus?
10      A      No.  Because I thought there was
11  some dividend coming.
12      Q      Do you know if anyone at Harvey
13  Family received a bonus?
14      A      That, I do not know.
15      Q      Are you aware of the payroll?
16      A      I'm sorry?
17      Q      The amount of the payroll at
18  Harvey Family?
19      A      No, I do not.
20      Q      Do you know if Mr. Brual
21  received any compensation --
22      A      I do not know.
23      Q      Let me just finish the question.
24      A      Sure.
25      Q      Do you know if Mr. Brual
```

```
                                    Page 71
 1                 J. Hwangbo
 2        Q       Does that generate a bill that
 3    you then review?
 4        A       I think so, yes.
 5        Q       And -- you think so?
 6        A       Yeah, because I don't do it, so
 7    I don't know, but he does it, something
 8    with the computer, yes.
 9        Q       Once the bills are reviewed by
10    you, what do you do with them?
11        A       I give it back to him.  He take
12    care of it.
13        Q       In terms of your selection of
14    the codes, the CPT codes to use, how do
15    you learn about these codes?  Was that
16    taught to you at school?
17        A       Yes, basic of it is taught in
18    school, yeah.
19        Q       And did you select all codes
20    that are used at Harvey Family?
21        A       There's not much code to use, so
22    pretty much -- yeah, same, for what I do,
23    yeah.
24        Q       Do you know how much revenue for
25    acupuncture services Harvey Family
```

```
                                    Page 72
 1                   J.  Hwangbo
 2   generated in 2013?
 3       A      I do not know.
 4       Q      Did you ever ask?
 5       A      No, I didn't.
 6       Q      How about for so far in 2014,
 7   the first three months, do you know how
 8   much revenue for acupuncture services
 9   Harvey Family generated?
10       A      No, I do not know.  It's
11   surprising to you, but it's not one of
12   those things that I pay much attention to.
13       Q      For your first full year at
14   Harvey Family 2013, who prepared the tax
15   return for the company?  Was it Mr. Floch?
16       A      I do not know.
17       Q      Did you have any role in
18   selecting the accountant for Harvey
19   Family?
20       A      No.
21       Q      Did you have any role in the
22   preparation of Harvey Family's tax
23   returns?
24       A      No.
25       Q      Did you review those tax returns
```

```
                                              Page 73
 1                    J.  Hwangbo
 2   before  they  were  filed?
 3        A      No.
 4        Q      Do  you  know  if  they  were  filed?
 5        A      No.   I  do  not  know.
 6        Q      Do  you  know  who,  if  anyone,
 7   reviewed  the  tax  returns  before  they're
 8   filed?
 9        A      No,  I  do  not  know.
10        Q      Did  you  have  to  sign  the  tax
11   returns  before  they  were  filed?
12        A      No,  I  didn't.
13        Q      No,  you  didn't  have  to,  or  no,
14   you  didn't  sign  it?
15        A      I  didn't  sign.   Not  that  I
16   remember.
17        Q      How  is  Harvey's  payroll  handled?
18        A      I  do  not  know.
19        Q      In  terms  of  your  payroll,  is
20   there  a  company?   Is  it  on  a  Harvey  check?
21   How  does  that  work?
22        A      There's  a  payroll  stub,  but  I
23   get  my  pay  direct  deposit,  so  usually  I
24   don't  take  a  closer  look  at  the  pay  --
25   payroll.
```

```
                                    Page 82
 1                 J.  Hwangbo
 2    question?
 3        Q     Do you have any sort of
 4    management function at Harvey Family?
 5        A      Yes, acupuncture treatment-wise,
 6    yes.  I dictate what is to be done, how
 7    it's to be done, yeah, everything.
 8             MR. CHISARI:  So you run the
 9        acupuncture portion of the practice?
10             THE WITNESS:  Yes, and the
11        treatment part, yes.
12        A     Did I answer the question?
13        Q     Yes.
14             I'm going to try to ask a very
15    broad question and hopefully will cover a
16    lot of ground.
17             Other than the money you receive
18    as your salary, are you aware at all of
19    any of the finances of Harvey Family?
20        A     No.
21        Q     Just to be a little more
22    specific for my follow-ups, when I say
23    "any of the finances," I'm referring to,
24    for example, the following things:  Are
25    you aware of the weekly or monthly
```

Page 83

```
 1                 J.  Hwangbo
 2   expenditures  of  Harvey  Family?
 3        A      No.
 4        Q      Are  you  aware  of  the  weekly  or
 5   monthly  income  of  Harvey  Family?
 6        A      No.
 7        Q      Are  you  aware  of  the  weekly  or
 8   monthly  payroll  expenses  of  Harvey  Family?
 9        A      No.
10        Q      Are  you  aware  of  the  weekly  or
11   monthly,  for  example,  office  supply
12   expenses  of  Harvey  Family?
13        A      No.
14        Q      After  you  spoke  with  the
15   accountant  who  told  you  that  there  was  no
16   profits  for  2013,  did  you  ever  discuss
17   with  Dr.  Harvey  or  Mr.  Brual  ways  the
18   company  could  become  more  profitable  in
19   the  year  ahead?
20        A      First  of  all,  I  think  the  profit
21   was  for  me  that  the  1  percent  share,  there
22   was  no  profit.   I  don't  think  --  I  don't
23   know  about  any  --  whether  Dr.  Harvey  made
24   any  profit.   I  think  he  did,  otherwise  he
25   would  be  closing  down,  so  I  do  not
```

Page 113

1          J. Hwangbo

2          Allstate reserves all rights

3      consistent with those which have been

4      previously put on the record.

5          Thank you.

6

7          (TIME NOTED:  1:02 P.M.)

8      _____

9          Jin Hwangbo

10

11  Subscribed and sworn to

12  before me this _____

13  day of _____, 2014.

14  _____

15      Notary Public

16

17

18

19

20

21

22

23

24

25

115

1

2                          CERTIFICATION

3

4          I, DENISE PARISI, a Notary Public for

5     and within the State of New York, do

6     hereby certify:

7          That the witness whose testimony as

8     herein set forth, was duly sworn by me;

9     and that the within transcript is a true

10    record of the testimony given by said

11    witness.

12         I further certify that I am not

13    related to any of the parties to this

14    action by blood or marriage, and that I am

15    in no way interested in the outcome of

16    this matter.

17         IN WITNESS WHEREOF, I have hereunto

18    set my hand this 16th day of April, 2014.

19

20                    _____

21                         DENISE PARISI

22

23              *      *      *

24

25

# EXHIBIT E

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 04 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO
CASUALTY CO.,

                                        Plaintiffs,          Docket No.
                                                             CV 10-5409(SLT)(JMA)

        -against-

NATALIO DAMIEN, M.D., et al.,

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## ORDER FOR INJUNCTIVE RELIEF AND TEMPORARY RESTRAINING ORDER

This matter is before the Court as a result of Plaintiffs' Order to Show Cause seeking an Order,

pursuant to Fed. R. Civ. P. 13(a) and Fed. R. Civ. P. 65, enjoining Defendants City Medical

Diagnostics, P.C. ("City Medical"), Rapid Medical Diagnostics, P.C. ("Rapid Medical"), Sergey

Gabinsky, M.D. ("Dr. Gabinsky"), Alba Management, Inc. ("Alba"), Arthur Bogoraz

("Bogoraz"), Serge Denevich, ("Denevich"), Stella Mednik, Esq. ("Mednik") and Stella Mednik,

Esq. P.C. a/k/a Advanced Legal Services, P.C. ("Mednik P.C.") (collectively, "Defendants")

from commencing or prosecuting, or causing to be commenced or prosecuted, any future claims

against GEICO for no-fault benefits on behalf of Defendants City Medical and/or Rapid Medical

(collectively the "PC Defendants"), either through state court proceedings or through arbitration,

except as counterclaims to this action; and for an injunction staying any claims currently pending

in arbitration proceedings between GEICO and the PC Defendants, or either of them.[1]

---

[1]     Prior to the January 4, 2011 hearing on this application, Plaintiffs filed stipulations signed
by their counsel and counsel for Vital Radiology P.C., Essential Radiology P.C., Aurora
Radiology, P.C., Oracle Radiology, P.C. and their respective owners, whereby each of the those
Defendants agreed to cease submission of any new claims and/or lawsuits and to cease
prosecution of any lawsuits currently pending in state court or before the American Arbitration