UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------ X
                                                                               )
ALLSTATE INSURANCE COMPANY, ALLSTATE PROPERTY &                                )
CASUALTY INSURANCE COMPANY, ALLSTATE FIRE &                                    )
CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY                                 )        15-cv-7149
COMPANY AND ALLSTATE NORTHBROOK INDEMNITY                                       )        (SJ) (CLP)
COMPANY,                                                                        )
                                                                               )
                                        PLAINTIFFS,                            )
                                                                               )
                              -AGAINST-                                         )
                                                                               )
HARVEY FAMILY CHIROPRACTIC, PHYSICAL THERAPY &                                 )
ACUPUNCTURE, PLLC, RICHARD HARVEY, D.C., JIN HWANGBO,                           )
L.Ac., and BERVIN NELSON BRUAL, P.T.                                           )
                                                                               )
                                        DEFENDANTS.                            )
------------------------------------------------------------------------------ X

**M**EMORANDUM OF **L**AW IN SUPPORT OF **P**LAINTIFFS' **M**OTION **P**URSUANT TO **R**ULE 65 OF THE
**F**EDERAL **R**ULES OF **C**IVIL **P**ROCEDURE **AND** 28 U.S. Code § 2283 SEEKING A **T**EMPORARY
RESTRAINING ORDER AND ORDER TEMPORARILY STAYING ALL **N**O-FAULT COLLECTION
PROCEEDINGS CURRENTLY PENDING BETWEEN **H**ARVEY **F**AMILY **C**HIROPRACTIC, **P**HYSICAL
**T**HERAPY & **A**CUPUNCTURE, PLLC AND **P**LAINTIFFS

**S**TERN & **M**ONTANA, LLP
**A**TTORNEYS FOR **P**LAINTIFFS
**O**NE **W**ORLD **F**INANCIAL **C**ENTER, 30**TH** **F**LOOR
**N**EW **Y**ORK, **N**EW **Y**ORK **10281**
**T**ELEPHONE: **(212) 532-8100**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF RELEVANT FACTS .............................................................. 4

1.   The No-fault Law .......................................................................................... 4

2.   Requirements for PLLCs .............................................................................. 6

3.   The Complaint ............................................................................................... 7

        A.   Harvey FCPTA's Fraudulent Organization .................................... 9

        B.   Harvey FCPTA's Examination Under Oath and the Civil Court Actions ...................... 12

ARGUMENT ........................................................................................................ 14

I.   A TEMPORARY RESTRAINING ORDER AND
     PRELIMINARY INJUNCTION SHOULD BE GRANTED ............................... 14

        A.  The Court Has Authority to Enjoin the Underlying Actions Injunction ...................... 14

        B.  Standard of Review ........................................................................ 16

        C.  Plaintiffs Will Suffer Immediate Irreparable Harm in the Absence
            of a TRO And Preliminary Injunction. ........................................... 16

        D.  There are Sufficiently Serious Questions Going to the Merits of this
            Matter to Make Them a Fair Ground For Litigation. ....................... 22

        E.  The Balance of Hardships Tips Decidedly in Allstate's Favor. ....................... 24

CONCLUSION ...................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Allstate Ins. Co. v. Bay Needle Care Acupuncture, P.C.*,
150613-CV-2013 (Sup. Ct. N.Y. Cty. March 3, 2015) .............................................................. 21

*Allstate Ins. Co. v. P.R. Medical, P.C.*,
01949-CV-2010 (Sup. Ct. Nassau Cty. Mar. 4 2015) .............................................................. 21

*Allstate Ins. Co. v. Tvildiani*,
14-CV-7328 (SJ)(RLM) (E.D.N.Y. Apr. 14, 2015), Doc. No. 28 .................................... *passim*

*Dandong v. Pinnacle Performance Ltd.*,
2011 WL 6156743 (S.D.N.Y. Dec. 12. 2011) .......................................................................... 24

*AIU Ins. Co. v. Deajess Med. Imaging, P.C.*,
24 Misc. 3d 161, 166 (Sup. Ct. Nassau Cty. 2009) .................................................................. 21

*Allstate Ins. Co. v. Elzanaty*,
929 F. Supp. 2d (E.D.N.Y. 2013) ...................................................................... 5, 17, 19, 20, 21

*AutoOne Ins. Co. v. Manhattan Heights Med.*, P.C.,
2009 NY Slip Op 51663U (Sup. Ct. Nassau Cty. 2009) .......................................................... 22

*Bruce v. Martin*,
680 F. Supp. 616 (SDNY 1988) ............................................................................................... 22

*Castrol, Inc. v. Quaker State Corp.*,
977 F.2d 57 (2d Cir. 1992) ....................................................................................................... 16

*Chevron Corp. v. Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014) ..................................................................................... 15

*GEICO Ins. Co. v. Williams*,
2011 NY Slip Op 30326U (Sup. Ct. Nassau Cty. 2011) .......................................................... 21

*Government Employees Insurance Co., et al. v. Damien*, et al.,
Docket No. CV 10-5409 (SLT)(JMA) ..................................................................................... 20

*Hamilton Watch Co. v. Benrus Watch Co.*,
206 F2d. 738 (2d Cir. 1953) ..................................................................................................... 23

*Jackson v. Johnson*,
962 F. Supp. 391, 392 (S.D.N.Y. 1997)..................................................................................16

*Jayaraj v. Scappini,*
    66 F.3d 36, 39 (2d Cir.1995) .......................................................................................... 19

*Kamerling v. Massanari,*
    295 F3d 206 (2d Cir. 2002) .......................................................................................... 16

*Local 1814, Int'l Longshoreman's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.,*
    965 F.2d 1224 (2d Cir. 1992) ....................................................................................... 16

*Med. Soc'y of State of N.Y. v. Serio,*
    100 N.Y.2d 854 (2003)................................................................................................... 4

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Doe,*
    868 F. Supp. 532 (S.D.N.Y. 1994) .............................................................................. 17

*Michael Miller Fabrics, LLC v. Studio Imports Ltd., Inc.,*
    12 CV 3858 KMW JLC, 2012 WL 2065294 (S.D.N.Y. June 7, 2012).................................... 21

*Mitchum v. Foster,*
    407 U.S. 225 (1972)...................................................................................................... 15

*Multiquest P.L.L.C. v. Allstate Ins. Co.,*
    17 Misc. 3d 37, 844 N.Y.S.2d 565 (App. Term 2007) ............................................... 6

*People v. Cole,*
    219 N.Y. 98 (1916)......................................................................................................... 7

*Safeco Ins. Co. of Ind. v. Morel,*
    2009 NY Slip Op 32187U (Sup. Ct. Nassau Cty. 2009) ........................................... 21


*State Farm Mut. Auto. Ins. Co. v. Mallela,*
    4 N.Y.3d 313 (2005).............................................................................................. *passim*

*State Farm Mut. Auto. Ins. Co. v. Rabiner,*
    749 F. Supp. 2d 94 (E.D.N.Y. 2010) ............................................................................ 5

## Statutes

11 N.Y.C.R.R.
    § 65 ............................................................................................................... *passim*
    § 65 3.9(a) .......................................................................................................... 25
    § 65-3.11(a). ......................................................................................................... 4
    § 65-3.16 (a) (12) ............................................................................................. 5, 6
    § 65-4.5 ............................................................................................................... 24

18 U.S.C.

§ 1961...................................................................................................... 3, 14
§ 1961(a).................................................................................................. 14, 15
§ 1964(a).................................................................................................. 14

22 U.S.C. § 2283............................................................................................ 1, 14

28 U.S.C.
§ 1651...................................................................................................... 19
§ 2283...................................................................................................... 1, 14

N.Y. Business Corporation Law
§ 1507...................................................................................................... 5, 7
§1508....................................................................................................... 5

N.Y. Education Law § 6507(4)(c).................................................................... 5

N.Y. Insurance Law
§ 5101...................................................................................................... 1
§ 5102...................................................................................................... 4, 6
§ 5103(d).................................................................................................. 4

N.Y. LLC Law
§ 1203(a).................................................................................................. 6
§ 1203(b).................................................................................................. 6
§ 1211(a).................................................................................................. 6

## Rules

Fed. R.Civ.P.
65 .......................................................................................................... 1
65(b)....................................................................................................... 16

## INTRODUCTION

Plaintiffs respectfully submit this Memorandum in support of their Motion pursuant to Fed.R.Civ.P. 65 and 28 U.S. Code § 2283 seeking a Temporary Restraining Order ("TRO") and Preliminary Injunction enjoining Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC ("Harvey FCPTA") from: i) proceeding with No-fault collection action pending in the New York City Civil Courts between Harvey FCPTA and Allstate until the resolution of the instant matter;[1] and (ii) filing new arbitration proceedings or civil actions seeking collection of No-fault benefits from Allstate until the resolution of the instant matter. This matter seeks, among other things, equitable relief in the form of a declaratory judgment for which there is no adequate remedy at law. Earlier this year in a case involving virtually identical legal and factual issues, this Court entered a similar Preliminary Injunction. *See Allstate Ins. Co. v. Tvildiani*, 14-CV-7328 (SJ) (RLM) (E.D.N.Y. Apr. 14, 2015), Doc. No. 28, at 3 (Order) (Marvin Decl. Exh. "A.")

## PRELIMINARY STATEMENT

New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, *et seq*.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, *et seq*.), automobile insurers are required to provide Personal Injury Protection Benefits ("No-fault benefits") to insureds or to the insureds' medical provider assignees.  While the No-fault program's goals are honorable, it has unfortunately been plagued by rampant fraud by dishonorable individuals who have sought, through health care providers, to exploit the program for their own personal gain.

In an effort to combat this fraud, insurers such as Allstate have taken steps, as required by New York's Insurance Law, to identify the fraudulent schemes associated with the No-fault program and to

---

[1] As set forth in Section the Anti-Injunction Act (the "AIA"), 22 U.S.C. § 2283  does not prohibit the relief requested.

1

hold those who commit such fraud accountable. In one type of such scheme, individuals have engaged in certain deceptive practices to circumvent or violate applicable State licensing requirements in order to fraudulently obtain licenses to operate medical practices and bill insurers under the no-fault program. Initially, the most common form of this scheme included unlicensed non-physicians fraudulently incorporating or controlling medical professional corporations in violation of the prohibition of the corporate practice of medicine. Once uncovered, insurers disputed the right of these fraudulent medical providers to receive No-fault reimbursement. The N.Y. Court of Appeals in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313 (2005), unanimously held that such corporations were "not entitled to reimbursement," relying upon an Insurance Department regulation requiring all health care "providers" to be in compliance with licensing requirements to be eligible for no fault reimbursement. *Id.* at 319-320.

However, when one form of the fraudulent scheme was foreclosed, individuals seeking to circumvent New York's licensing laws turned to other forms. Now, insurers are finding that instead of trying to fraudulently obtain licenses to operate professional medical corporations, individuals are now focusing their attention to other types of medical "providers", in particular, facilities licensed under Article 28 of the New York Public Health Law and, as in this action, entities organized under Article 12 of the New York State Limited Liability Company Law. In these situations, individuals are either fraudulently obtaining licenses to operate these types of medical "providers" by submitting false information to the State regulators, or engaging in conduct after obtaining licenses that would render these facilities ineligible to receive no-fault reimbursement under *Mallela* and 11 N.Y.C.R.R. § 65-3.16(a)(12).

With respect to fraudulently organized Article 12 entities under the Limited Liability Company Law, insurers have found that some unscrupulous chiropractors, who are not licensed to provide any health care services other than chiropractic, are recruiting licensed acupuncturists and

2

physical therapists whose names the chiropractors are forming, and fraudulently operating professional limited liability companies ("PLLCS") which provide chiropractic, physical therapy and acupuncture services. While the acupuncturists and physical therapists are falsely identified as members of those PLLCS and as maintaining ownership interests for which they are responsible for the practice of their respective professions, in reality, they are secretly owned and controlled solely by the chiropractor in contravention of New York law. It is this type of situation that is the subject of Allstate's Complaint against Defendants, which alleges that Defendant Harvey recruited a licensed acupuncturist (Defendant Hwangbo) and physical therapist (Defendant Brual) as nominal paper owners of Harvey FCPTA in an effort to circumvent N.Y. licensing laws and maximize profits by billing for services that he was otherwise prohibited by law from providing.

In 2014, Defendants Brual and Hwangbo provided sworn testimony in which they acknowledged that they were employees, and not owners of Harvey FCPTA, which is solely owned by Defendant Harvey. Although its formation, operation and ownership was, and continues to be, in violation of New York State law, Harvey FCPTA billed for, and continues to bill for, acupuncture and physical therapy services. Harvey FCPTA has filed, and continues to file and prosecute, hundreds of New York City Civil Court and Nassau County District Court actions (the "Underlying Actions") seeking reimbursement of No-fault benefits to which it is not entitled. For example, in 2015, Harvey FCPTA filed more than 200 Underlying Actions, and with hundreds scheduled for court appearances within the next 12 months, and approximately 80 scheduled for appearances this month alone. In addition, within recent weeks, Harvey FCPTA has bombarded Plaintiffs with new matters, discovery demands, and other litigation documents exponentially accelerating the pace of the Underlying Actions. The pendency of those actions, including the risk of inconsistent decisions, poses an immediate threat to the equitable relief Plaintiffs are seeking in the Complaint, and it is respectfully submitted that the relief sought herein should be granted.

3

## STATEMENT OF RELEVANT FACTS

### 1.    The No-fault Law

In 1973, the New York State Legislature enacted No-fault Law, with the goals of ensuring prompt compensation for losses incurred by accident victims without regard to fault or negligence, reducing the burden on the courts, and providing substantial premium savings to New York motorists.[2] *Med. Soc'y of State of N.Y. v. Serio,* 100 N.Y.2d 854, 860 (2003). In furtherance thereof, pursuant to Ins. Law § 5103(d), the Legislature empowered the Superintendent of the New York State Department of Insurance (now known as the New York State Department of Financial Services (the "DFS")) to promulgate regulations implementing the No-fault Law, which are codified at 11 N.Y.C.R.R. §§ 65 *et seq.* Those regulations, among other things: (i) mandate that No-fault insurers reimburse eligible injured persons up to $50,000 for basic economic loss (including reasonable and necessary medical expenses), *see* Ins. Law § 5102, relating to personal injury suffered as the result of the use or operation of a covered motor vehicle; (ii) state that a health care provider that fails to meet any applicable New York State or local licensing requirement is ineligible to receive reimbursement pursuant to the No-fault Law; and (iii) allow a claimant the right to assign a claim for No-fault benefits to a healthcare provider, which may submit requests for payment directly to insurers pursuant to 11 N.Y.C.R.R. § 65–3.11(a). When an insurer denies and/or withholds payment for billed-for services, a provider may initiate an action against the insurers for breach of contract, either in court or arbitration.

In the seminal case of *Mallela*, the N.Y. State Court of Appeals addressed the certified question from the United States Court of Appeals for the Second Circuit of whether a medical corporation that was fraudulently incorporated under N.Y. Business Corporation Law §§ 1507,

---

[2] Despite the intended, goals fraud and abuse in the system have been rampant in this state for many years. *See e.g.* Marvin Dec. Exh. "A" at p. 3, wherein this Court noted that "allegations of fraud on our health care system generally, and even the specific Civil RICO scheme alleged in the complaint, have become too common."

1508, and N.Y. Education Law § 6507(4)(c)[3] was entitled to be reimbursed by insurers pursuant to the No-fault Law, and its implementing regulations, for medical services rendered by licensed medical practitioners. *Mallela*, 4 N.Y.3d at 320. The Court analyzed Section 65-3.16(a)(12) and unanimously answered the question in the negative. *Id*. In addition, the *Mallela* Court recognized that insurers could maintain a cause of action for fraud or unjust enrichment to recoup from any such fraudulently incorporated providers payments made after April 4, 2002, the effective date of the amendment to the implementing regulations that required medical providers be licensed in accordance with applicable state and local law to be eligible for reimbursement of No-fault benefits. *Id* at 322; *see also State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 99 (E.D.N.Y. 2010) (recognizing *Mallela*'s holding that insurers could maintain actions for fraud or unjust enrichment relating to payments made to fraudulently incorporated medical providers).

Although the *Mallela* facts concerned fraudulently incorporated medical corporations, the regulation relied upon by the Court of Appeals for its holding applies equally to any "provider of health care services." As Judge Spatt held in *Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 295-96 (E.D.N.Y. 2013), *motion to certify appeal granted*, No. 11-CV-3862 ADS ARL, 2013 WL 2154759 (E.D.N.Y. May 16, 2013), *appeal dismissed* (Nov. 14, 2014), with respect to allegations concerning the improper licensing of Article 28 facilities:

> "[]*Mallela* made no distinction between health care providers incorporated as business entities pursuant to the business corporation law, and health care providers licensed as Article 28 facilities under the public health law. While the healthcare provider at issue in *Mallela* was licensed as a medical corporation and *not* an Article 28 facility as in the instant case, this difference appears to be irrelevant. What type of licensing document is at issue, whether it is a certificate of authority issued to a professional corporation or an operating license issued to an Article 28 facility, is immaterial. The operative regulation 11 NYCRR § 65−3.16(a)(12) merely states that a provider of healthcare services is not eligible for reimbursement under Insurance

---

[3] N.Y. Business Corporation Law §§ 1507, 1508 and N.Y. Education Law § 6507(4)(c) provide, in essence, that a certificate of authority to operate as a professional corporation may only be issued to a corporation whose owners are licensed in the profession which the corporation is authorized to practice.

5

Law § 5102 if the provider fails to meet *any* New York State or local licensing requirements. Article 28 was in existence as the time this regulation was promulgated in 2002, and thus if there was an intent to exclude Article 28 facilities from its scope, such an exclusion would have been included. Simply because *Mallela* concerned business licensing requirements as opposed to healthcare licensing requirements does not necessitate an alternate outcome…"

Equally true, the licensing requirements of *Mallela* also apply to PLLCs. For example, in *Multiquest P.L.L.C. v. Allstate Ins. Co.*, the Supreme Court, Appellate Term, Second Department, applied *Mallela's* holding to fraudulently formed PLLCs. 17 Misc. 3d 37, 39, 844 N.Y.S.2d 565 (App. Term 2007) (reasoning that the "requirements of membership, professional licensing, and filing are substantially the same" for professional service corporations and PLLCs, and concluding that "11 N.Y.C.R.R. 65-3.16 (a) (12) clearly applies" to PLLCs). Accordingly, under *Mallela* and its progeny, a PLLC is not eligible for reimbursement pursuant to the No-fault Law if it fails to meet any applicable state or local licensing requirement.

## 2.   Requirements for PLLCs

Pursuant to New York State LLC Law ("LLC Law"), PLLCs may only engage in a profession or professions in which one or more of its members are authorized to practice in New York. LLC Law § 1203(a). While more than one professional may form a PLLC, each such professional must be authorized by law to render a professional service within the state for which the professional service limited liability is seeking to operate.[4] *See id.*  Moreover, the articles of organization must state the professions to be practiced and the names and residence addresses of all individuals who are original members and managers of the PLLC. § 1203(b). Furthermore, the LLC law prohibits a member of a PLLC from selling or assigning his or her membership interest in such limited liability company and further provides that "[a]ny sale or transfer in violation of such restrictions shall be void." § 1211(a) (emphasis supplied).

---

[4] Under Articles 136 and 160 of the Education law, only persons licensed in physical therapy and acupuncture may practice those services.

6

The restrictions contained in Article 12 of the LLC Law with respect to the organization of a professional limited liability company, serve the same purpose as those in Article 15 of the New York State Business Corporation Law ("BCL") governing the formation and ownership of professional service corporations. Those restrictions were meant to "ensure that a professional service corporation renders professional services only through qualified members of the professions and are *in fact controlled only by qualified members*."  New York Legislative Annual 1970, p. 129 (emphasis added). The restrictions in B.C.L. § 1507 in particular "were designed to insure that a professional service corporation *could not be* controlled by a person who is not authorized to practice in the field for which the corporation was formed."  New York State Legislative Annual 1971, p. 130; *see State Farm Mut. Auto. Ins. Co. v. Mallela*, 175 F. Supp. 2d 401, 414 (E.D.N.Y. 2001) (citation omitted) ("[T]o avoid perceived dangers 'inherent in the corporate practice of medicine,'…the legislature requires professional health service corporations to be owned and controlled only by those who are licensed to practice medicine…."). The foregoing are not mere technical requirements, but are part of an important and long-established regulatory scheme specifically designed by the Legislature to protect patients' health and safety and to insure the ethical and competent practice of the profession of medicine. *See People v. Cole*, 219 N.Y. 98 (1916) (purpose of licensing provisions is to protect the public).

**3.** **The Complaint**

Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program. Doc. No. 1 ("Compl.") ¶ 57. Harvey FCPTA is ostensibly a healthcare provider that bills for chiropractic, acupuncture and physical therapy services to, among others, individuals covered under the No-fault Law. *Id.* at ¶ 59. In exchange for its services, Harvey FCPTA accepted assignments of benefits from its patients covered under the No-fault law ("Claimants") and submitted claims for payment to No-fault insurance carriers, in general, and to

7

Plaintiffs, in particular. *Id.* In purported compliance with the No-fault Law and 11 N.Y.C.R.R. 65 *et seq.*, Harvey FCPTA submitted proof of its claims to Plaintiffs. To process and verify claims submitted by Harvey FCPTA, Plaintiffs required, and Harvey FCPTA submitted, to the extent applicable, narrative reports and other records relative to the alleged medical treatment rendered to Claimants, for which Harvey FCPTA was seeking payment from Plaintiffs. Compl. *Id.* at ¶ 73. Pursuant to the No-fault law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are generally required to process the claims for which a PLLC has standing to submit, within 30 days of receipt of proof of claim. Compl. ¶ 74. To fulfill its obligation to promptly process claims, Allstate justifiably relied upon the bills and documentation submitted by Harvey FCPTA in support of its claims, and paid Harvey FCPTA based on the representations and information that Harvey FCPTA mailed to Allstate. Compl. ¶ 75. To the extent Plaintiffs denied Harvey FCPTA's proof of claims, Harvey FCPTA, in many instances, initiated actions in Civil Courts challenging the denials and seeking reimbursement of the claims. A list identifying pending matters between Plaintiffs and Harvey FCPTA is annexed to Flaherty Aff. as Exh. "A."

Against the foregoing backdrop, Plaintiffs commenced this action alleging, *inter alia*, violations of RICO, 18 U.S.C. § 1961 *et seq.*, and New York State common law. The Complaint alleges that Defendant Richard Harvey, D.C. (referred to as the "Controller" or "Harvey") presided over an enterprise that systematically stole hundreds of thousands of dollars from automobile insurance companies, including Plaintiffs, through New York State's No-fault system via the submission of fraudulent claims for chiropractic, acupuncture, and physical therapy services submitted by Harvey FCPTA, an entity formed and operated in violation of Article 12 of the New York State Limited Liability Company Law, Articles 136 and 160 of the Education Law, and the implementing regulations promulgated by the DFS concerning the eligibility of health care providers seeking reimbursement under the No-fault law. Compl. ¶ 1.

8

A. **Harvey FCPTA's Fraudulent Organization**

Defendant Harvey is a licensed chiropractor, but is not licensed to practice acupuncture or physical therapy in the State of New York. *Id.* at ¶ 76. Prior to the formation of Harvey FCPTA, Defendant Harvey was a sole proprietor providing chiropractic, acupuncture, and physical therapy services that sought reimbursement for services through, among others, the No-fault system under the assumed name of "Harvey Family Chiropractic," which maintained its offices at 944 North Broadway, Yonkers, New York 10701. Compl. ¶ 92-93. The Complaint alleges that, in or about March 2011, recognizing that as a licensed chiropractor, not licensed or otherwise certified in acupuncture and/or physical therapy, he was ineligible to seek reimbursement for such services, Defendant Harvey recruited a licensed acupuncturist and physical therapist as nominal owners in order to reconstitute Harvey Family Chiropractic as Harvey FCPTA in an effort to circumvent New York licensing laws and maximize profits by billing for services that he was otherwise prohibited by law from providing.[5]   Compl. ¶ 94. In order to feign the appearance that a new business entity was being established, Defendant Harvey moved the location of Harvey FCPTA from 944 North Broadway, Yonkers, NY, to 984 North Broadway, Yonkers, NY. *Id* at ¶ 96.

The Complaint alleges that Defendant Harvey unilaterally established the manner and means through which Harvey FCPTA was set up and operated, as well as provided all start-up and operating costs of Harvey FCPTA, Compl. ¶ 99; exercised complete control over all aspects of Harvey FCPTA, from billing, to hiring all professional and non-professional staff, to collecting on

---

[5]   The Complaint further alleges that in violation of Article 12 of the LLC Law, at the time Harvey FCPTA was organized in the State of New York, its original nominal, paper owner acupuncturist Paul S. Wong ("Wong") and physical therapist Ricardo S. Sanahon, Jr. ("Sanahon"), who are not named as defendants in this action, were divested of any and all attributes as true members of Harvey FCPTA, as well as true ownership, management and control, which were held exclusively by Defendant Harvey. Compl. ¶ 17. When a purported acupuncturist or physical therapist member/owner ceased their employment relationship with Harvey FCPTA, Defendant Harvey replaced them with another acupuncturist and/or physical therapist, who would similarly serve as a member/owner of Harvey FCPTA, in name only and that, irrespective of which licensed acupuncturist and/or physical therapist was listed on the articles of organization, none of them incurred any costs to establish and/or operate Harvey FCPTA, nor did they invest any money in the practice which they purportedly owned.  Compl. ¶¶ 97-98.

9

the medical bills submitted to insurance companies, to making personnel decisions, to retaining attorneys to pursue No-fault collections on behalf of Harvey FCPTA, to retaining other professionals such as accountants, to establishing relationships with the clinics that referred "patients" to Harvey FCPTA, to controlling the bank account(s) of Harvey FCPTA, to determining what disbursements would be made from Harvey FCPTA's accounts, to determining what agreements would be entered into on behalf and/or in the name of Harvey FCPTA, and controlling and managing all other aspects of the finances of Harvey FCPTA. *Id.* at ¶ 79.

The Complaint further alleges that Harvey FCPTA's operating agreement, a copy of which is annexed to the Marvin Decl. as Exh. "B" (hereinafter referred to as the "Operating Agreement"), which purported to organize Harvey FCPTA as a professional limited liability company in which the paper owners were listed as owners/members, together with Defendant Harvey, was nothing more than a device used by Defendant Harvey to fraudulently conceal the actual relationship between the purported member owners of Harvey FCPTA and deceive insurers into believing that Harvey FCPTA was a legitimate professional limited liability company legally organized under the laws of the State of New York. *Id.* at ¶¶ 103, 106. The Operating Agreement purports to allocate 1000 shares in Harvey FCPTA as follows: 970 shares (or 97%) to Defendant Harvey as the PLLC's member chiropractor, 20 shares or (2%) to the PLLC's member physical therapist, and 10 shares or (1%) to the PLLC's member acupuncturist, *see* Operating Agreement at 3, though, in reality, no profits were distributed to the member physical therapist or acupuncturist, Compl. ¶¶ 105, 108, and vested Defendant Harvey with the unilateral right to make any and all decisions on behalf of Harvey FCPTA. *Id.* at ¶ 107. Specifically, the Operating Agreement vested Defendant Harvey with the exclusive right to call member meetings, approve mergers and sales and dispositions of assets, file bankruptcy and reorganization petitions, amend or its terms, remove a member, appoint managers, approve sales of new shares and the sale/transfer of members' shares,

decide when profits are distributed, and dissolve Harvey FCPTA. *Id.*; *see also* Operating Agreement at 3- 5, 8, 10-12. The Complaint further alleges that the Operating Agreement was drafted by an attorney chosen by Defendant Harvey without any input from any of the paper owners. Compl. ¶ 104.

In furtherance of the scheme to defraud, it is alleged that Defendant Harvey solicited and secured Defendants Jin Hwangbo L.Ac. ("Hwangbo") and Bervin Nelson Brual P.T. ("Brual") (collectively referred to as the "Paper Owners" or "Sham Member Providers") to serve as nominal owners of Harvey FCPTA, divesting each of them immediately of any attributes of ownership in Harvey FCPTA. *Id.* at ¶ 88. The Paper Owners did not exercise any control over Harvey FCPTA, nor did they maintain or have access to the books and records, including accounting, financial records, bank statements and reports relating to Harvey FCPTA, all of which were controlled and maintained by Defendant Harvey and/or others acting under his direction and control. *Id.* at ¶ 114. By way of example and not limitation, the Paper Owners did not: (i) control Harvey FCPTA's money or other assets; (ii) contribute any capital to Harvey FCPTA; (iii) negotiate any lease agreements relating to the physical premises and equipment for Harvey FCPTA; (iv) retain the attorney and/or accountant that drafted the incorporation papers and or Operating Agreements for Harvey FCPTA; (v) have access to any corporate books, bank accounts, financial or business ledgers; (vi) receive profits or percentage of profits, revenue or other income from Harvey FCPTA, except for their salary; (vii) receive written daily, weekly, monthly or annual accounting or financial ledger or reports concerning Harvey FCPTA's account receivables or disbursements; (viii) manage the daily operations of Harvey FCPTA's business; (ix) hire any employees, professional or non-professional; (x) retain the accountants that managed Harvey FCPTA's financial affairs; or (xii) purchase, lease, select, order, arrange to maintain, or repair any of the office and/or medical equipment housed at Harvey FCPTA's location. *Id*. at ¶ 115.

11

**B.  Harvey FCPTA's Examination Under Oath and the Civil Court Actions**

The allegations of the Complaint were confirmed in 2014 through the sworn testimony of Defendants Brual and Hwangbo during an Examination Under Oath in *In the Matter of the Claim of Dr. Richard G. Harvey/Harvey Family Chiropractic, Physical Therapy & Acupuncture, PLLC, et al.* For example, Brual acknowledged that despite being listed on the articles of organization as a member/owner of Harvey FCPTA, he: (i) considers himself an "employee" of Harvey FCPTA, *see* Marvin Aff. at Exh. "C" (Brual Testimony Excerpts) at 54:5-9; (ii) earns a salary of $30.00 per hour, an amount which was set by Defendant Harvey, *id.* at 18:15-19:5; (iii) has never received compensation based upon his purported ownership, *id.* at 32:4-7; (iv) does not know if any of the other members, including Harvey, receive a salary, *id.* at 29:9-16; (v) is unaware of any of Harvey FCPTA's employees' salaries, *id.* at 43:15-17; (vi) did not contribute any capital to buy into Harvey FCPTA, *id.* at 31:3-13; (vii) is not aware of Harvey FCPTA's overall revenues or net income, *id.* at 32:10-21; (viii) does not know the amount of Harvey FCPTA's monthly billing to insurance companies for the physical therapy services which Harvey FCPTA, through Brual, purportedly provides, *id.* at 79:7-22; (ix) does not know Harvey FCPTA's revenue for the physical therapy services which Harvey FCPTA, through Brual, provides, *id.*; (x) is not aware of how Harvey FCPTA's lease is paid, *id.* at 32:22-25; (xi) is not a signatory on Harvey FCPTA's bank account, *id.* at 33:2-8; (xii) has never discussed the daily operation of Harvey FCPTA with Defendant Harvey, *id.* at 32:13-16, 43:20-44:10; (xiii) did not interview or hire any of Harvey employees, including but not limited to its Physical Therapy Assistant, who was interviewed and hired solely by Defendant Harvey, *id.* 43:11-14, 36:10-37:17; (xiv) is not aware of Harvey FCPTA's billing procedure, *id.* at 44:15-17; (xv) has never seen any of Harvey FCPTA's tax returns, *id.* at 51:17-19; (xvi) does not know the attorneys that Harvey FCPTA uses, *id.* at 52:11-14; and (xvii) does not know who is responsible for Harvey FCPTA's payroll. *Id.* at 52:21-23.

Further proof that Harvey FCPTA is secretly owned solely by Defendant Harvey is demonstrated through the testimony of Defendant Hwangbo in the same matter (*see* Marvin Decl. at Exh. "D") (Hwangbo Testimony Excerpts), who acknowledged that despite being listed on the articles of organization as a member/owner of Harvey FCPTA, he: (i) is paid a salary, by Defendant Harvey, of $35.00 per hour, Exh. "D" at 31:16-21; (ii) is not a signatory on Harvey FCPTA's bank account, *id.* at 40:20-25; (iii) has never participated in a meeting of the members of Harvey FCPTA, *id.* at 44:13-25; (iv) is unaware of any rights he has under the Operating Agreement which bears his signature, *id.* at 41:23-4, 42:4; 45:14-21; (v) does not possess a key to gain entry to the facility, *id.* at 48:18-19; (vi) does not have any knowledge concerning Harvey FCPTA's revenue, *id.* at 55:2-4; (vii) has never received any dividends from Harvey FCPTA, *id.* at 38:18-40:12, 55:8-18; (viii) is not aware of the amount of Harvey FCPTA's payroll or how it is handled, *id.* at 56:15-19, 73:17-18; (ix) is not aware of how much revenue Harvey FCPTA generates from acupuncture services he purportedly provides, *id.* at 71:24-72:12; (x) does not know who the accountant is that prepares Harvey FCPTA's tax returns, *id.* at 72:13-16; (xi) does not review Harvey FCPTA's tax returns before, or even know if, they are filed, *id.* at 72:25-73:5; (xii) is unaware of any of the finances of Harvey FCPTA, *id.* at 82:17-83:13; and (xiii) is not aware of Harvey FCPTA's weekly and/or monthly income. *Id.* at 83:4-6.

Subsequent to the admissions of Brual and Hwangbo, Harvey FCPTA began filing hundreds of New York City Civil Court and Nassau County District Court actions seeking reimbursement of No-fault benefits to which it is not entitled. Indeed, so far in 2015, Harvey FCPTA has filed at least 200 such actions; overall there are over 280 Harvey FCPTA actions scheduled for court appearances within the next 12 months, with over 80 scheduled for appearances within the next nineteen days (between the date of this filing and January 4, 2016). Moreover, within recent weeks, Harvey FCPTA has bombarded Plaintiffs with new matters,

discovery demands and other litigation documents, exponentially accelerating the pace of the litigations. All the while, Harvey FCPTA continues to fraudulently operate as a facility which is secretly owned solely by Defendant Harvey.

**ARGUMENT**

**I.    A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE GRANTED**

**A.    The Court Has Authority to Enjoin the Underlying Actions Injunction**

As a threshold matter, with respect to that portion of the Motion seeking an order enjoining the Underlying Actions, the Anti-Injunction Act (the "AIA"), 22 U.S.C. § 2283  does not prohibit this Court from issuing such an order. While the AIA generally prevents a court of the United States from granting an injunction which would stay proceedings in a state court, the AIA makes an exception when injunctions of state court actions have been "expressly authorized by an Act of Congress." *Id.*[6] Such is the case here, where the Complaint is premised on substantive violations of 18 U.S.C. 1961, *et seq*. (the "RICO Act").

In particular, Section 1964(a), of the RICO Act expressly provides that "district courts of the United States shall have jurisdiction to prevent and restrain violations of…[the RICO Act] …by issuing appropriate orders, including, but not limited to…imposing reasonable restrictions on the future activities...of any person…" *See* 18 U.S.C. 1961(a) (emphasis added). At bar, an order staying the Underlying Actions would directly serve and promote Section 1964(a)'s goal of restraining violations of the RICO Act, as each of the Underlying Actions seeks reimbursement for No-fault claims which are part of a pattern of racketeering activity in violation of the RICO Act. Indeed, the ultimate goal of the RICO enterprise alleged in the Complaint is to collect reimbursement on those fraudulent No-fault claims. Consequently, the Underlying Actions are a

---

[6] The AIA provides three exceptions allowing a court of the United States to grant an injunction to stay proceedings in a state court" when except as expressly authorized by Act of Congress where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.  28 U.S.C. § 2283.

vital and essential means through which the Defendants are seeking to realize the fruits of their RICO enterprise. Here, the injunctive relief requested is aligned with the statutory mandate under Section 18 U.S.C. 1964(a) to "prevent and restrain" RICO violations, and therefore, preventing Defendants from using state courts to further the affairs of the Harvey FCTPA enterprise does not run afoul of the AIA. *See* 22 USC 2283.

Moreover, even if the RICO Act did not expressly grant this Court the authority to issue the requested TRO and Preliminary Injunction (which it does), the issuance thereof would still not run afoul of the AIA because he test of whether an injunction is authorized by the AIA is not whether the statute at issue explicitly mentions injunction powers, but "[t]he test, rather, is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." *Mitchum v. Foster*, 407 U.S. 225, 238 (1972). The provisions of the RICO Act could not be afforded their intended scope if courts were deprived the right to issue injunctions restraining violations thereof. Judge Kaplan of the Southern District reached a similar conclusion in *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 569 (S.D.N.Y. 2014) wherein he found (in the context of final equitable relief) that allowing Courts to issue injunctions pursuant to the RICO ACT is consistent with Congress's intent "not merely to compensate victims but to turn them into prosecutors, private attorneys general, dedicated to eliminating racketeering activity, and further found that "the Supreme Court repeatedly has rejected efforts to curtail the scope of civil RICO actions where courts ignore Congress's insistence that the statute be liberally construed to effectuate its remedial purposes. Although Judge Kaplan did not address the specific issue of injunctions barring state court matters from proceeding, his ultimate conclusion that "[i]t would be extraordinary indeed if Congress, in enacting a statute that Congress expressly specified was to be liberally construed to effectuate its remedial purposes, intended, without expressly so stating, to deprive the district courts of utilizing

15

this classic remedial power [of injunctions] in private civil actions brought under the act," *Id.* at 570 (citations omitted), is no less applicable to such injunctions. Accordingly, given the curtailing effect that the AIA would have on the RICO Act give the liberal interpretation to which Congress intended that it be afforded, and since the RICO Act could not be given its intended scope of preventing and restraining RICO violations unless injunctions such as the one requested herein were permitted, the requested relief would not run afoul of the AIA.

### B.      Standard of Review

A movant is entitled to a temporary restraining order or preliminary injunction upon the showing of: (1) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them fair ground for litigation, with a balancing of the hardships tipping decidedly toward the applicant; and (2) irreparable harm. *See Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992). Despite its expedited nature, the standard for granting a temporary restraining order is the same as that for a preliminary injunction. *See Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997) (citing *Local 1814, Int'l Longshoreman's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). A temporary restraining order will only be granted if the applicant demonstrates that the irreparable harm is immediate and will result before the adverse party can be heard in opposition.*See* Fed. R. Civ. P. 65(b). As set forth below, Plaintiffs have established all of the aforementioned requirements.

### C.      Plaintiffs Will Suffer Immediate Irreparable Harm in the Absence of a TRO And Preliminary Injunction

To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm, which cannot be adequately redressed by final relief on the merits and for which monetary damages cannot provide adequate compensation. *Kamerling v. Massanari*, 295 F3d 206, 214 (2d Cir. 2002) (citations omitted). In addition, irreparable harm must be shown

16

to be actual and imminent, and not remote or speculative. *Id.* Here, there is no doubt that Plaintiffs will suffer irreparable harm in the absence of the requested preliminary injunction and accompanying stay. Plaintiffs are seeking, among other things, a final declaratory judgment that they are not required to pay any No-fault claims from Harvey FCPTA that seek reimbursement for any medical services, due to the Harvey FCPTA 's fraudulent organization. That relief, by its very nature, is equitable and could therefore not be redressed by monetary damages. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Doe*, 868 F. Supp. 532, 535 (S.D.N.Y. 1994). Indeed, if the requested injunction is not granted and the Underlying Actions were allowed to proceed, it would severely threaten any judgment of this Court if such actions result in inconsistent rulings with regard to Harvey FCPTA's eligibility for reimbursement of No-fault insurance payment. *See Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 220 (E.D.N.Y. 2013)) (grating a stay of pending No-fault actions because allowing them to proceed "would severely threaten any judgment of [the] Court to have pending arbitrations or future arbitrations result in inconsistent rulings with regard to [defendant medical providers'] eligibility for reimbursement of No-Fault insurance payments…"). That threat, which could ultimately strip Plaintiffs' of their right to seek and be awarded a declaratory judgment by this Court, clearly meets the threshold for irreparable harm.

Moreover, the threat is immediate. As noted, there are hundreds of pending Underlying Actions, with at least 80 scheduled for court appearances within the next few weeks. If a TRO (and ultimately a stay) is not granted, Plaintiffs will be required to litigate these related actions while the instant declaratory judgment is pending. Moreover, if Plaintiffs are not granted a TRO and ultimately a preliminary injunction, Defendants will undoubtedly continue to flood Plaintiffs and the Civil Courts with underlying litigations in an effort to subvert the authority of this Court and force Plaintiffs to expend resources in litigating matters relating to insurance proceeds that Defendants are not entitled to in the first place. Putting aside that it is impractical for a New York

17

City Civil Court Judge to adequately consider the substantive Federal questions raised in the Complaint, any such litigations will likely be presented to dozens of different judges, and will undoubtedly result in a gallimaufry of independent and potentially contradictory conclusions. If this Court were to ultimately grant declaratory judgment in Plaintiffs' favor and find that Harvey FCPTA is not properly licensed and therefore ineligible for reimbursement, to the extent court decisions resulted in contrary conclusions, they would likely be unenforceable. Accordingly, if Plaintiffs were made to make repetitious arguments in many arbitrations and/or litigations which could ultimately result in unenforceable and likely inconsistent decisions, it would result in harm to Plaintiffs from which Plaintiffs could not recover.

*Allstate Insurance Co. v. Tvildiani*, a matter which was before this Court earlier this year, bears substantial similarities to the case at bar. In *Tvildiani*, the plaintiffs sought monetary relief and a final declaratory judgment for alleged RICO and related state law violations relating to the alleged fraudulent incorporation of professional service corporations that submitted claims for payment to No-fault insurance carriers, including plaintiffs. Plaintiffs alleged, as they do here, that they paid the defendants' No-fault claims in reliance on representations and information mailed to plaintiffs contending that defendants were, among other things, in compliance with the No-fault Law and 11 N.Y.C.R.R. 65 *et seq. See Tvildiani*, 14-CV-07328 (SJ) (RLM) (E.D.N.Y. March 5, 2015), Doc. No. 12-3 (Memorandum in Support of Amended Motion for Temporary Restraining Order) at 5-6).  In *Tvildiani*, as here, the professional service corporation defendants ("Defendant PCs") initiated actions against the plaintiffs in the Civil Courts (and also before the AAA) challenging the plaintiffs' denials of their claims for payment and seeking reimbursement of the same. *Id.* at 5.  The plaintiffs moved for an order preliminarily enjoining the Defendant PCs from filing and proceeding with any No-fault collection actions. *See generally id.* This Court granted the plaintiffs' motion, finding that the "[p]laintiffs demonstrated that they face[d] irreparable harm

18

absent the award of a preliminary injunction," there were "sufficiently serious questions going to the merits to make them a fair ground for litigation, and "[t]he balance of hardships tip[ped] in favor of staying arbitration." *Tvildiani*, 14-CV-07328 (E.D.N.Y. April 14, 2015).

It is for that same reason that the Court in *Elzanaty*, 929 F Supp. 2d 199 (relied upon by this Court in *Tvildiani*) granted a similar motion to the one at bar ,[7] finding:

> [i]f this Court were to grant a declaratory judgment finding [defendant medical professional corporations] ineligible for reimbursement, it may be that an award won by the Defendants in arbitration would conflict with this Court's ruling and may not be enforceable. With this in mind, it cannot be said that the only injuries at stake here are "money, time and energy necessarily expended in the absence of a stay", which are not considered "irreparable." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir.1995).... [T]here is a concern here with wasting time and resources in an arbitration with awards that might eventually be, at best, inconsistent with this Court's ruling, and at worst, essentially ineffective. The Court need not address now the precise effect of an inconsistent declaratory judgment from this Court on certain arbitration awards. It is sufficient to recognize the large realm of potential problems this may cause on the validity of those awards, especially in light of their multitude and internal inconsistency with each other.

*Elzanaty*, 929 F. Supp. 2d at 221-222. Accordingly, the court found that "allowing a large number of proceedings to be heard by a mix of arbitrators, each of whom will likely come to their own independent and potentially contradictory conclusions, will result in harm to Allstate from which it cannot recover." *Id* at 222.  The reasoning used in *Elzanaty* and *Tvildiani* is applicable here, where a stay would be the most economic result and guide the outcome of pending and future litigations. Indeed, if this Court finds Harvey FCPTA to be ineligible for reimbursement due to its

---

[7] The *Elzanaty* Court also addressed its authority to issue the requested stay pursuant to the All Writs Act, 28 U.S. Code § 1651, which allows federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law" and noted that the Second Circuit's decision in *In re American Express* expressly allows the possibility that, in certain circumstances, the All Writs Act could permit a court to enjoin arbitration. *Elzanaty*, 929 F. Supp at 219-220. *Elzanaty* further found that in the case before the Court, which is identical to the matter at bar, "it would severely threaten any judgment of [the] Court to have pending arbitrations or future arbitrations result in inconsistent rulings with regard to [defendant medical providers'] eligibility for reimbursement of No-fault insurance payments..." If "he providers "rights are delayed, rather than effectively terminated, the Court believes that a stay is the most appropriate solution here in order to avoid the large volume of arbitrations and inconsistent judgments that are gradually culminating in a procedural and substantive train wreck..." "In the Court's view, this situation presents precisely the kind of circumstance envisioned by the Second Circuit when it left the express exception it did in *In re American Express. Elzanaty*, 929 F. Supp. 2d at 220.

illegal corporate structure, then all pending and future matters become moot. If however, this Court finds that the Harvey FCPTA is not structured illegally, then any defense on that ground in the related litigations similarly become moot. Accordingly, the Court's decision in this matter will likely dispose of main controversies in the related litigations.

Judge Spratt's decision in *Elzanaty* and this Court's decision in *Tvildiani* are not aberrations, but are in accord with a long line of federal and state court cases which have stayed both state court proceedings and arbitrations pending the determination of a related No-fault declaratory judgment action. For example, in *Government Employees Insurance Co. v. Damien, et al.*, a matter which also involved an alleged scheme by defendants to fraudulently obtain No-fault payments from plaintiff-insurers through medical professional corporations, Judge Townes granted plaintiff-insurers' request and ordered that defendant medical professional corporations be "...enjoined from commencing *and/or* prosecuting, or causing to be commenced or prosecuted, any future collection proceeding against [plaintiffs] seeking payment for No-fault benefits…either through state court proceedings or arbitration, except as counterclaims to this action", and "…from prosecuting any collection proceedings currently pending in arbitration before the American Arbitration Association between [plaintiffs] and [medical professional corporations], or any of them, and all such arbitrations are hereby stayed pending resolution of this action." 10-CV-5409 (SLT)(JMA) (E.D.N.Y Jan. 4, 2011). A copy of Judge Townes's Order is annexed to the Marvin Decl. as Exh. "E." Similarly, in *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, Judge Weinstein also stayed pending No-fault arbitrations, finding that "[p]ermitting these individual claims to proceed to arbitration while [a related] claim for a declaratory judgment remains pending in this court puts the plaintiffs at significant risk of multiple judgments that may be inconsistent with the ultimate decision in this case." 879 F Supp. 2d 243, 264 (E.D.N.Y. 2012) *accord Michael Miller Fabrics, LLC v. Studio Imports Ltd., Inc.*, 12 CV 3858 KMW JLC, 2012 WL 2065294 (S.D.N.Y. June 7,

2012) (staying a parallel court action filed by defendant because allowing it to go forward would cause immediate damage to plaintiff and would create the risk of irreparable harm in the event of the issuance of inconsistent decisions).

New York State Courts are also in agreement. *See, e.g.*, *Allstate Ins. Co. v. P.R. Medical, P.C.*, 01949-CV-2010 (Nassau Sup. Ct. Mar. 4 2015); (in an action seeking a declaration that defendants were not entitled to recover No-fault benefits, the Court stayed all pending No-fault arbitrations and lawsuits pending the outcome of the declaratory judgment to avoid repetitive litigation of the same issues); *Allstate Ins. Co. v. Bay Needle Care Acupuncture, P.C.*, 150613-CV-2013 (N.Y. Sup. Ct. March 3, 2015) (in an action seeking a judicial determination that plaintiff was not obligated to pay No-Fault benefits, the court stayed all pending No-Fault proceedings commenced by defendants pending the outcome declaratory judgment to avoid risking "inconsistent decisions in a multiplicity of suits and arbitration proceedings"); *GEICO Ins. Co. v. Williams*, 2011 NY Slip Op 30326U at * 10 - * 11 (Nassau Sup. Ct. 2011) (in an action seeking a declaration that defendants were not entitled to recover No-Fault benefits, the Court stayed all pending No-fault arbitrations pending the outcome of the declaratory judgment due to the possibility of 19 significantly varying outcomes if the plaintiff-insurer was required to litigate each allegedly fraudulent claim separately); *AIU Ins. Co. v. Deajess Med. Imaging, P.C.*, 24 Misc. 3d 161, 165 (Nassau Sup. Ct. 2009) (in an action seeking a declaration that defendants were ineligible to receive No-fault reimbursement, the Court agreed to stay state court actions and arbitrations, and to consolidate them with the declaratory judgment action, noting the large number of actions and arbitrations involving the common question of the defendants' eligibility for No-fault reimbursement.); *Safeco Ins. Co. of Ind. v. Morel*, 2009 NY Slip Op 32187U at *3- *4 (Nassau Sup. Ct. 2009) (in action seeking declaration that defendants were not entitled to recover No-Fault reimbursement, the Court stayed the defendants' pending arbitrations noting that a single,

21

declaratory judgment action was the most efficient means to resolve the dispute amongst the parties); *AutoOne Ins. Co. v. Manhattan Heights Med.*, P.C., 2009 NY Slip Op 51663U at \*3-\*4 (Nassau Sup. Ct. 2009) (staying No-Fault collection matters to prevent repetitive litigation and arbitration where the Supreme Court declaratory judgment action would universally determine whether the professional corporations were fraudulently incorporated.).

As these Federal and State Court cases demonstrate, the potential harm to Allstate from hundreds of related litigations is actual, imminent and real, and the requested temporary restraining order and stay will have the dual effect of protecting Allstate from that harm, as well as protecting the issues in dispute before this Court from dozens of potentially contradictory conclusions which would only serve to confuse those issues (*see* Argument I B, *supra*).

### D.      There Are Sufficiently Serious Questions Going to the Merits of this Matter to Make Them a Fair Ground For Litigation

In addition to a showing of irreparable harm, a party seeking a preliminary injunction must demonstrate either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor. In that regard, in a matter such as this, where the Complaint outlines, in great detail, complex schemes to defraud which require extensive discovery and further investigation of matters within the peculiar knowledge of the Defendants, it would be premature for the Court to determine the likelihood of Plaintiffs' success on the merits. *See e.g.*, *Bruce v. Martin*, 680 F. Supp. 616, 622 (S.D.N.Y. 1988) ("[I]t would be premature at this stage of the proceedings to offer any opinion on whether the plaintiffs have shown a likelihood of success on the merits. It suffices to say that the pleadings of the plaintiffs have shown sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in their favor").; *see also Hamilton Watch Co. v. Benrus Watch Co.*, 206 F2d.

22

738, 740 (2d Cir. 1953) (finding that "[t]o justify a temporary injunction, it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly toward plaintiff), and it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation"). Thus, the relief requested herein should be granted, as Plaintiffs can easily demonstrate sufficiently serious questions going to the merits, as well as a balance of hardships tipping in Plaintiffs' favor.[8]

As in *Tvildiani*, the Complaint in this action clearly sets forth sufficiently serious questions going to the merits to make them fair grounds for litigation. As noted above, the Complaint raises serious questions regarding the ownership of Harvey FCPTA, which operated a well-organized illegal enterprise that engaged in systematic and fraudulent practices, and schemed to defraud, and did defraud, Allstate of hundreds of thousands of dollars. Indeed, the Complaint details how the nominal paper owners of Harvey FCPTA were divested of any and all attributes of ownership and control, which was diverted to Defendant Harvey. Plaintiffs have particularized the fraudulent statements made by Defendants within the body of the Complaint, as well as in numerous Exhibits and Predicate Act tables, which are annexed thereto and identify, among other things, representative fraudulent mailings to each of the Plaintiffs by or on behalf of Harvey FCPTA, including claim numbers, claimant initials and dates of service. Moreover, the transcripts of the EUOs of Defendants Hwangbo and Brual, and the Operating Agreement, support Plaintiffs' claims that Defendant Harvey exclusively owned, operated, controlled and managed Harvey FCPTA. *See supra* at pp. 9-13. To the extent that Harvey FCPTA represented to Plaintiffs, though the

---

[8] It is noted, that while the threshold showing of sufficiently serious questions going to the merits is easily made out here, Plaintiffs' can also easily show a likelihood of success on the merits based upon the sworn testimony of Defendants Hwangbo and Brual in which they acknowledged that they were not owners of Harvey FCPTA.

submission of claims, that it is properly licensed, and to the extent Harvey FCPTA disputes the well-pled allegations of the Complaint, there is no doubt that Plaintiffs have raised serious questions to make them fair grounds for litigation. *See e.g.*, *Dandong v. Pinnacle Performance Ltd.*, 2011 WL 6156743 (S.D.N.Y. Dec. 12. 2011) (noting that "[t]he Second Circuit has held that 'conflicting stories between parties can establish a sufficiently serious question going to the merits for the purposes of justifying a preliminary injunction.'" (citations omitted)).

     E.    **The Balance of Hardships Tips Decidedly in Allstate's Favor.**

As noted in Section I A, *supra*, if the requested relief is not granted, Plaintiffs will be required, in the context of civil court litigations, to undertake significant time and expense to litigate hundreds of related matters while the instant declaratory judgment is pending. Allstate will be made to make repetitious arguments in these matters, which could ultimately result in unenforceable and likely inconsistent decisions. In addition, the results of these proceedings, which will be occurring on an ongoing basis throughout the pendency of this action, will undoubtedly be brought before the Court by the prevailing parties in those matters, which will do little more than dilute the issues before the Court regarding the complex allegations in the Complaint, rather than sharpen them. It is respectfully submitted that the requested TRO and stay is the only way to avoid the large volume of litigations and inconsistent judgments that could culminate "in a procedural and substantive train wreck." *See Elzanaty*, 929 F. Supp. 2d at 220; *Tvildiani*, 14-CV-7328 (April 14, 2015) ("Justice would be better administered with the fewest number of fora hearing the issues….").

In addition, it would be fundamentally unfair to Plaintiffs to allow Harvey FCPTA to seek No-fault payments from Plaintiffs in other proceedings, when the fundamental issue concerning their eligibility to be paid in the first place is at issue in this matter.  This is especially true in light of Harvey FCPTA's unwavering effort to file and litigate as many matters as possible as soon as

24

possible. This unfairness can be easily avoided by staying the current matters and any future matters. If Plaintiffs prevail in this case, all of the related matters will become moot, whereas if the Defendants prevail, and ultimately prevail on the related matters, they will benefit from the language of 11 N.Y.C.R.R. 65 3.9(a), which mandates the award of interest of two percent (2%) *every month* No-fault payments are overdue. Accordingly, in the very unlikely event that the Defendants prevail in this matter (and subsequently in the related litigations), they will be well compensated for the delay with a *twenty-four percent* (24%) yearly return on the outstanding principle of their successful claims. When weighed against the time and expense which Plaintiffs would need to expend in litigating each of the individual claims, the balance of equities tips decidedly and overwhelmingly in favor of Plaintiffs.

## <u>CONCLUSION</u>

For the reasons set forth herein, it is respectfully submitted that Plaintiffs' Motion pursuant to Rule 65 of the Federal Rules of Civil Procedure seeking a Temporary Restraining Order and Order temporarily staying all No-fault collection proceedings currently pending between Plaintiffs and Harvey FCPTA be granted.

Dated: New York, New York
          January 4, 2016

                    STERN & MONTANA, LLP

                    By: ___/s/ Daniel S. Marvin_____
                         Robert A. Stern, Esq. (RAS-1282)
                         Sandra P. Burgos, Esq. (SB- 6856)
                         Daniel S. Marvin, Esq. (DM-7106)
                         Attorneys for Plaintiffs
                         One World Financial Center
                         30th Floor
                         New York, New York 10281
                         212-532-8100