

EXAMINATION UNDER OATH
----------------------------------------X
IN THE MATTER OF THE CLAIM OF

DR. RICHARD G. HARVEY/ HARVEY FAMILY CHIROPRACTIC,
PHYSICAL THERAPY & ACUPUNCTURE, PLLC

                        -and-

ALLSTATE INSURANCE COMPANY
CLAIMANT                           CLAIM #

Hazel Warsop                       0252198022
Maximiliano Navas                  0245368345
Antonia Colorado                   0250922911
Jennifer Martin                    0255291577
Donte Sanchez                      0245791082
Lindsay G. Campbell                0251515986
Lacoya D. Jones                    0246851430
Marilyn Navas                      0245368345
Quentin Brown                      0250634607
Mark Roberts                       0244951786
Lauren Harrison                    0243105186
Derrick Norman                     0245313549
Franklin Sanchez                   0245313549
Sandra Michaels                    0245313549
Octavia Michaels                   0245313549
Kathleen Franklin                  0254090780
Julia Winters                      0231667031
Emilia Ortiz                       0240086579
Jack Dickerson Jr.                 0256763293
Richard Fincher Jr.                0257964742
Aneika Roache                      0259034189
Nicole R. Ueberall                 0258394963
Prince Thompson                    0256763293
Veronica M. Thompson               0256763293
James Kelly                        0250922911
Melvin A. Dias                     0220567150
----------------------------------------X

                        Stern & Montana, LLP
                        115 Broadway
                        New York, New York 10006
                        DATE: January 31, 2013
                        TIME: 12:22 a.m.


             EXAMINATION UNDER OATH of DR. RICHARD G.

HARVEY, taken by ALLSTATE INSURANCE COMPANY, pursuant
to Notice and Policy Provisions, held at 115 Broadway,
New York, New York before Rebecca Lalla, a Notary
Public for and within the State of New York.

<div align="center">

LH REPORTING SERVICES, INC.

Computer-Aided Transcription

(516) 484-2325

</div>

(1)

(2)

(3)                    A P P E A R A N C E S:

(4)

(5)    MARCOTE & ASSOCIATES, P.C.
            Attorneys for Dr. Richard G. Harvey/Harvey
(6)         Family Chiropractic, Physical Therapy &
            Acupuncture, PLLC
(7)         403 Merrick Avenue, 2nd Floor
            East Meadow, New York 11554
(8)    BY:  LOUIS F. CHISARI, ESQ.

(9)

(10)   STERN & MONTANA, LLP
            Attorneys for Allstate Insurance Company
(11)        115 Broadway, 20th Floor
            New York    , New York 10006
(12)   BY:  DANIEL MARVIN, ESQ.
            File No.: 1280.266
(13)

(14)         *           *           *           *           *

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)     D R.  R I C H A R D  G.  H A R V E Y, after having

(3)     first been duly sworn by a Notary Public of the State

(4)     of New York, was examined and testified as follows:

(5)     EXAMINATION BY

(6)     MR. MARVIN:

(7)          Q    Good afternoon, Dr. Harvey.  My name is

(8)     Daniel Marvin.  I am an attorney here with the law

(9)     firm of Stern & Montana.  We represent Allstate in

(10)    connection with this request for additional

(11)    verification in the form of an Examination Under

(12)    Oath, or EUO, with respect to the claims that were

(13)    identified in the Notices of Examination Under Oath

(14)    that were sent to Harvey Family Chiropractic,

(15)    Physical Therapy & Acupuncture, PLLC.

(16)          For the purposes of the EUO, I will refer

(17)    to that corporation as either Harvey Family or just

(18)    Harvey.

(19)          Do you understand?

(20)          A    Yes.

(21)          Q    In addition, the EUO will verify all other

(22)    aspects and elements related to the claimants that

(23)    are the subject of this EUO.

(24)          We are here today in connection with the

(25)    verification of certain treatments and/or testing

(1)                    DR. RICHARD G. HARVEY

(2)     that was rendered by or through Harvey Family

(3)     relating to the claims, which will be read into the

(4)     record and which are identified in the Notice of the

(5)     Examination Under Oath, which was sent to you.

(6)              We are here to verify certain other

(7)     aspects of Harvey Family's practice necessary to

(8)     verify the claims as well as Harvey Family's

(9)     entitlement of reimbursement of no-fault benefits,

(10)    including verification that Harvey Family is

(11)    operating in accordance with applicable New York

(12)    State Law.

(13)             Dr. Harvey, did you do anything to prepare

(14)    for today's EUO?

(15)        A    Nothing specific.

(16)        Q    Did you meet with anyone other than your

(17)    attorney in preparation for your EUO?

(18)        A    No.

(19)        Q    Did you discuss the nature of your

(20)    anticipated testimony with anyone other than your

(21)    attorney?

(22)        A    No.

(23)        Q    Did you review any documents prior to the

(24)    EUO in connection with your testimony here today?

(25)             MR. CHISARI:  Did you look at the patient

DR. RICHARD G. HARVEY

(1)

(2)     files?

(3)         A     I've seen the patient files, yes.

(4)         Q     Did you review them specifically for the

(5)     EUO or are you just familiar with them generally?

(6)         A     Familiar with them generally.

(7)         Q     Have you ever given an EUO before?

(8)         A     Yes.

(9)         Q     How many times?

(10)        A     Twice, I think.

(11)        Q     When were those?

(12)        A     Probably eight years ago.

(13)        Q     Do you remember the circumstances

(14)    surrounding those EUOs?

(15)        A     Yes.  It was with State Farm.  It was just

(16)    to see the structure of my business at the time.

(17)        Q     That was in relation to a different

(18)    business other than Harvey Family?

(19)        A     No.  It was the same business.

(20)        Q     Was the other EUO also with an insurance

(21)    company?

(22)        A     Both were with State Farm.

(23)        Q     That was also in connection with verifying

(24)    the claims for reimbursement you have submitted?

(25)        A     Correct.

(1)                    DR. RICHARD G. HARVEY

(2)        Q    Have you ever been deposed before or given

(3)   any other type of sworn statements?

(4)        A    I've testified on behalf of patients

(5)   before.

(6)        Q    Why?

(7)        A    To settle lawsuits for them.

(8)        Q    In depositions?

(9)        A    Yes.

(10)       Q    How many times have you done that?

(11)       A    Probably a dozen times.

(12)       Q    Recently?

(13)       A    No.  It was not recently.  The last time

(14)  was probably two years ago.

(15)       Q    Have you ever testified in court?

(16)       A    Yes.

(17)       Q    How many times?

(18)            MR. CHISARI:  If you know.

(19)       A    A dozen times, approximately.

(20)       Q    When was the last time?

(21)       A    A couple of years ago.

(22)       Q    What were the circumstances surrounding

(23)  the last time that you testified in court?

(24)       A    There was a patient I had been seeing who

(25)  was suing somebody, and the attorney asked me to

DR. RICHARD G. HARVEY

(1)

(2)    come in and testify on behalf of my patient what his

(3)    injuries were.

(4)        Q    The previous times you testified in court,

(5)    were they also under similar circumstances?

(6)        A    Yes.

(7)        Q    Each and every time?

(8)        A    Yes.

(9)        Q    Before we go any further, I am going to

(10)   review some ground rules with you surrounding your

(11)   testimony here today.

(12)            First, I am going to be asking you some

(13)   questions.  When you answer, I am going to assume

(14)   you understood my question.  If at any time you do

(15)   not understand my question, please ask me to repeat

(16)   or rephrase and I will to the extent that I can.

(17)   The reason I tell you this is because I am going to

(18)   rely on what you tell me to verify the various

(19)   no-fault claims that we will be discussing today.

(20)            Do you understand?

(21)       A    Yes.

(22)       Q    Second, there is court reporter seated

(23)   here to your right that is going to be taking down

(24)   everything we say.  In order to allow her to take

(25)   down an accurate record, I will ask that you provide

(1)                     DR. RICHARD G. HARVEY

(2)     audible responses out loud; do not shake your head,

(3)     and do not provide any other gestures.

(4)              Also, because the court reporter cannot

(5)     take down two or more people speaking at once, I am

(6)     going to ask that you allow me to finish the

(7)     questions before you answer, even if you anticipate

(8)     what I am going to say, and I will provide you with

(9)     the same courtesy.

(10)             Do you understand?

(11)        A    Yes.

(12)        Q    Third, if at any time you need a break,

(13)    you can have a break, except if there is a question

(14)    pending.  If there is a question pending, I will ask

(15)    you to finish your answer, and then you will be able

(16)    to take a break.

(17)             Similarly, if you need to speak with your

(18)    attorney, you may do so at any time, except if there

(19)    is a question pending.

(20)             MR. CHISARI:  Counsel, I am going to

(21)         object to that.  He is allowed to do whatever

(22)         he wants.  You cannot tell him how to answer a

(23)         question.  He can talk to me whenever he wants.

(24)        Q    Lastly, you have been given an oath today

(25)    to tell the truth, the whole truth, and nothing but

(1)                    DR. RICHARD G. HARVEY

(2)    the truth.

(3)                Do you understand that oath?

(4)        A    Yes.

(5)        Q    Do you understand that although we are

(6)    taking your EUO in a law office, the same rules

(7)    apply to this oath as though you were in a court of

(8)    law?

(9)        A    Yes.

(10)       Q    Are you having any physical problems or

(11)   are you currently under the influence of any drugs,

(12)   medication, or alcohol that would impair your

(13)   ability to testify truthfully and accurately?

(14)       A    No.

(15)       Q    Finally, I just want to remind you that

(16)   this is not an evidentiary or judicial proceeding.

(17)   It is not guided by the rules of civil procedure or

(18)   other rules of evidence.  Any objections made by

(19)   your lawyer have no bearing on this proceeding.  In

(20)   the event that your lawyer does object, his

(21)   objection will be noted for the record, and you

(22)   should answer the question.

(23)                In addition, if your lawyer instructs you

(24)   not to answer certain questions and you choose not

(25)   to answer based on the advice of your lawyer, please

(1)                      DR. RICHARD G. HARVEY

(2)    be advised that failure to answer the questions

(3)    asked during your Examination Under Oath could be

(4)    construed as a failure to cooperate and result in

(5)    the denial of the claims.

(6)              Do you understand all of the instructions

(7)    I just reviewed with you?

(8)         A    Yes.

(9)         Q    I am just going to ask you some brief

(10)   preliminary background questions.

(11)        A    Okay.

(12)        Q    Please state and spell your full name for

(13)   the record.

(14)        A    Richard G. Harvey, DC.  R-I-C-H-A-R-D,

(15)   H-A-R-V-E-Y.

(16)        Q    Have you ever been known by any other

(17)   name?

(18)        A    No.

(19)        Q    Do you have any sort of photo ID or

(20)   license that you can produce?  I will make a

(21)   photocopy, and that will become a part of the

(22)   record.

(23)        A    Yes.

(24)             MR. MARVIN:  For the record, Dr. Harvey

(25)        has produced a New York state driver's license.

LH REPORTING SERVICES, INC.       (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)          We will make a photocopy of this identification

(3)          and mark the copy as Exhibit A.

(4)                              (Whereupon, Exhibit A, New York

(5)                               State driver's license, was

(6)                               marked for Identification.)

(7)     BY MR. MARVIN:

(8)          Q    What is your date of birth?

(9)          A    3/29/60.

(10)         Q    And your place of birth?

(11)         A    New York City.

(12)         Q    Are you a U.S. citizen?

(13)         A    Yes.

(14)         Q    Where do you currently live?

(15)              MR. CHISARI:  I am going to object.  He

(16)         can go through his business address.  This all

(17)         relates to Harvey Family Chiropractic.  You do

(18)         not need his home address.

(19)         Q    What is your business address?

(20)         A    984 North Broadway, Yonkers, New York

(21)    10701.

(22)         Q    Can you briefly describe your educational

(23)    background?

(24)         A    I went to Hamilton College from 1978 to

(25)    1982.  From 1982 to 1985, I went to New York

(1)                    DR. RICHARD G. HARVEY

(2)   Chiropractic College.

(3)        Q    Where is New York Chiropractic College?

(4)        A    At the time I went to it, it was on Long

(5)   Island.

(6)        Q    You graduated in 1985?

(7)        A    December of 1985.

(8)        Q    When did you receive your license to

(9)   practice chiropractics?

(10)       A    In January of 1986.

(11)       Q    Are you licensed or certified to practice

(12)  in any other healthcare profession?

(13)       A    No.

(14)       Q    Do you have a license to provide

(15)  acupuncture services?

(16)       A    No.

(17)       Q    Do you have a license to provide physical

(18)  therapy services?

(19)       A    No.

(20)       Q    Have you ever taken any training classes

(21)  or seminars related to providing physical therapy

(22)  services or acupuncture services?

(23)       A    I've never taken a training class for

(24)  acupuncture.  In chiropractic school, we had

(25)  physical therapy classes.

(1)                     DR. RICHARD G. HARVEY

(2)          Q    Other than those classes in school, have

(3)     you taken any classes in physical therapy or

(4)     attended any seminars?

(5)          A    No.

(6)          Q    Have you ever taken any training classes

(7)     or seminars relating to providing electrodiagnostic

(8)     testing?

(9)          A    No.

(10)         Q    Has your license to practice chiropractics

(11)    ever been suspended or revoked?

(12)         A    No.

(13)         Q    Have you ever been disciplined relating to

(14)    your practice of chiropractics?

(15)         A    No.

(16)         Q    Have you ever had a lawsuit filed against

(17)    you in your professional capacity as a chiropractor?

(18)         A    Yes.

(19)         Q    How many lawsuits?

(20)         A    I believe two.

(21)         Q    When were those filed?

(22)         A    There was one filed 15 years ago, and one

(23)    was filed five or six years ago.

(24)         Q    With respect to the one that was filed

(25)    five or six years ago, what was the nature of that

(1)                    DR. RICHARD G. HARVEY

(2)      suit?

(3)           A     A patient came to see me that hurt his

(4)      back on the job.  His medical doctor had referred

(5)      the patient to me.  When I looked at the patient's

(6)      MRI, it was questionable as to whether or not there

(7)      was a possible lesion.  On numerous occasions, I

(8)      instructed the patient to follow it up.  He finally

(9)      followed up on it about a year later, and there was

(10)     a lesion.  He had surgery, was fine, and he claimed

(11)     that I never referred him out.

(12)          Q     Is that lawsuit over with?

(13)          A     Yes.

(14)          Q     How was it revolved?

(15)              MR. CHISARI:  Objection.  Do not answer

(16)          the question.  It's a matter of public record.

(17)          He's not answering the question.

(18)          Q     Did the lawsuit result in a --

(19)              MR. CHISARI:  He is not answering anymore

(20)          questions dealing with the lawsuit.  It has

(21)          nothing to do with the no-fault bills.  Unless

(22)          you are going to give me a reasonable and

(23)          objective standard of why you are going into

(24)          this line of questioning, I am going to

(25)          instruct him not to answer any of these

<br>

(1)                    DR. RICHARD G. HARVEY

(2)        questions.

(3)        Q    Your Counsel has instructed you not to

(4)   answer the questions.

(5)             Are you going to listen to your Counsel's

(6)   advice?

(7)        A    Yes.

(8)        Q    Have you ever been convicted of a crime?

(9)             MR. CHISARI:  Objection.  Do not answer

(10)       that.  That is an outrageous question.

(11)       Q    Upon graduating chiropractic school in

(12)  December of 1985, did you begin working as a

(13)  chiropractor at that point?

(14)       A    Yes.

(15)       Q    Could you briefly talk about your work

(16)  experience upon graduating?

(17)       A    After I graduated, I opened up my own

(18)  practice.  I started in April of 1986.

(19)       Q    What was the name of the practice you

(20)  started?

(21)       A    Harvey Family Chiropractic.

(22)       Q    Is that the same corporation that you

(23)  still currently own?

(24)       A    When I first opened it, it wasn't a PLLC.

(25)       Q    What business form was it in when you

(1)                    DR. RICHARD G. HARVEY

(2)    first opened it?

(3)        A    Just a sole proprietor.

(4)        Q    Where did you operate it from?

(5)        A    Originally, it was 480 North Broadway in

(6)    Yonkers.

(7)        Q    From 1986 through today, you've worked

(8)    through your own corporation, Harvey Family

(9)    Chiropractic, either as a sole proprietorship or in

(10)   its current form; is that correct?

(11)       A    Correct.

(12)       Q    Did you ever own any other companies?

(13)            MR. CHISARI:  Objection.  Unless it has to

(14)        deal with healthcare --

(15)            MR. MARVIN:  I will rephrase the question.

(16)   BY MR. MARVIN:

(17)       Q    Have you ever owned any professional

(18)   corporations or other businesses through which you

(19)   provided chiropractic services?

(20)       A    Yes.

(21)       Q    How many?

(22)       A    One.

(23)       Q    What was the name of that corporation?

(24)       A    It was called AB Chiropractic.

(25)       Q    When did you open AB Chiropractic?

DR. RICHARD G. HARVEY

(1)

(2)    A    Three or four years ago.

(3)    Q    Is AB Chiropractic still operating?

(4)    A    No.

(5)    Q    Where did AB Chiropractic operate?

(6)    A    In the Bronx.

(7)    Q    Why did you open AB Chiropractic?

(8)         MR. CHISARI:  Objection.  I am instructing

(9)    him not to answer any other questions

(10)   concerning AB Chiropractic.  There are no bills

(11)   to Allstate from AB Chiropractic.  There is

(12)   nothing from AB Chiropractic.  It is no longer

(13)   operating.

(14)   Q    Are you going to follow the advice of your

(15)   Counsel to not answer any questions relating to AB

(16)   Chiropractic?

(17)   A    Yes.

(18)   Q    Have you ever provided professional

(19)   chiropractic services through any other companies

(20)   other than Harvey Family Chiropractic, AB

(21)   Chiropractic, and/or Harvey Family as it exists in

(22)   its current form?

(23)   A    No.

(24)        MR. CHISARI:  I am going to mark the EUO

(25)        Notice, dated October 12, 2012, as Exhibit B.

LH REPORTING SERVICES, INC.        (516) 484-2325

(1)              DR. RICHARD G. HARVEY

(2)                    (Whereupon, Exhibit B, EUO

(3)                    Notice, dated October 12, 2012,

(4)                    was marked for Identification.)

(5)    BY MR. MARVIN:

(6)        Q    This EUO Notice was sent to you.  It is

(7)    dated October 12, 2012, which was the first notice

(8)    that was sent to you.  There have been subsequent

(9)    notices that were sent to you as well.

(10)            MR. CHISARI:  Are we going to go over

(11)        every notice?

(12)            MR. MARVIN:  I am going to go through this

(13)        first letter and the last letter, which we will

(14)        mark as Exhibit C.

(15)                    (Whereupon, Exhibit C, EUO

(16)                    Notice, was marked for

(17)                    Identification.)

(18)            MR. CHISARI:  I am not going to let him

(19)        answer any questions about it because I gave

(20)        him legal advice about them.

(21)    BY MR. MARVIN:

(22)        Q    Dr. Harvey, have you seen Exhibit B

(23)    before?

(24)        A    Yes.

(25)        Q    On the second page of Exhibit B, there is

(1)                    DR. RICHARD G. HARVEY

(2)    a list of items that we requested you bring with you

(3)    today.

(4)                    MR. CHISARI:  I am going to object.  I am

(5)         going to instruct him not to answer any

(6)         questions.  You have all of the documents.  We

(7)         provided everything to Allstate with the

(8)         submission of the bills.  We went through this

(9)         last time we were here.  He is not going to

(10)        answer.  You either have the records or you do

(11)        not.  If you do not have the records, that is a

(12)        different scenario.

(13)                   MR. MARVIN:  We do not have the records.

(14)                   MR. CHISARI:  What records don't you have?

(15)                   MR. MARVIN:  I am going to go through the

(16)        list.

(17)                   MR. CHISARI:  He has brought nothing with

(18)        him today.

(19)                   MR. MARVIN:  I am going to go through the

(20)        list anyway.

(21)                   MR. CHISARI:  I am going to instruct my

(22)        client not to answer any of these questions

(23)        about these exhibits.

(24)             Why don't you ask him questions?

(25)                   MR. MARVIN:  I am asking questions.

(1)                    DR. RICHARD G. HARVEY

(2)          MR. CHISARI:  I am going to instruct him

(3)     not to answer any questions about these

(4)     documents because it may revoke attorney-client

(5)     privilege since we have discussed them.  He is

(6)     not going to answer any of your questions.

(7)          MR. MARVIN:  Asking this witness if these

(8)     documents exist will not revoke any

(9)     attorney-client privilege.

(10)         MR. CHISARI:  I am instructing him not to

(11)    answer --

(12)         MR. MARVIN:  Let me finish.

(13)         I need to know if these documents exist in

(14)    order to make that determination for the

(15)    verification of these claims.

(16)         MR. CHISARI:  Why don't you ask him a

(17)    different question.  I am not going to let you

(18)    go into document, Exhibit B, this document.

(19)         MR. MARVIN:  I'm sorry.  Can you say that

(20)    again?

(21)         MR. CHISARI:  Counsel, maybe you should

(22)    learn how to ask a question.  I guarantee you

(23)    can ask every question you want without

(24)    referring to that document.  Since you pointed

(25)    out that this is not an evidentiary hearing, I

(1)                  DR. RICHARD G. HARVEY

(2)         can instruct my client however I want.  I am

(3)         instructing him not to answer any questions

(4)         about those exhibits.

(5)     BY MR. MARVIN:

(6)         Q    Relating to the claimants today, do any

(7)     sign-in sheets exist related to the treatment of

(8)     these claimants?

(9)         A    Yes.

(10)        Q    Where are the sign-in sheets?

(11)        A    Some are in my office, and some have been

(12)    disposed of.

(13)        Q    Under what circumstances were the sign-in

(14)    sheets disposed of?

(15)        A    We use the sign-in sheets so they can log

(16)    people in the computer.  Typically, after a week, we

(17)    get rid of the sign-in sheets.

(18)        Q    So the information is transferred from the

(19)    sign-in sheets to a computer database?

(20)        A    Correct.

(21)        Q    Are there printouts of the sign-in sheets

(22)    that exist?

(23)        A    No.

(24)        Q    Could the information from the sign-in

(25)    sheets, which have been entered into the computer be

(1)                     DR. RICHARD G. HARVEY

(2)     printed out?

(3)          A     I'm sorry.  Can you say that again?

(4)          Q     Just to go back, please explain what you

(5)     define as a sign-in sheet.

(6)          A     There's a sheet of paper for when the

(7)     patient comes in that they'll sign.

(8)          Q     Why do they sign that sheet of paper?

(9)          A     They sign the sheet of paper so we know

(10)    that they were there for billing purposes.

(11)         Q     So they sign in just to verify that they

(12)    were at Harvey Family on a particular day?

(13)         A     Correct.

(14)         Q     Without going through each patient

(15)    one-by-one, which we could if it will help you, is

(16)    it standard practice to dispose of the sign-in

(17)    sheets a week after they are entered into the

(18)    computer?  What is the standard practice of Harvey?

(19)         A     To dispose of them after a week,

(20)    typically.

(21)         Q     With respect to all of the claimants which

(22)    are the subject of today's EUO, which were

(23)    identified in the schedule of Exhibit B, would it be

(24)    fair to say that the original sign-in sheets for all

(25)    of those claimants were disposed of, approximately,

DR. RICHARD G. HARVEY

(1)
(2) one week after the information was entered into your
(3) computer?
(4)      A    Yes.
(5)      Q    In terms of the medical records, including
(6) but not limited to narrative reports, progress
(7) reports, diagnostic reports, test results,
(8) handwritten, typed, or computer-generated notes,
(9) referrals, medical histories for each claimant
(10) relating to this EUO, you did not bring any of those
(11) medical records or documents with you today?
(12)      A    No.
(13)      Q    Do you know if those documents exist?
(14)      A    Yes.
(15)      Q    Where are those documents maintained?
(16)      A    In my office.
(17)      Q    Is there a reason you did not bring them
(18) with you today?
(19)           MR. CHISARI:   Under the advice of Counsel,
(20)      I advised him that there could be HIPAA
(21)      violations with bringing those files here.
(22)      Until we have the clarification from HIPAA, he
(23)      will not produce those files.  He will produce
(24)      what is necessary for the payment of the bills,
(25)      which he has already submitted to the insurance

(1)                    DR. RICHARD G. HARVEY

(2)          carriers.

(3)               MR. MARVIN:  We are going to call for the

(4)          production of the complete medical records

(5)          relating to the treatment of the claimants

(6)          which are the subject of the EUO.

(7)               MR. CHISARI:  Again, we state our

(8)          objection.  Put it in writing, and we will take

(9)          it under advisement.  For the record, we state

(10)         our objection based on HIPAA.  There may be

(11)         documents in there that have nothing to do with

(12)         no-fault or car accidents or these claims.

(13)         Unless Allstate can produce a valid HIPAA

(14)         authorization for every record in Dr. Harvey's

(15)         file, we are not going to produce it.

(16)    BY MR. MARVIN:

(17)         Q    Dr. Harvey, do the claimants sign HIPAA

(18)    waivers in your office?

(19)         A    Yes.

(20)         Q    Are those maintained in the files?

(21)         A    Yes.

(22)         Q    Now, are the medical records for each

(23)    claimant contained in one file?  In other words, if

(24)    the claimant receives multiple types of treatment,

(25)    physical therapy, acupuncture, and chiropractic, is

(1)                    DR. RICHARD G. HARVEY

(2)    all of that information maintained in one file?

(3)         A    I typically try to use one file for

(4)    chiropractic.  If they're doing physical therapy,

(5)    they will have a physical therapy file.  If they're

(6)    doing acupuncture, they'll have an acupuncture file.

(7)         Q    If the claimant receives three types of

(8)    treatment, they will have three separate files?

(9)         A    Yes.

(10)        Q    Are they all maintained in the same place?

(11)        A    Yes.

(12)        Q    How are those records maintained?  Are

(13)   they kept in one larger file with sub-folders?

(14)        A    In separate files within my office.

(15)        Q    Are they kept in manila folders?  How are

(16)   these files actually maintained?

(17)        A    They are in a manila folder.

(18)             MR. CHISARI:  This is a ridiculous

(19)        question.

(20)             MR. MARVIN:  If you have an objection,

(21)        state your objection.

(22)             MR. CHISARI:  I object to a ridiculous

(23)        question.  It is ridiculous to ask how he keeps

(24)        his files.  Next are you going to ask him how

(25)        to crack a knuckle?

(1)                    DR. RICHARD G. HARVEY

(2)          MR. MARVIN:  You can keep your commentary

(3)     to yourself.

(4)          MR. CHISARI:  You can not tell me what I

(5)     can say and what I cannot.  As you like to say,

(6)     this does not follow the rules of the CPL law,

(7)     so I can state what I want on the record and

(8)     you can say what you want on the record.

(9)          MR. MARVIN:  You can object.  Otherwise, I

(10)    ask that you keep your commentary to yourself.

(11)         MR. CHISARI:  I will say what I need to

(12)    say.

(13)         MR. MARVIN:  None of these medical records

(14)    relating to the treatment of any of these

(15)    patients have been produced in the context of

(16)    this EUO or during the verification of these

(17)    claims.

(18)         MR. CHISARI:  They were provided when the

(19)    bills were submitted to Allstate with the bills

(20)    as per the insurance regulations.  If your

(21)    client does not have them and lost them, that

(22)    is your client's problem.

(23)    BY MR. MARVIN:

(24)         Q    Dr. Harvey, did you submit complete

(25)    medical records for the treatment of these patients

DR. RICHARD G. HARVEY

(1)

(2) in conjunction with all of the bills that you

(3) submitted to Allstate?

(4)     A     Yes.

(5)     Q     Are the Assignment of Benefits forms for

(6) each claimant also contained in each folder within

(7) your office?

(8)     A     Yes.

(9)     Q     Do you keep a copy of the records and

(10) bills which are sent to insurers in general, and

(11) Allstate in particular, related to your claims for

(12) reimbursement?

(13)    A     Yes.

(14)    Q     Where are those documents kept?

(15)    A     The records are in the patient's folder.

(16) The bills are in the computer.

(17)    Q     Do you keep an actual hard copy of what

(18) you submitted to insurance companies, particularly

(19) what you submitted to Allstate, in connection with

(20) these claimants?

(21)    A     I'm not following your question.

(22)    Q     In other words, with respect to these

(23) claimants, you or someone on your behalf submitted a

(24) package of documents to Allstate, correct?

(25)    A     Yes.

DR. RICHARD G. HARVEY

(1)

(2)      Q    Do you keep a copy of that package?

(3)      A    Yes.

(4)      Q    Where do you keep those documents?

(5)      A    In the patient's file.

(6)      Q    Could you briefly describe how Harvey

(7) Family was formed?

(8)        MR. CHISARI:  Do you mean Harvey Family

(9)      Chiropractic, Physical Therapy & Acupuncture?

(10)        MR. MARVIN:  Yes.  As I stated earlier, I

(11)      will be referring to Harvey Family

(12)      Chiropractic, Physical Therapy & Acupuncture,

(13)      PLLC as Harvey or Harvey Family.

(14)        MR. CHISARI:  Okay.

(15) BY MR. MARVIN:

(16)      Q    Can you describe how Harvey Family was

(17) formed?

(18)      A    When I decided I wanted to have everything

(19) under one roof, I consulted with a healthcare

(20) attorney.  He put together the documents for my

(21) corporation.

(22)      Q    What is that attorney's name?

(23)      A    Chris Turcotte.

(24)      Q    When did you make the decision to do that?

(25)      A    I don't know exactly.  I believe the

(1)                    DR. RICHARD G. HARVEY

(2)   corporation was formed in 2010.

(3)        Q    Had you been working with physical

(4)   therapists and acupuncturists prior to that?

(5)        A    Yes.

(6)        Q    Was that the same physical therapist and

(7)   acupuncturist you eventually formed Harvey Family

(8)   Chiropractic with?

(9)        A    No.

(10)       Q    Why did you make the decision to

(11)  reconstitute your business as a PLLC, adding on

(12)  acupuncture and physical therapy?

(13)       A    I was moving my office to a bigger space

(14)  and I wanted to incorporate everything in the same

(15)  office location so patients would not have to go to

(16)  different offices to get the services that I could

(17)  provide them.

(18)       Q    Where was Harvey Family prior to moving to

(19)  its current location?

(20)       A    At 944 North Broadway.

(21)       Q    Is that in the same complex where Harvey

(22)  Family is located now?

(23)       A    No.

(24)       Q    It is close by though?

(25)       A    Yes.

DR. RICHARD G. HARVEY

(1)

(2)     MR. CHISARI:  The address is familiar

(3)     because that is where DRD Medical is.

(4)     Q    Did you have any sort of a business plan?

(5)     MR. CHISARI:  I am going to object.  What

(6)     do you mean by business plan?

(7)     Q    Do you understand the question?

(8)     A    No.  I don't understand the question.

(9)     Q    You were taking on a new corporate form

(10)    when you reinstituted your business.

(11)         Did you put together a business plan in

(12)    terms of projected earnings, liabilities, or things

(13)    of that nature before you formed your practice as

(14)    Harvey Family?

(15)    MR. CHISARI:  I am going to object.  That

(16)    calls for, potentially, a conversation he had

(17)    with Chris Turcotte, his healthcare attorney,

(18)    which would be client privileged and

(19)    attorney-client privileged.  I am going to

(20)    instruct him not to answer that question.

(21)    Q    Outside of any conversations you may have

(22)    had with your healthcare attorney, could you

(23)    articulate any sort of business plan that you had in

(24)    terms of forming Harvey Family?

(25)    A    My plan was to offer these services to

DR. RICHARD G. HARVEY

(1)
(2)     patients under one roof.
(3)          Q     Had you ever had prior experience working
(4)     with acupuncturists and physical therapists?
(5)              MR. CHISARI:  I am going to object.
(6)              Do you understand what he means by that?
(7)              THE WITNESS:  No.  I don't understand.
(8)          Q     You said that when you formed Harvey
(9)     Family, you wanted to put all of these services
(10)    under one roof, correct?
(11)         A     Correct.
(12)         Q     Is it fair to say that you were providing
(13)    or helping to provide those services to patients
(14)    outside of being under one roof; you were working
(15)    with other physical therapists and acupuncturists
(16)    that treat patients?
(17)         A     Yes.
(18)         Q     What percentage of those patients were you
(19)    doing that with prior to forming Harvey Family?
(20)         A     I really don't know percentage.
(21)         Q     Did most of your patients also receive
(22)    acupuncture and physical therapy services?
(23)         A     Many of my patients do.
(24)         Q     By many, would it be fair to say more than
(25)    80 percent?

(1)                    DR. RICHARD G. HARVEY

(2)          MR. CHISARI:  I am going to object.  He

(3)      said he does not know percentages.

(4)      Q    Can you give me a ballpark, if you know?

(5)      A    A ballpark would be 50 percent.  I don't

(6) know.  I don't keep statistics.

(7)      Q    Prior to forming Harvey Family, were there

(8) certain physical therapists or acupuncturists that

(9) you worked primarily with in furtherance of the

(10) treatment of your patients?

(11)     A    Yes.

(12)     Q    Who were they?

(13)     A    Northway Physical Therapy.

(14)     Q    Where is Northway Physical Therapy

(15) located?

(16)     A    944 North Broadway in Yonkers.

(17)     Q    That was at the same location as Harvey

(18) Family?

(19)     A    The same building.

(20)     Q    Are there multiple physical therapists

(21) that work through Northway or was it one, primarily,

(22) that you dealt with?

(23)          MR. CHISARI:  I am going to object.  If

(24)      you happen to know the answer, you can answer.

(25)      Do not guess.

```
(1)                    DR. RICHARD G. HARVEY
(2)        A    He had people working, but I don't know
(3)   their names.
(4)        Q    Do you know the names of any physical
(5)   therapists at Northway?
(6)        A    His name was Hussein.  I don't know if
(7)   that was his first name or his last name.
(8)        Q    What about acupuncture services; was there
(9)   a primary acupuncturist you worked with prior to
(10)  forming Harvey Family?
(11)       A    Yes.
(12)       Q    Who was that?
(13)       A    His name was Mun Shieh.  S-H-I-E-H was his
(14)  last name, I believe.
(15)       Q    Did Mr. Shieh work through a company or a
(16)  corporation?
(17)       A    I don't know.
(18)       Q    Where was he located?
(19)       A    He was at 944 North Broadway.
(20)       Q    How did it come to be that you and the
(21)  acupuncturist and the physical therapist that you
(22)  ultimately opened up Harvey Family with came
(23)  together to open up Harvey Family?
(24)       A    (No verbal response.)
(25)       Q    Who was the physical therapist that you
```

(1)                    DR. RICHARD G. HARVEY

(2)    initially opened Harvey Family with?

(3)           A     Initially, his name was Ricardo Sanahon.

(4)           MR. MARVIN:  For the record, I am going to

(5)       mark this document as Exhibit D.

(6)                           (Whereupon, Exhibit D, Articles

(7)                           of Organization, was marked for

(8)                           Identification.)

(9)    BY MR. MARVIN:

(10)          Q     I am going to show you what I have marked

(11)   as Exhibit D, which is the Articles of Organization

(12)   for Harvey Family Chiropractic, Physical Therapy &

(13)   Acupuncture, PLLC.

(14)                 Please take a look at this document, and

(15)   tell me if you believe it to be a fair and accurate

(16)   representation of the articles of incorporations for

(17)   Harvey Family.

(18)          A     Yes.

(19)          Q     Exhibit D, Dr. Harvey, lists Sanahon R.

(20)   Sanbajon Jr. as an original member or manager of the

(21)   company.

(22)                 Is that the physical therapist you are

(23)   speaking of?

(24)          A     Yes.

(25)          Q     How do you know Mr. Sanbajon?

(1)                    DR. RICHARD G. HARVEY

(2)        A    I don't remember.

(3)        Q    How did it come to be that Mr. Sanbajon

(4)   came to be a member of Harvey Family?

(5)        A    I told him what I was doing, as far as

(6)   forming a PLLC, and he was interested in becoming a

(7)   part of the department.

(8)        Q    You do not remember where you first met

(9)   him?

(10)       A    No.

(11)       Q    Had you met him prior to forming Harvey

(12)  Family?

(13)       A    No.

(14)       Q    Do you remember when you first met him?

(15)       A    No.

(16)       Q    Do you remember the circumstances

(17)  surrounding the conversation that you just

(18)  described?

(19)       A    Some details.

(20)       Q    What can you recall?

(21)       A    I recall explaining to him that I wanted

(22)  to form a PLLC, if he was interested in becoming a

(23)  part of that, which he was, and we decided he was

(24)  going to come on board with my company.

(25)       Q    Did he ask any questions about what his

(1)                    DR. RICHARD G. HARVEY

(2)    role would be in the company?

(3)          A     Yes.

(4)          Q     What did he ask?

(5)          A     I can't recall exactly what he asked.

(6)          Q     Did he ask --

(7)                MR. CHISARI:   Counsel, I am going to

(8)          object.  He is saying he doesn't remember.  You

(9)          are talking about a conversation that could be

(10)         well over three or four years ago.  He said he

(11)         doesn't remember.  He gave you the basics.

(12)         He's going to say he doesn't remember.

(13)         Q     Other than Mr. Sanbajon stating that he

(14)   wanted to join Harvey Family, do you recall any

(15)   other details concerning your conversation with him

(16)   whatsoever?

(17)         A     No.

(18)         Q     Can you describe what he looks like?

(19)         A     Probably about five-foot-nine, Filipino,

(20)   thin.

(21)         Q     Where did Mr. Sanbajon work prior to

(22)   joining Harvey Family?

(23)                MR. CHISARI:   If you know.  Do not guess.

(24)         A     He may have been in a clinic in Brooklyn.

(25)         Q     How long had he been working as a physical

                    DR. RICHARD G. HARVEY

(1)

(2)    therapist prior to joining Harvey Family?

(3)         A    I don't know.

(4)         Q    Do you know where he went to school for

(5)    physical therapy?

(6)         A    No.

(7)         Q    Do you know the types of patients he

(8)    provided physical therapy to prior to joining Harvey

(9)    Family?

(10)        A    No.

(11)        Q    What was your understanding of what

(12)   Mr. Sanbajon's role was going to be at Harvey

(13)   Family?

(14)        A    He was going to provide physical therapy

(15)   services for patients that required it.

(16)        Q    Now, you mentioned there came a point

(17)   where you consulted a healthcare attorney, Chris

(18)   Turcotte, regarding forming Harvey Family; is that

(19)   correct?

(20)        A    Yes.

(21)        Q    Was that before or after you spoke with

(22)   Mr. Sanbajon about him potentially joining your

(23)   company?

(24)        A    I'm not sure.

(25)        Q    We will come back to this in a second.   I

(1)                    DR. RICHARD G. HARVEY

(2)   want to ask about the other individual who was an

(3)   original managing member of Harvey Family.  That is

(4)   Paul Woong.

(5)              How do you know Mr. Woong?

(6)        A    I believe I put an ad on the internet that

(7)   I was looking for an acupuncturist, and he responded

(8)   to the ad.  That's how we met.

(9)        Q    Was that in connection with your desire to

(10)  form Harvey Family with an acupuncturist?

(11)       A    Correct.

(12)       Q    Where on the internet did you place that

(13)  ad?

(14)       A    It may have been Craig's List.

(15)       Q    Was he the only person that responded or

(16)  did multiple people respond?

(17)       A    Multiple people responded.

(18)       Q    Do you remember how many?

(19)       A    Twenty.

(20)       Q    Did you meet with all 20 of those people?

(21)       A    No.

(22)       Q    Did you have correspondence with all 20 of

(23)  those people?

(24)       A    Yes.

(25)       Q    Ultimately, why did you select Mr. Woong

DR. RICHARD G. HARVEY

(1)
(2) out of the 20 or so people to come and be a member
(3) of your company?
(4)     A    I liked him, personally, and he seemed to
(5) be very competent.
(6)     Q    Did you meet with him to discuss the
(7) formation of the company?
(8)     A    Yes.
(9)     Q    What were the circumstances of that
(10) meeting?
(11)     A    I explained to him that I was forming a
(12) PLLC, asked him if he would like to be part of the
(13) corporation, and he decided that he would like to
(14) be.
(15)     Q    Did you explain to him what his role would
(16) be in the corporation?
(17)     A    Yes.
(18)     Q    What was that?
(19)     A    Providing acupuncture services to
(20) patients.
(21)     Q    Do you know where he worked prior to
(22) becoming an original member of Harvey Family?
(23)     A    I believe somewhere on Long Island.
(24)     Q    Do you know how long he had been providing
(25) acupuncture services prior to joining Harvey Family?

LH REPORTING SERVICES, INC.        (516) 484-2325

DR. RICHARD G. HARVEY

(1)

(2)     A    No.

(3)     Q    With regard to Mr. Woong and Mr. Sanbajon,

(4)  did you request professional references from them

(5)  prior to forming Harvey Family?

(6)     A    I don't recall.

(7)     Q    Were any professional references given to

(8)  you?

(9)     A    I don't recall.

(10)     Q    Did you, personally, perform any due

(11)  diligence regarding their history or things of that

(12)  nature?

(13)     A    No.

(14)     Q    Do you know if anyone performed any due

(15)  diligence in that regard?

(16)          MR. CHISARI:  I am going to object.  When

(17)       he filed his corporation, I'm sure the state

(18)       made sure they were licensed.

(19)          MR. MARVIN:  That is a fine assumption.

(20)          MR. CHISARI:  It is a matter of public

(21)       record.  If you would like, you can run them in

(22)       the internet and see if they are there.

(23)  BY MR. MARVIN:

(24)     Q    Prior to forming Harvey Family, did you do

(25)  any due diligence or investigation concerning

LH REPORTING SERVICES, INC.     (516) 484-2325

DR. RICHARD G. HARVEY

(1)

(2)      whether or not Mr. Woong or Mr. Sanbajon had been

(3)      subject to any disciplinary hearing, malpractice

(4)      action, or class actions?

(5)          A     No.

(6)          Q     Do you know if anyone performed any due

(7)      diligence in that regard?

(8)          A     Not that I am aware of.

(9)          Q     How many times did you meet with

(10)     Mr. Turcotte --

(11)             MR. CHISARI:  I am going to object.  I am

(12)         going to instruct you not to answer any

(13)         questions about Mr. Turcotte.  He's his

(14)         attorney.  It's all attorney-client privilege.

(15)         I am instructing him not to answer.

(16)         Q     Did Mr. Woong or Mr. Sanbajon accompany

(17)     you to meet with Mr. Turcotte?

(18)             MR. CHISARI:  I am going to instruct my

(19)         client, again, not to answer these questions.

(20)         Q     If you would like, you can answer the

(21)     question.

(22)         A     Based on his advice, I am not going to

(23)     answer it.

(24)         Q     Did you fill out any paperwork in order to

(25)     form Harvey Family?

DR. RICHARD G. HARVEY

(1)

(2)     MR. CHISARI:  I am going to object and ask

(3)     you to be more specific when you say paperwork.

(4)     That can also deal with papers that were filed

(5)     from Mr. Turcotte's office.  If you are talking

(6)     about papers filed by the state, that is a

(7)     matter of public record, and you can acquire a

(8)     copy of them.  Obviously, you have a copy of

(9)     the incorporation papers.

(10)    Q    Are you aware of the documents that are

(11)  necessary to form a PLLC?

(12)    A    I used the advice of my attorney to put

(13)  those papers together.  All of the papers that were

(14)  done were based on his recommendations.

(15)    Q    In terms of Mr. Woong and Mr. Sanbajon

(16)  signing documents before opening Harvey Family, can

(17)  you describe the circumstances under which they

(18)  signed documents?

(19)    MR. CHISARI:  I am going to object and ask

(20)    him not to answer any of that.  It was all

(21)    produced by Mr. Turcotte's office and it is all

(22)    privileged.

(23)    MR. MARVIN:  Counsel, these questions are

(24)    not --

(25)    MR. CHISARI:  Counsel, it's a matter of

(1)                 DR. RICHARD G. HARVEY

(2)      public record.

(3)               MR. MARVIN:  Can I make a statement?

(4)               MR. CHISARI:  Sure.

(5)               MR. MARVIN:  The questions I am asking are

(6)      not eliciting any confidential information.

(7)      The fact that certain documents were submitted

(8)      to an attorney's office or Mr. Turcotte's name

(9)      may come up in a question, does not make the

(10)     information I am eliciting privileged.

(11)              MR. CHISARI:  That is your opinion.  My

(12)     opinion is that anything that was signed that

(13)     was filed with the state is a matter of public

(14)     record.  You can get a hold of it.  If you need

(15)     help, I can show you on your computer where to

(16)     get it all.  I know your office knows how to

(17)     get it because you have a copy right there of

(18)     it.

(19)              Anything they signed having to do with

(20)     establishing this corporation that was filed

(21)     with the state is on record with the state.

(22)     You can get it there.  I am instructing my

(23)     client not to answer.

(24)              MR. MARVIN:  The circumstances under which

(25)     these documents came to be that were executed

(1)                    DR. RICHARD G. HARVEY

(2)        are not online.  You cannot show it to me on a

(3)        computer, nor is it privileged.  I am entitled

(4)        to ask these questions to verify --

(5)             MR. CHISARI:  I am instructing my client

(6)        not to answer.  The state feels he, Mr. Woong,

(7)        and Mr. Sanbajon are allowed to file this.

(8)        After that, the inquiry stops.

(9)             If you can give me a reasonable and

(10)       objective basis of why you are going into these

(11)       documents, please let me know what fraud you

(12)       think is going on.  If you do not, I am

(13)       instructing my client not to answer anymore of

(14)       these questions.  You are accusing my client of

(15)       being a criminal without actually saying it.

(16)            MR. MARVIN:  I have not accused him of

(17)       anything.  I am entitled to ask questions to

(18)       verify Harvey Family's ability to submit and

(19)       receive reimbursement from no-fault.  As you

(20)       know, no-fault allows insurers to go beyond the

(21)       face of documents.  These are innocuous

(22)       questions in which I am not accusatory in any

(23)       manner; nor are they privileged, and I am

(24)       entitled to ask them.

(25)            MR. CHISARI:  Again, unless you can give

(1)                      DR. RICHARD G. HARVEY

(2)        me some good faith, an objective reason why you

(3)        are going beyond the face of the documents that

(4)        you think they are not entitled to

(5)        reimbursement, let me know because the State of

(6)        New York seems to think they are.

(7)              MR. MARVIN:  I am just asking questions to

(8)        verify the corporate status.

(9)              MR. CHISARI:  The corporate status exists.

(10)       If you have a reasonable and objective basis to

(11)       say that he is not entitled, state it on the

(12)       record or he is not answering anymore questions

(13)       of this nature.

(14)    BY MR. MARVIN:

(15)          Q    Does Harvey Family maintain a bank

(16)    account?

(17)          A    Yes.

(18)          Q    Where?

(19)          A    Chase Bank.

(20)          Q    Where is the branch located?

(21)          A    In the same building as my office.

(22)          Q    Did you open up that bank account?

(23)          A    Yes.

(24)          Q    Who are the signatories on the bank

(25)    account?

LH REPORTING SERVICES, INC.        (516) 484-2325

DR. RICHARD G. HARVEY

(1)

(2)   A    Paul Woong, Ricardo, and myself.

(3)   Q    That is as of today, Mr. Woong,

(4)  Mr. Sanbajon and you are the three signatories of

(5)  the account?

(6)   A    Yes.

(7)   Q    Do you maintain all of the statements?

(8)   A    (No verbal response.)

(9)   Q    I mean you, personally.

(10)       The bank statements that were sent to

(11)  Harvey Family, do you personally maintain those or

(12)  are they maintained in the office?

(13)   A    The bank sends them to me, I look at them,

(14)  and then I dispose of them.

(15)   Q    As far as the checkbook, where is that

(16)  kept?

(17)   A    In my office.

(18)   Q    Do you sign checks on the corporate

(19)  account?

(20)   A    Yes.

(21)   Q    Aside from you, does anyone else sign

(22)  checks on the corporate account?

(23)   A    Typically, it is just myself.

(24)   Q    When you first opened Harvey Family, you

(25)  entered into an operating agreement with Mr. Woong

LH REPORTING SERVICES, INC.     (516) 484-2325

(1)                  DR. RICHARD G. HARVEY

(2)    and Mr. Sanbajon; is that correct?

(3)         A    Yes.

(4)         Q    Who directed the operating agreement?

(5)         A    Chris Turcotte.

(6)         Q    Now, in connection with today's EUO, you

(7)    produced a second amended operating agreement of

(8)    Harvey Family Chiropractic, Physical Therapy &

(9)    Acupuncture, PLLC.

(10)        A    Yes.

(11)             MR. MARVIN:   Mark this as Exhibit E,

(12)        please.

(13)                       (Whereupon, Exhibit E, amended

(14)                       operating agreement, was marked

(15)                       for Identification.)

(16)   BY MR. MARVIN:

(17)        Q    Do you mind taking a look at the document?

(18)        A    Okay.

(19)        Q    Are you familiar with this document?

(20)        A    Yes.

(21)        Q    Is this document substantially similar to

(22)   the original operating agreement that you entered

(23)   into with Mr. Woong and Mr. Sanbajon, obviously

(24)   without their names not being in this agreement and

(25)   the dates being different?

(1)                    DR. RICHARD G. HARVEY

(2)         A    Yes.

(3)         Q    With regard to the original operating

(4)    agreement, is it fair to say that you owned

(5)    97 percent of the shares, Mr. Woong owns --

(6)              MR. CHISARI:  Counsel, I think in the

(7)         document it says exactly how many shares

(8)         everybody owns.

(9)         Q    Mr. Woong owns 1 percent, and Mr. Sanbajon

(10)   owns 2 percent of the shares?

(11)        A    Yes.

(12)        Q    In terms of originally financing Harvey

(13)   Family, how was that done?

(14)             MR. CHISARI:  If you understand that

(15)        question.

(16)        Q    How much money was needed to start the

(17)   company?

(18)             MR. CHISARI:  I think it was already an

(19)        existing entity.

(20)        Q    Did Mr. Woong buy into the company when he

(21)   become a manager?

(22)        A    Yes.

(23)        Q    How much did he pay?

(24)        A    It was $1,000 to buy in.  I believe that's

(25)   what it was.

LH REPORTING SERVICES, INC.      (516) 484-2325

<center>DR. RICHARD G. HARVEY</center>

(1)

(2)     Q    Did mr. Sanbajon pay?

(3)     A    $1,000.

(4)     Q    Was there a reason why Mr. Woong And

(5) Mr. Sanbajon paid the same amount notwithstanding

(6) Mr. Woong would have 1 percent of the company and

(7) Mr. Sanbajon doubled that at 2 percent?

(8)     A    It was what my attorney recommended.

(9)     Q    Did Mr. Woong receive a salary?

(10)     A    Yes.

(11)     Q    How much was his salary?

(12)     A    I believe it was $800 a week.

(13)     Q    It was $800 a week?

(14)     A    I believe so.

(15)     Q    Was that negotiated between you and him?

(16)     A    Yes.

(17)     Q    Did Mr. Sanbajon receive a salary as well?

(18)     A    Yes.

(19)     Q    How much was his salary?

(20)     A    It was either $1,200 or $1,500 a week.   I

(21) don't recall offhand.

(22)     Q    Was that also negotiated?

(23)     A    Yes.

(24)     Q    Did Mr. Woong ever receive any other

(25) payments, other than his salary through Harvey

(1)                        DR. RICHARD G. HARVEY

(2)    Family?

(3)                  MR. CHISARI:   Percentage of the profits,

(4)          things like that.

(5)          A     He did get a percentage of the profits,

(6)    yes.

(7)          Q     Being that he was entitled to a percentage

(8)    of the profits, did he ever actually receive a

(9)    percentage of the profits?

(10)         A     Yes.

(11)         Q     When was that?

(12)         A     Over a year ago.  I don't recall exactly

(13)   the date.

(14)         Q     Was it only one time?

(15)         A     Yes.  He's no longer with me.

(16)         Q     How much did he receive?

(17)         A     I don't recall.

(18)         Q     Did you maintain a record of how much he

(19)   received?

(20)         A     My accountant should have it.

(21)         Q     Who are your accountants?

(22)         A     GRE & Associates.

(23)         Q     Where are they located?

(24)         A     Long Island.

(25)         Q     Did Mr. Sanbajon ever receive any money

(1)                   DR. RICHARD G. HARVEY

(2)    outside of his salary?

(3)         A    No.

(4)         Q    Just to clarify, by money I mean profit

(5)    distribution, dividends, and things like that.

(6)         A    I understand.

(7)         Q    The answer is still no?

(8)         A    Right.

(9)         Q    Did Mr. Woong review the operating

(10)   agreement before he signed it?

(11)             MR. CHISARI:  I am going to object.

(12)        A    Yes.

(13)        Q    Did Mr. Sanbajon review the operating

(14)   agreement before he signed it?

(15)        A    Yes.

(16)        Q    Were any of the terms of the operating

(17)   agreement negotiated with Mr. Woong?

(18)        A    Not that I recall.

(19)        Q    Were any of the terms of the operating

(20)   agreement negotiated with Mr. Sanbajon?

(21)        A    Not that I recall.

(22)        Q    Did you develop the terms of the operating

(23)   agreement?

(24)             MR. CHISARI:  I am going to object.  This

(25)        is attorney-client privilege.  He already

DR. RICHARD G. HARVEY

(1)

(2)    stated it was a document drafted by his

(3)    attorney.  I am going to instruct him not to

(4)    answer any questions with the drafting or

(5)    provisions of the agreement.

(6)        Q    With regard to the operating agreement, is

(7)  it fair to say that only you can call a meeting of

(8)  the members of Harvey Family?

(9)        A    I don't know offhand.

(10)        MR. CHISARI:  If it is in the document, we

(11)        will say it is in the document.  You do not

(12)        have to play the little subtle games.  If

(13)        that's what it says, we're not going to fight

(14)        you on it.

(15)        Q    You can keep a copy as we go through the

(16)  items.  I am now referring to section 3.5.

(17)        Is it fair to say that only you can call

(18)  the meetings of the members of Harvey Family?

(19)        MR. CHISARI:  I am going to instruct him

(20)        not to answer because you are asking him to

(21)        determine a legal document.  If that is what

(22)        the document says, we will agree.  I am not

(23)        having my client sit here, read it, and give a

(24)        legal analysis of a document when he is a

(25)        chiropractor, not an attorney.

LH REPORTING SERVICES, INC.        (516) 484-2325

DR. RICHARD G. HARVEY

(2)    Q   Dr. Harvey, who can call a meeting of the
(3) members at Harvey Family?

(4)        MR. CHISARI:  If you know.

(5)    A   If anybody wants to, they can call it.

(6)    Q   Dr. Harvey, do you agree that Exhibit E
(7) states that meetings of members may be called by any
(8) PLLC member or members collectively holding
(9) 25 percent or more of the PLLC units upon seven days
(10) written notice?

(11)        MR. CHISARI:  I am going to object.  If
(12)        that is what that documents says in its plain
(13)        language, that is what it says.

(14)    Q   Dr. Harvey, is it your testimony that any
(15) member of Harvey Family can call a meeting of the
(16) members?

(17)    A   If they choose to.

(18)    Q   Is it your understanding that is what the
(19) operating agreement states?

(20)        MR. CHISARI:  I am going to object to that
(21)        again.  What he understands, he said.  He
(22)        answered that anybody in the PLLC can call a
(23)        meeting.  We are not fighting that it says
(24)        something else.  His understanding is that
(25)        anybody can call a meeting.

DR. RICHARD G. HARVEY

(1)

(2)     Q     Who can approve a merger of the business

(3) combination of Harvey Family?  I will tender the

(4) document back to you if you need it to refresh your

(5) recollection.

(6)     A     Thank you.  Can you repeat the question?

(7)     Q     Who can approve a merger or business

(8) combination of Harvey Family?

(9)         MR. CHISARI:  I am going to object.  We

(10)     are going to be here a long time.  He's not

(11)     answering any questions about the document.  It

(12)     speaks for itself.  Again, you are asking him

(13)     to read the document.  He's not an attorney.

(14)     He's not going to read the document and give an

(15)     opinion.

(16)         If he thinks everybody in the PLLC can

(17)     approve it or no one can, that is his question.

(18)     I am not going to let him look at the document,

(19)     read the document, and give a legal opinion.

(20)     He is a chiropractor.  He's not an attorney.

(21)     Q     Dr. Harvey, what is your understanding of

(22) who can approve a merger or a business combination

(23) of Harvey Family, the company which you own

(24) 97 percent of?

(25)     A     I don't know.

(1)                    DR. RICHARD G. HARVEY

(2)        Q     What is your understanding of whom among

(3)    the members of Harvey Family can approve a sale of

(4)    disposition of the PLLC's assets?

(5)        A     I don't know offhand.

(6)        Q     Would anything refresh your recollection?

(7)        A     If someone was to read it to me and tell

(8)    me, then it would refresh my recollection.

(9)        Q     Would you like to look at the operating

(10)   agreement in an attempt to refresh your

(11)   recollection?

(12)       A     Sure.

(13)       Q     I could direct you to section 3.5, and

(14)   your attorney may assist you.

(15)           MR. CHISARI:  If I assist him and tell him

(16)       what it means, that would be a legal opinion.

(17)       That would be me giving him a legal opinion.

(18)       He doesn't know.  Please move on.

(19)       Q     Dr. Harvey, whom among the members of the

(20)   PLLC can file bankruptcy or reorganization

(21)   petitions?

(22)       A     I don't know offhand.

(23)       Q     Would anything refresh your recollection?

(24)           MR. CHISARI:  Again, you are asking him to

(25)       give a legal opinion of the document.  I am not

(1)                    DR. RICHARD G. HARVEY

(2)      going to let him answer.  He doesn't know.

(3)              MR. MARVIN:  Counsel, this is his company.

(4)              MR. CHISARI:  He said that he would go to

(5)      his lawyer and have his lawyer tell him.  He's

(6)      not a lawyer.  You are asking him to draw a

(7)      legal conclusion.  Maybe you want to get into

(8)      the patients.

(9)              Again, if you are trying to go into some

(10)     kind of fraud defense, I want to know the

(11)     objective standard of why you and Allstate

(12)     believe Harvey Family Chiropractic, Physical

(13)     Therapy & Acupuncture, PLLC is not entitled to

(14)     receive reimbursement for no-fault benefits.

(15)   BY MR. MARVIN:

(16)     Q    Dr. Harvey, did you read the Articles of

(17)   Organization before you signed it?

(18)     A    Yes.

(19)     Q    Did you understand all of the different

(20)   provisions in the Articles of Organization?

(21)     A    At the time, yes.

(22)     Q    Do you no longer understand the provisions

(23)   of the operating agreement?

(24)     A    I just haven't reviewed it.

(25)     Q    Do you recall which among the members can

LH REPORTING SERVICES, INC.        (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)    file bankruptcy or reorganization petitions

(3)    according to the operating agreement?

(4)            MR. CHISARI:  Objection.  That was the

(5)        question that started everything.  He's not

(6)        answering it.  He stated he would go to his

(7)        attorney.

(8)        Q    Dr. Harvey, which among the members of

(9)    Harvey Family can modify the operating agreement if

(10)   needed?

(11)           MR. CHISARI:  Again, my same objection.

(12)       It is going to call for a legal conclusion.  He

(13)       would go to an attorney for that.

(14)       Q    Do you know the answer?

(15)       A    I would have to consult the papers.

(16)       Q    Would you like to consult the papers?

(17)       A    If you would like me to.

(18)       Q    Sure.  If it is any help, I can direct you

(19)   to sections 3.5 and 9.1.

(20)           MR. CHISARI:  Again, I am going to direct

(21)       my client not to answer the question because it

(22)       is calling for a legal conclusion from reading

(23)       a legal document.  He is a chiropractor, not an

(24)       attorney.

(25)           MR. MARVIN:  The document may refresh his

(1)                    DR. RICHARD G. HARVEY

(2)        recollection as to his understanding of who can

(3)        take certain actions with respect to his

(4)        company.

(5)             THE WITNESS:  Any questions you are asking

(6)        me, the answer is in the document.

(7)             MR. CHISARI:  That's his answer.  The

(8)        answer is in the document.  It speaks for

(9)        itself.  You have a copy of the document.

(10)             MR. MARVIN:  For the record, some of the

(11)        answers he has given are inconsistent with the

(12)        document.  Saying the answers are in the

(13)        document is not really the case.  I am entitled

(14)        to go over these questions with him to get his

(15)        understanding of who can take certain actions

(16)        with respect to this PLLC.

(17)             MR. CHISARI:  Before you go any further, I

(18)        want the objective standard that Allstate has

(19)        to layout these questions that he is not

(20)        entitled to reimbursement.  I want those

(21)        standards, Counsel.  I am entitled to them

(22)        because you are questioning about them.  You

(23)        want to make sure that he is entitled to

(24)        reimbursement.  I want to know the objective

(25)        reasonable standard Allstate has to believe he

DR. RICHARD G. HARVEY

(1)
(2)     is not.
(3)             MR. MARVIN:  Counsel, I am asking
(4)     questions to verify Harvey Family PLLC's
(5)     ability to --
(6)             MR. CHISARI:  Why?
(7)             MR. MARVIN:  I am not doing so in an
(8)     accusatory nature.
(9)             THE WITNESS:  When it comes to the
(10)    documents, I am the chiropractor.  I formed
(11)    this corporation, but as far as these types of
(12)    questions, I never had to deal with them.  I
(13)    don't know the answers offhand.  With any of
(14)    these questions, I am just going to refer to
(15)    the document.
(16)  BY MR. MARVIN:
(17)    Q   Is it fair to say that any substance of
(18)  action with respect to Harvey Family PLLC cannot be
(19)  taken without your approval?
(20)            MR. CHISARI:  Again, he said he is going
(21)        to refer to the document.
(22)    A   If that is what it says in the document, I
(23)  would agree.  I am not sure if that is what it says
(24)  in the document.
(25)    Q   Do you recall if the operating agreement

LH REPORTING SERVICES, INC.      (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)    was drafted prior to you speaking with Mr. Woong

(3)    about becoming a member?

(4)         A    I don't recall.

(5)         Q    Do you recall if it was drafted prior to

(6)    you speaking with Mr. Sanbajon about becoming a

(7)    member?

(8)         A    I don't recall.

(9)         Q    Do you recall if there were any terms of

(10)   the operating agreement which Mr. Woong or

(11)   Mr. Sanbajon objected to which were removed?

(12)             MR. CHISARI:  He already testified to

(13)        that.  You asked him about any amendments

(14)        changed to the document.  He testified, as far

(15)        as he knew, that they were not made.

(16)        A    I am not aware.

(17)        Q    Do you recall if Mr. Woong or Mr. Sanbajon

(18)   asked that any provisions be added to the operating

(19)   agreement prior to them signing it?

(20)             MR. CHISARI:  Note my previous objection.

(21)        A    No.

(22)        Q    Did you ever have any discussion with

(23)   Mr. Woong if he would have any role in the operation

(24)   of Harvey Family, separate and apart from providing

(25)   acupuncture services?

(1)                    DR. RICHARD G. HARVEY

(2)        A    I don't recall.

(3)        Q    What about with respect to Mr. Sanbajon;

(4)   did you have any discussion with him about his role

(5)   in Harvey Family over and beyond providing physical

(6)   therapy services?

(7)        A    I don't recall.

(8)        Q    With respect to Mr. Woong, other than

(9)   providing acupuncture services, did he have any role

(10)  in the operational management of Harvey Family?

(11)       A    His role, besides acupuncturist, was that

(12)  we would discuss how to give patients better

(13)  service.

(14)       Q    What about with respect to Mr. Sanbajon;

(15)  other than providing physical therapy to patients,

(16)  did he have any role in the daily operational

(17)  management of Harvey Family?

(18)       A    Helping to insure the patients got the

(19)  best possible care.

(20)       Q    Was there any other function that Mr.

(21)  Woong or Mr. Sanbajon had in the operational

(22)  management of Harvey Family?

(23)       A    Not that I recall.

(24)       Q    Do you, yourself, draw a salary from

(25)  Harvey Family, as did Mr. Woong And Mr. Sanbajon?

LH REPORTING SERVICES, INC.        (516) 484-2325

                    DR. RICHARD G. HARVEY

(1)

(2)      A    No.

(3)      Q    How do you receive compensation?

(4)           MR. CHISARI:  However your accountant

(5)      tells you to take it?

(6)      A    I'm not sure exactly how.

(7)      Q    Do you receive dividends?

(8)      A    I guess I take a draw.

(9)      Q    Is it a set period of time; every one

(10)  week, two weeks, monthly, something else?

(11)     A    Sometimes weekly, sometimes monthly.

(12)     Q    Has that always been the case since the

(13)  inception of Harvey Family?

(14)     A    I believe so.

(15)     Q    Do you ever discuss the draw you take with

(16)  the other managers?

(17)     A    No.

(18)     Q    At some point, Mr. Woong left Harvey

(19)  Family; is that correct?

(20)     A    Correct.

(21)     Q    Can you describe the circumstances

(22)  surrounding him leaving?

(23)     A    From what I recall, he needed to work

(24)  full-time hours.  At my office, we only work three

(25)  days a week, so that wasn't available for him.  He

(1)                    DR. RICHARD G. HARVEY

(2)    wanted to work six days a week.

(3)         Q    The three days a week he worked, what were

(4)    the hours he worked during those days?

(5)         A    Typically, Tuesdays from 8:30 until 7:30.

(6)    Thursdays from 8:30 until, approximately, 3:00.

(7)    Saturdays from 8:30 until, approximately, 12:00.

(8)         Q    What is the reason he could not take on

(9)    more days?

(10)        A    I don't have room on Mondays, Wednesdays,

(11)   and Fridays.  I do therapy on those days.  I can

(12)   only have acupuncture three days a week and therapy

(13)   three days a week.

(14)        Q    Physical therapy?

(15)        A    Three days a week, yes.

(16)        Q    Do you perform chiropractics every day of

(17)   the week at Harvey Family?

(18)        A    Yes.

(19)        Q    Does that include weekends?

(20)        A    Yes.

(21)        Q    What are the office hours at Harvey

(22)   Family?

(23)             MR. CHISARI:  In regard to physical

(24)        therapy, chiropractic, or acupuncture?

(25)        Q    Harvey family is open seven days a week,

LH REPORTING SERVICES, INC.        (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)      correct?

(3)          A      Six days a week.

(4)          Q      What day is Harvey Family closed?

(5)          A      Sundays, unless there's an emergency.

(6)          Q      Does Harvey Family open at 8:30 in the

(7)      morning every day of the week it is open?

(8)          A      By 8:00 we're there.

(9)          Q      Is there a set closing time?

(10)         A      When the last patient leaves, which is,

(11)     typically, between 7:30 and 8:00.

(12)         Q      To put things into context, can you just

(13)     describe what your office looks like?  I guess you

(14)     have two exam rooms?

(15)         A      No.

(16)         Q      Can you describe what it looks like?

(17)         A      When you walk in, I have a reception area.

(18)     Behind the reception area, there is someone who does

(19)     billing and filing.  Off to the side, I have four

(20)     treatment areas for physical therapy.  Next to that,

(21)     we have physical therapy equipment.  I have an

(22)     office for myself, and I have four exam rooms that

(23)     we use.  We have an x-ray room.  We have a room for

(24)     spinal decompression.  We also have a room for

(25)     developing x-rays.

DR. RICHARD G. HARVEY

(1)

(2)     Q     The four treatment areas for physical

(3)  therapy that you mentioned, that is the space that

(4)  is shared with acupuncture?

(5)     A     Yes.

(6)     Q     Acupuncture is Monday, Wednesday, and

(7)  Friday?

(8)     A     No.  Acupuncture is Tuesday, Thursday, and

(9)  Saturday.

(10)    Q     Physical therapy is Monday, Wednesday, and

(11) Friday?

(12)    A     Yes.

(13)    Q     Did Mr. Woong or his replacement,

(14) Mr. Shieh, have an office at Harvey Family?

(15)    A     You mean a specific room?

(16)    Q     You stated that you have an office there,

(17) correct?

(18)    A     Yes.

(19)    Q     Your office has a desk and you meet with

(20) patients in that room?

(21)    A     Yes.  There's a room off to the side that

(22) they would share.

(23)    Q     Is it an office?

(24)    A     It's a room, yes.

(25)    Q     When Mr. Woong left Harvey Family, is that

DR. RICHARD G. HARVEY

(1)

(2)  when he was given his distribution?

(3)       A    No.   The state told me how much to pay

(4)  him, and that's when I did.

(5)       Q    Did he get his initial contribution back?

(6)       A    I would have to check with the accountant.

(7)  I don't recall.

(8)       Q    Mr. Shieh ultimately replaced Mr. Woong,

(9)  correct?

(10)      A    Yes.

(11)      Q    As a member of Harvey Family?

(12)      A    Yes.

(13)      Q    What were the circumstances surrounding

(14)  that happening?

(15)      A    What do you mean?

(16)      Q    Did you approach Mr. Shieh and ask him if

(17)  he wanted to come --

(18)      A    Yes, I did.

(19)      Q    Did you meet with or interview any other

(20)  acupuncturists?

(21)      A    At that time, no.

(22)      Q    Did you initially ask Mr. Shieh to join

(23)  Harvey Family when you first were looking for an

(24)  acupuncturist?

(25)      A    No.

DR. RICHARD G. HARVEY

(2)    Q   Why did you select Mr. Shieh to be a
member of Harvey Family?

(4)    A   I had known him from the past.  I liked
the work he did, so that's why I spoke with him.

(6)    Q   Do you remember any details of the
conversation you had with him when you asked him to
become a member of Harvey Family?

(9)    A   No.

(10)    Q   Did Mr. Shieh review the operating
agreement prior to joining Harvey Family?

(12)    A   Yes.

(13)    Q   Did he ask for any changes to it?

(14)    A   Not me specifically.  He spoke to my
attorney, the attorney for the corporation.

(16)    Q   Did he ask to see any books or records of
financial statements so he could get an
understanding of how much he would be expected to
earn?

(20)    A   Not that I recall.

(21)    Q   Do you recall ever showing him any books
or records?

(23)    A   No.

(24)    Q   Did you discuss a salary with him or his
compensation?

(1)                    DR. RICHARD G. HARVEY

(2)        A     Yes.

(3)        Q     What was that salary?

(4)        A     (No verbal response.)

(5)        Q     How much does he currently earn?

(6)        A     He's not with me anymore.  He was earning

(7)  $700 or $800 a week.

(8)        Q     Did he ever ask to be added to the

(9)  signatory to Harvey Family's bank account?

(10)       A     Not that I recall.

(11)       Q     It's fair to say he put in a capital

(12)  contribution of $500?

(13)       A     Yes.

(14)       Q     He also received the same 1 percent that

(15)  Mr. Woong had for that $500?

(16)       A     Correct.

(17)       Q     Did he ever ask how much money he could be

(18)  expecting to receive in return for the capital

(19)  contribution of $500?

(20)       A     I believe he did.

(21)       Q     What did he ask you?

(22)       A     What I thought, in addition to his salary,

(23)  he would make.  I told him it was based on the

(24)  profits of the corporation.

(25)       Q     Did you give him a ballpark of what he

(1)                    DR. RICHARD G. HARVEY

(2)    could expect to earn?

(3)         A    I believe I gave him a ballpark.

(4)         Q    Do you recall what that number was?

(5)         A    No.

(6)         Q    When Mr. Woong was with Harvey Family

(7)    Tuesdays, Thursdays, and Saturdays, was he there

(8)    during the hours you identified before, from 8:30 to

(9)    7:30 on Tuesday, 8:30 to 3:00 on Thursday, and from

(10)   8:30 to 12:00 on Saturday?

(11)        A    Yes.

(12)        Q    Did he ever receive any profits or

(13)   dividends while he was there?

(14)             MR. CHISARI:  Woong or Shieh?

(15)             MR. MARVIN:  I am talking about Shieh.

(16)        A    No.

(17)        Q    What were the circumstances surrounding

(18)   Mr. Shieh leaving?

(19)        A    He wanted to go back to school to become

(20)   an occupational therapist.

(21)        Q    When did he leave Harvey Family?

(22)        A    I believe it was October of 2012.

(23)        Q    Did he receive his capital contribution of

(24)   $500 back?

(25)        A    I believe so.

DR. RICHARD G. HARVEY

(2)  Q    Did someone replace Mr. Shieh as the

(3)  acupuncturist member of Harvey Family?

(4)  A    Yes.

(5)  Q    Who was that?

(6)  A    His name is Jin.

(7)  Q    Do you have a document reflecting the

(8)  spelling of his last name?

(9)       MR. CHISARI:  I have his license.

(10)      MR. MARVIN:  For the record, Dr. Harvey

(11)      has handed me a New York State license in

(12)      acupuncture for Jin Hwangbo.  Last name is

(13)      spelled H-W-A-N-G-B-O.

(14)      MR. CHISARI:  Jin is his last name.

(15)      MR. MARVIN:  Counsel has informed me that

(16)      Jin, although is first on his license, is his

(17)      last name.

(18) BY MR. MARVIN:

(19)      Q    Dr. Harvey, how do you know Mr. Jin?

(20)      A    I believe someone from my office -- I put

(21) in an ad, I believe, on Craig's List.  Jin was the

(22) person I felt most comfortable with.

(23)      Q    How many people did you interview?

(24)      A    Approximately ten.

(25)      Q    Did you do the interviews in your office?

LH REPORTING SERVICES, INC.        (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)        A    Yes.

(3)        Q    Why did you feel most comfortable with

(4)   Mr. Jin?

(5)        A    I liked his personality, I liked his

(6)   background, and I got a good sense about him.

(7)        Q    What is his background?

(8)        A    His background was that he's been working,

(9)   where he studied, and based on that, that's why I

(10)  chose him.

(11)       Q    How long has he been providing acupuncture

(12)  services?

(13)       A    He's been with me since November 1st, I

(14)  believe.

(15)       Q    How long has he been providing acupuncture

(16)  services in his whole career?

(17)       A    He just started with me in 2012.

(18)       Q    He is just out of school?

(19)       A    I don't know when he finished school.

(20)  He's been working with me since November 1, 2012.

(21)       Q    When you said you liked his background and

(22)  that you felt comfortable with him, what about his

(23)  background did you like?

(24)       A    I don't recall right now.

(25)       Q    Do you recall where he worked prior to

LH REPORTING SERVICES, INC.        (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)    joining Harvey Family?

(3)          A    No.

(4)          Q    Do you know how long he provided

(5)    acupuncture services for prior to joining Harvey

(6)    Family?

(7)          A    No.

(8)               MR. CHISARI:  Do you not know or you just

(9)          don't remember?

(10)              THE WITNESS:  I don't recall.  At the time

(11)         I knew.  I don't know now.

(12)         Q    This was two or three months ago?

(13)         A    Three months ago, yes.

(14)         Q    Did Mr. Jin sign a copy of the Articles of

(15)    Organization?

(16)         A    Yes.

(17)         Q    I'm sorry.  Not the Articles of

(18)    Organization, but the operating agreement?

(19)         A    Yes.

(20)         Q    There is a third amended --

(21)         A    Yes.

(22)         Q    -- operating agreement?

(23)         A    Yes.

(24)              MR. MARVIN:  For the record, we will call

(25)         for production of the third amended operating

(1)                    DR. RICHARD G. HARVEY

(2)        agreement.

(3)            MR. CHISARI:  Put it in writing, and we

(4)        will take it under advisement.

(5)   BY MR. MARVIN:

(6)        Q    Aside from his name being substituted in

(7)   the operating agreement for Mr. Shieh and the date

(8)   being different, is it identical to the second

(9)   amended operating agreement and, for that matter,

(10)  the original operating agreement?

(11)       A    I believe so.

(12)       Q    Did Mr. Jin ask for any changes to be made

(13)  to the operating agreement?

(14)       A    Not that I recall.

(15)       Q    What was his capital contribution?  Did he

(16)  make a capital contribution to Harvey Family?

(17)       A    $1,000.

(18)       Q    Did Mr. Jin ask what his expected return

(19)  would be on an annual basis for the $1,000?

(20)       A    Yes.

(21)       Q    What did you tell him?

(22)       A    Again, it'd be based on the profits.

(23)       Q    Did you tell him what the expected profits

(24)  would be?

(25)       A    I believe I did.

DR. RICHARD G. HARVEY

(1)

(2)     Q     What did you tell him?

(3)     A     I told him to check with the accountant,

(4) and he would go over it with him.

(5)     Q     Other than providing acupuncture services

(6) and patient care at Harvey Family, does Mr. Jin do

(7) any other sort of management or operation of the

(8) daily affairs of the PLLC?

(9)     A     He's involved strictly with providing

(10) acupuncture services to the patients.

(11)    Q     Did Mr. Jin ever ask to see the books and

(12) records of Harvey Family prior to joining?

(13)    A     No.

(14)    Q     Were the books and records shown to him

(15) prior to joining?

(16)    A     No.

(17)    Q     Was Mr. Jin added as a signatory to Harvey

(18) Family's bank account?

(19)    A     Not yet.

(20)    Q     How much does Mr. Jin earn?

(21)    A     $700 is his salary, I believe.

(22)    Q     Is there a reason his salary is less than

(23) the two prior acupuncturists?

(24)    A     No.

(25)    Q     Who determines his salary?

DR. RICHARD G. HARVEY

(1)

(2)     A     Him and I discussed it.  That's the fee we

(3)   came up with.

(4)     Q     That was negotiated?

(5)     A     Yes.

(6)     Q     Did he ask for more?

(7)     A     Not that I recall.

(8)     Q     The initial figure of $700, was that your

(9)   figure or his figure?

(10)     A     I think it was mine.

(11)     Q     You told him $700 a week, and he was okay

(12)   with that?

(13)     A     Yes.

(14)     Q     Let's talk briefly about the physical

(15)   therapist, who was initially Mr. Sanbajon.

(16)           Did there come a time where Mr. Sanbajon

(17)   left Harvey Family?

(18)     A     Yes.

(19)     Q     When was that?

(20)     A     I don't recall exactly when he left.

(21)     Q     Do you remember why he left?

(22)     A     No.

(23)     Q     Did you have any discussions with him

(24)   about him leaving?

(25)     A     He told me he was leaving, and I told him

LH REPORTING SERVICES, INC.        (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)    I was happy with the work he was doing.  He may have

(3)    gone back to the Philippines, I don't recall.  I

(4)    have not spoken with him since the day he left.

(5)         Q    Did he receive his initial capital

(6)    contribution back?

(7)         A    I don't recall.

(8)         Q    Now, there came a point in time where

(9)    Nelson D. Brual became a member of Harvey Family

(10)   replacing Mr. Sanbajon; is that correct?

(11)        A    Yes.

(12)        Q    What were the circumstances surrounding

(13)   Mr. Brual joining Harvey Family?

(14)        A    I don't recall offhand of how I got in

(15)   touch with him or how he got in touch with me.  At

(16)   the time, I met with a bunch of therapists.  I felt

(17)   the most comfortable with him, and we discussed him

(18)   joining the corporation.

(19)        Q    Did you put an ad on Craig's List for him

(20)   as well?

(21)        A    I don't believe I did.

(22)        Q    How many other physical therapists did you

(23)   meet with at the time you were looking to replace

(24)   Mr. Sanbajon?

(25)        A    I don't recall.

(1)             DR. RICHARD G. HARVEY

(2)        Q     Do you recall if Mr. Sanbajon made a

(3)   capital contribution to Harvey Family?

(4)        A     I believe he did.

(5)        Q     Do you remember how much it was?

(6)        MR. CHISARI:  I believe he testified

(7)        earlier it was $1,000.  You asked that question

(8)        when we first got here.

(9)        Q     Did Mr. Brual ask how much he would be

(10)  expected to receive in exchange for his capital

(11)  contribution, if he would receive any profits,

(12)  dividends, and so forth?

(13)       A     Yes.  I told him it was based on the

(14)  corporation's profits.

(15)       Q     Did he ask what those profits were?

(16)       A     I don't recall if he did or not.

(17)       Q     What were the corporation's profits in the

(18)  year of 2012?

(19)       MR. CHISARI:  Taxes probably have not been

(20)       done for 2012 since the first day you can file

(21)       them is today.

(22)       Q     Do you review periodic accounting so

(23)  Harvey Family can see what its cost, liabilities,

(24)  disbursements, and profits are?

(25)       A     No.

LH REPORTING SERVICES, INC.     (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)        Q     Does anyone?

(3)        A     My accountant, I assume.

(4)        Q     Does Mr. Brual work the same hours as

(5)   Mr. Sanbajon did?

(6)        A     Correct.

(7)        Q     Did Mr. Brual ask for any changes to the

(8)   operating agreement before he signed it?

(9)        A     I don't recall.

(10)       Q     Why wasn't Mr. Brual added as a signatory

(11)  to Harvey Family's bank account?

(12)       A     If he wasn't, it's an oversight.  He will

(13)  be added on.

(14)       Q     Did he ever ask to be made a signatory to

(15)  the bank account?

(16)       A     Not that I recall.

(17)       Q     Did Mr. Brual get paid the same as his

(18)  predecessor, Mr. Sanbajon, which, I believe, you

(19)  said was $1,200 to $1,500 a week?

(20)       A     It's in that ballpark.

(21)       Q     Does he get a set salary every week or is

(22)  it different week to week?

(23)       A     It's typically the same.  I think after

(24)  taxes, it's $1,128.

(25)       Q     It is a set salary?

                    DR. RICHARD G. HARVEY

(1)

(2)        A    Yes.

(3)        Q    Is he a W2 employee?

(4)        A    He's a K1.

(5)        Q    With respect to all of the other managing

(6)   members that we discussed, are they also K1

(7)   employees?

(8)        A    Yes.

(9)        Q    At the time you decided to open Harvey

(10)  Family, the official date of incorporation is

(11)  April 19, 2011.

(12)            At that point, did you already have the

(13)  location of 984 North Broadway selected?

(14)       A    Yes.

(15)       Q    Is that something you discussed with the

(16)  other managers at that time?

(17)       A    I told them I was going to be moving my

(18)  office there.

(19)       Q    Did either of the two original managing

(20)  members, other than yourself, ask to see the office

(21)  prior to going into business with you?

(22)       A    Yes.

(23)       Q    Did you take them into the office?

(24)       A    Yes.

(25)       Q    Was the office space at 984 North Broadway

                    DR. RICHARD G. HARVEY
(1)
(2)    already built out as a chiropractic and physical
(3)    therapy office or did you have to put any capital
(4)    expenditures into it?
(5)         A    I put some money into it.
(6)         Q    Do you recall how much?
(7)         A    No.
(8)         Q    What exactly did you do?
(9)         A    I had some walls built and a front desk
(10)   built.  It wasn't a lot.
(11)        Q    Do you have a lease for the space?
(12)        A    Yes.
(13)        Q    Is that a yearly lease?  Is it renewed
(14)   every year?
(15)        A    No.  I think it's a five-year lease with a
(16)   five-year option.
(17)        Q    You are still in the first lease?
(18)        A    Yes.
(19)        Q    Did you negotiate that lease yourself?
(20)        A    Yes.
(21)        Q    Did Mr. Woong or Mr. Sanbajon have any
(22)   role in the negotiation of the lease for the
(23)   premises?
(24)        A    No.
(25)        Q    Is the lease paid out of the bank account

(1)                    DR. RICHARD G. HARVEY

(2)     for Harvey Family?

(3)          A     Yes.

(4)          Q     You pay that personally?

(5)                MR. CHISARI:   When you say personally, do

(6)          you mean does he write the check from the

(7)          checkbook?

(8)                MR. MARVIN:   Yes.

(9)          A     Yes.  I write the check.

(10)         Q     That is drawn out of the account of Harvey

(11)    Family?

(12)         A     Correct.

(13)         Q     Do you sublease your space to any other

(14)    providers?

(15)         A     No.

(16)         Q     Is 984 North Broadway a medical building

(17)    or just an office building?

(18)         A     It's an office building, but it's

(19)    predominately medical spaces.

(20)         Q     Are there any other providers in that

(21)    building that you work with for the treatment of

(22)    patients?

(23)         A     Yes.

(24)         Q     Can you name those providers?

(25)         A     I work with Dr. David Dynof, I work with a

(1)                    DR. RICHARD G. HARVEY

(2)     neurologist, Dr. Dickoff.  I work with Dr. Shaw, and

(3)     I work with Dr. McCarthy.  I think those are the

(4)     main providers in the building that I work with.

(5)          Q    Aside from chiropractics, acupuncture, and

(6)     physical therapy, does Harvey Family provide any

(7)     other services to patients, any other medical

(8)     services to patients?

(9)          A    No.

(10)         Q    Does Harvey Family have a website to do

(11)    marketing and so forth?

(12)         A    Yes.

(13)         Q    Did you develop that website yourself?

(14)         A    I had a person who specialized in website

(15)    development do it for me.

(16)         Q    When did you first create the website?

(17)         A    I don't recall.

(18)         Q    Did you ever discuss the website with any

(19)    of the other managing members, including Mr. Woong,

(20)    Mr. Sanbajon, or any of their replacements?

(21)         A    They are aware of the website.

(22)         Q    Have they ever had any substance of input

(23)    as far as what is on the website?

(24)              MR. CHISARI:  How advanced is the website?

(25)         A    I don't know how advanced it is.  I leave

DR. RICHARD G. HARVEY

(1)

(2)     that to the girls.  They handle that.  If the girls

(3)     have any questions about the website, they ask the

(4)     other people.  I'm sure they have given insight, but

(5)     I don't know about it.

(6)         Q    Does the website have a portion describing

(7)     the background of the doctors or the people that

(8)     provide services?

(9)         A    I'm not sure.

(10)        Q    Have you seen the website recently?

(11)        A    No.

(12)        Q    When was the last time you saw it?

(13)        A    Sometime within the last year.

(14)        Q    Do you know what the names are of any of

(15)    the medical providers who perform services, other

(16)    than yourself, that are listed on the website?

(17)        A    I don't know.

(18)        Q    Generally speaking, what percentage of

(19)    patients who present to Harvey Family receive

(20)    chiropractic treatment?

(21)        A    Probably 90 percent.

(22)        Q    Forgive me if I asked this before.

(23)            What percentage of patients receive

(24)    chiropractic treatment only?  When I say only, I

(25)    mean they do not receive physical therapy or

                        DR. RICHARD G. HARVEY

(1)

(2)    acupuncture.

(3)         A    I don't know.

(4)         Q    What percentage of patients receive

(5)    physical therapy at Harvey Family?

(6)         A    Maybe 50 percent, possibly.

(7)         Q    How about acupuncture services?

(8)         A    Maybe 30 percent.

(9)         Q    In terms of the profits of Harvey, do you

(10)   know what percentage of profits are attributable to

(11)   chiropractics, what percentage is attributable to

(12)   physical therapy, and what percentage is

(13)   attributable to acupuncture?

(14)        A    No.

(15)        Q    Have you ever made that inquiry?

(16)        A    No.

(17)        Q    Have any of the other managing members

(18)   asked that question to you?

(19)        A    Not that I recall.

(20)        Q    This is a little bit of a different

(21)   question than before.

(22)             In terms of the 90 percent of patients

(23)   that come to you for chiropractic treatment, what

(24)   percentage of those patients do you feel would

(25)   benefit from physical therapy, if you know?

DR. RICHARD G. HARVEY

(2)    A    It's hard to say.  It depends.  It's hard
(3)    to say.

(4)    Q    If you feel a patient could benefit from
(5)    physical therapy, what do you do?

(6)    A    I let them know that those services are
(7)    available, and if they are interested, they have to
(8)    consult either with their primary doctor, an
(9)    orthopedist, or with a pain management doctor.

(10)   Q    Generally speaking, how do new patients
(11)   get referred to your office?

(12)   A    A lot of it is word of mouth from other
(13)   patients.  Some is from the internet.  Some is from
(14)   the insurance companies, if they go to the insurance
(15)   company's website.  There are some attorneys who
(16)   refer patients to me.  There are doctors that refer
(17)   patients to me.

(18)   Q    Do most of Harvey Family's patients come
(19)   to you after being involved in car accidents, much
(20)   like the claimants that are the subject of this EUO?

(21)   A    Not most of them, no.

(22)   Q    What percentage would you say were
(23)   involved in automobile accidents?

(24)   A    40 percent, maybe.

(25)   Q    Is it fair to say that 40 percent of your

(1)                    DR. RICHARD G. HARVEY

(2)    practice is no-fault reimbursement?

(3)         A    Approximately.

(4)         Q    Is the rest private insurance?

(5)         A    The rest would be workers' compensation

(6)    and private insurance.

(7)              MR. MARVIN:  Let's take a break.

(8)                        (Whereupon, a recess was taken.)

(9)    BY MR. MARVIN:

(10)        Q    Dr. Harvey, does Harvey Family use a

(11)   management company?

(12)             MR. CHISARI:  Do you understand what a

(13)        management company is?

(14)             THE WITNESS:  Yes.

(15)        Q    Does Harvey Family use a management

(16)   company?

(17)        A    No.

(18)        Q    Has Harvey Family ever used a management

(19)   company?

(20)        A    No.

(21)        Q    Who manages the day-to-day operations of

(22)   Harvey Family?

(23)        A    Pretty much myself.

(24)        Q    Has Harvey Family ever entered into

(25)   management agreements with any other company?

(1)                    DR. RICHARD G. HARVEY

(2)        A    No.

(3)        Q    What is AB Life Center, if you know?

(4)        A    I'm not sure offhand.

(5)             MR. MARVIN:  Mark this as Exhibit F,

(6)        please.

(7)                        (Whereupon, Exhibit F, written

(8)                         consent form, was marked for

(9)                         Identification.)

(10)   BY MR. MARVIN:

(11)       Q    Dr. Harvey, I am showing you a document

(12)   that has been marked as Exhibit F, which is a

(13)   written consent of general managers of Harvey Family

(14)   Chiropractic, Physical Therapy & Acupuncture, PLLC.

(15)            I am going to ask you to take a look at

(16)   this document and let me know if you are familiar

(17)   with it.

(18)            MR. CHISARI:  Considering, Counsel, it is

(19)       unsigned; it is a page out of one or more

(20)       documents.  I am going to object to him

(21)       testifying to anything.  Where did you get it?

(22)            MR. MARVIN:  We got it from Dr. Harvey.

(23)            MR. CHISARI:  AB Life Center, I know what

(24)       that is.  That is Dr. Harvey's company.

(25)            MR. MARVIN:  You are testifying for the

DR. RICHARD G. HARVEY

(1)

(2)      witness, and I am not going to tolerate it.

(3)      There is a question pending.  Whether you know

(4)      what it is or not is irrelevant.

(5)      A     I believe it is a document from my

(6)  corporation.

(7)      Q     Well, the question is, do you know what AB

(8)  Life Center, Inc. is?

(9)      A     I believe it's part of my company that I

(10)  formed originally with my healthcare attorney.

(11)      Q     Is AB Life Center, Inc. a separate

(12)  corporation from Harvey Family?

(13)      A     I believe so.

(14)      Q     What was the purpose of forming AB Life

(15)  Center, Inc.?

(16)      A     I don't recall exactly.

(17)          MR. CHISARI:  Did you form AB Life Center,

(18)      Inc.?

(19)          THE WITNESS:  I believe I did with my

(20)      healthcare attorney.

(21)  BY MR. MARVIN:

(22)      Q     Are you familiar with Exhibit F?

(23)      A     After seeing it, yes.

(24)      Q     When was the last time you saw this

(25)  document prior to today?

(1)                    DR. RICHARD G. HARVEY

(2)        A     Probably when I formed my corporation.

(3)        Q     Dr. Harvey, this document, which you have

(4)   probably seen, states that the company Harvey Family

(5)   desires to renew certain management agreements with

(6)   AB Life Center, Inc., titled, contract to provide

(7)   maintenance and nonmedical services, premises

(8)   lease/sublease agreement, and equipment lease

(9)   agreement.

(10)            Did Harvey Family ever have a management

(11)   agreement with AB Life Center, Inc.?

(12)        A     I believe when my attorney formed the

(13)   corporation, yes.

(14)        Q     Did Harvey Family enter into management

(15)   agreements with AB Life Center, Inc.?

(16)        A     I believe it's all one in the same.

(17)        Q     What do you mean by that?

(18)        A     It's all part of my PLLC.

(19)            MR. CHISARI:  Counsel, what you are

(20)       missing is that he owns both of them.  They are

(21)       all part of one.  You are going down a path

(22)       that has Dr. Harvey owning a management

(23)       company.  If he has tax reasons for doing it,

(24)       he does.  You can bark down that tree for the

(25)       next three hours.  The answer is that he owns

(1)                     DR. RICHARD G. HARVEY

(2)          it.   It started with Harvey Chiropractic.

(3)               MR. MARVIN:  Are you finished?

(4)               MR. CHISARI:  Apparently you're not.  We

(5)          will sit here for three hours, and he will say

(6)          that he owns it.

(7)     BY MR. MARVIN:

(8)          Q    Are you the sole owner of AB Life Center,

(9)     Inc.?

(10)         A    I'm not sure.

(11)         Q    Do you recall anything about AB Life

(12)    Center, Inc., other than you believe it is a company

(13)    that you opened when you started Harvey Family?

(14)         A    I think it's how all of the bills get paid

(15)    through the practice.  I believe that's why it was

(16)    put together.  I don't know 100 percent.

(17)         Q    What bills are you referring to?

(18)         A    Day-to-day things; ordering supplies and

(19)    paying rent.

(20)         Q    I want to go through each of the three

(21)    agreements that are listed in the document.  One is

(22)    called the contractor providing maintenance and

(23)    nonmedical services, which Harvey Family has with AB

(24)    Life Center, Inc.

(25)              Could you provide any details about what

(1)                    DR. RICHARD G. HARVEY

(2)      that contract is?

(3)           A    No.

(4)           MR. CHISARI:  Was one actually executed?

(5)      There's a question you might have wanted to

(6)      ask, Counsel.

(7)           MR. MARVIN:  I am asking the questions --

(8)           MR. CHISARI:  Why don't you ask competent

(9)      questions.  Why don't you ask this question:

(10)     Is there one?  Did you renew it?

(11)          MR. MARVIN:  How would it be renewed if it

(12)     wasn't executed in the first place?

(13)          MR. CHISARI:  Why don't you get a book on

(14)     how to ask a question during an EUO.

(15)          MR. MARVIN:  Off the record.

(16)                    (Whereupon, a conversation was

(17)                     held off the record.)

(18)          MR. CHISARI:  I am going to object.  I

(19)     want the objective reasons you are going into

(20)     this line of questioning.

(21)          MR. MARVIN:  Counsel, I am asking the

(22)     questions.

(23)          MR. CHISARI:  No.  You are not asking

(24)     relative questions.  I asked for the objective

(25)     standards for going into this line of

(1)                    DR. RICHARD G. HARVEY

(2)        questioning.  In this EUO and in any past EUO,

(3)        I asked for you to give those standards, which

(4)        at this point, is required.

(5)             MR. MARVIN:  First of all, Counsel, you

(6)        are incorrect that me giving an objective

(7)        standard is required.  I believe these

(8)        questions are relevant for verification of

(9)        claims.

(10)            MR. CHISARI:  I am asking you how.

(11)            MR. MARVIN:  I do not have to tell you

(12)        why.  If you want to read a book on why these

(13)        questions are relevant, you can go read that

(14)        book.  If you are going to keep objecting, we

(15)        will be here all day.

(16)            MR. CHISARI:  Your script is worthless.

(17)            MR. MARVIN:  Okay.

(18)    BY MR. MARVIN:

(19)        Q    Dr. Harvey, do you know would the

(20)    contractor provide maintenance and nonmedical

(21)    services?

(22)        A    I don't know the details of the contract.

(23)        Q    Have you ever seen the contract?

(24)        A    The day it was drafted a few years ago,

(25)    but I have not seen it since.

                    DR. RICHARD G. HARVEY

(1)

(2)    Q    Do you know if any of the managing members

(3)  of Harvey Family ever saw that contract?

(4)    A    I do not know.

(5)    Q    What about the premises sublease

(6)  agreement; can you describe what that agreement is?

(7)    A    No, I can't.

(8)    Q    What about the equipment lease agreement;

(9)  can you describe what that agreement is?

(10)   A    No.

(11)   Q    Are the bills of Harvey Family paid out of

(12) a bank account for AB Life Center, Inc.?

(13)        MR. CHISARI:  Whose name is on the checks?

(14)   A    It's Harvey Family Chiropractic, Physical

(15) Therapy & Acupuncture.

(16)   Q    Does AB Life Center, Inc. have a bank

(17) account?

(18)   A    I don't believe so.

(19)   Q    Does it have a corporate office?

(20)   A    It would be 984 North Broadway.

(21) Everything is out of 984 North Broadway.

(22)   Q    What about the equipment lease agreement;

(23) do you recall what that agreement says?

(24)   A    No.

(25)   Q    Do you know who negotiated the terms of

<div style="text-align:center">DR. RICHARD G. HARVEY</div>

(1)

(2)        that agreement?

(3)             A     No.

(4)             Q     Does AB Life Center, Inc. provide

(5)        management services to any other corporations that

(6)        you know of?

(7)             A     No.

(8)             Q     Do you have copies of the three agreements

(9)        we are discussing?

(10)            A     In my office somewhere.  I must have them.

(11)                  MR. MARVIN:  We are going to call for

(12)            production of those documents.

(13)                  MR. CHISARI:  Put it in writing.  We will

(14)            take it under advisement.

(15)       BY MR. MARVIN:

(16)            Q     Do you know what AB Life Center, Inc.'s

(17)       involvement is in the day-to-day operations of

(18)       Harvey Family?

(19)            A     No.

(20)            Q     Has AB Life Center, Inc. paid any money

(21)       for the performance of any services on behalf of

(22)       Harvey Family?

(23)            A     Not that I am aware of.

(24)            Q     How many patients do you typically see on

(25)       any given day?

DR. RICHARD G. HARVEY

(1)
(2)     A     For chiropractic services?

(3)     Q     You, personally.

(4)     A     Approximately 100 patients.

(5)     Q     Per day?

(6)     A     Yes.

(7)     Q     You see 100 patients per day?

(8)     A     Yes.

(9)           MR. CHISARI:  Is that the whole practice

(10)    or you as a chiropractor?

(11)          THE WITNESS:  Me.

(12)    Q     Do you do consultations with each of these

(13)    patients?

(14)    A     Well, when they initially come into the

(15)    office, we do consultations.  After that, they get

(16)    whatever treatment as needed.  They don't get a

(17)    consultation every visit.

(18)    Q     How long do the initial consultations

(19)    last?

(20)    A     I would say, approximately, half an hour.

(21)    Q     When patients subsequently come back, what

(22)    types of services do you perform?

(23)    A     As a chiropractor?

(24)    Q     Yes.

(25)    A     Spinal adjustments, trigger point work,

DR. RICHARD G. HARVEY

(1)
(2)     exercise therapy, mechanical traction, occasionally
(3)     hot packs, occasionally muscle stimulation.
(4)          Q    How long does it take to perform each and
(5)     every one of those procedures?
(6)          A    The adjustment takes a few minutes.  The
(7)     mechanical traction and the trigger point could
(8)     take, approximately, 15 minutes.
(9)          Q    When you say trigger point, what are you
(10)    referring to?
(11)         A    With my hand I will find different areas
(12)    on the muscle that are called trigger points, which
(13)    is an area where waste product builds up in the
(14)    muscle and causes pain.  We work them out with the
(15)    trigger points with pressure applied.
(16)         Q    What is the age range of the patient
(17)    population that you, personally, treat?
(18)         A    There is no range.
(19)         Q    You treat from children to elderly?
(20)         A    Yes.
(21)         Q    What is the youngest you would treat?
(22)         A    A baby.
(23)         Q    On a typical day when Harvey Family
(24)    provides acupuncture services, how many patients are
(25)    seen?

DR. RICHARD G. HARVEY

(1)

(2)    A .   With acupuncture?

(3)    Q    Yes.

(4)    A    Tuesday has the most hours, so maybe 30

(5) patients.  I'm not sure.

(6)    Q    What about physical therapy; on a typical

(7) day, how many patients are seen?

(8)    A    At least 50 people, I think, they would

(9) see.

(10)   Q    Do you ever time the visits for the amount

(11) of time you spend with patients?

(12)   A    No.

(13)   Q    When you are doing an initial consultation

(14) with patients, do you take notes?

(15)   A    Yes.

(16)   Q    Can you describe exactly what it is that

(17) you write?

(18)   A    We have an exam sheet.  On the exam sheet,

(19) we'll take the history from the patient, then do an

(20) examination, and put the examination findings on the

(21) initial exam report.

(22)   Q    You do this yourself?

(23)   A    My associate does it.

(24)   Q    Is someone with you, generally, when you

(25) do the exam?

LH REPORTING SERVICES, INC.      (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)        A    Yes.

(3)        Q    Is it the same person every time?

(4)        A    Yes.

(5)        Q    Who is that person?

(6)        A    Neil Goldsmith.

(7)        Q    Is he a chiropractor?

(8)        A    Yes.

(9)        Q    For every patient you see that has an

(10)   initial consultation, he is with you?

(11)       A    Yes.

(12)       Q    What is his role while you are doing the

(13)   initial consultation, aside from entering --

(14)       A    He does the examination.

(15)       Q    What is your role?

(16)       A    Typically, with new patients, I greet the

(17)   patient, go over certain things about the office,

(18)   then let him do the examination, and do the

(19)   examination consultation.

(20)       Q    Do you do any initial consultations or

(21)   examinations yourself?

(22)       A    Occasionally.

(23)       Q    Typically, it is him?

(24)       A    Yes.

(25)       Q    Are you able to put a percentage on that?

(1)                    DR. RICHARD G. HARVEY

(2)      Is it more than 90 percent of the time that he does

(3)      the initial consultation?

(4)           A    He does most of them.

(5)           Q    In terms of the other treatments for

(6)      patients that you mentioned, who provides those

(7)      treatments?

(8)           A    I do most of them.

(9)           Q    Is it fair to say that Mr. Goldsmith does

(10)     the initial evaluations and you do the treatments on

(11)     patients?

(12)          A    He treats patients also, but I do the

(13)     majority of the adjusting.

(14)          Q    Are there follow-up consultations with

(15)     patients that are performed by Harvey Family?

(16)          A    Yes.

(17)          Q    How often are those performed?

(18)          A    Typically, every four to six weeks.

(19)          Q    Does Mr. Goldsmith also perform those?

(20)          A    Yes.

(21)          Q    Does he take notes also?

(22)          A    Yes.

(23)          Q    What type of notes does he take?

(24)          A    We have a SOAP note that we use.

(25)          Q    Are these documents made a part of the

(1)                    DR. RICHARD G. HARVEY

(2)    file?

(3)         A    Yes.

(4)         Q    Are there any other types of documents

(5)    that are created during the course of a patient's

(6)    treatment, other than the initial consultation

(7)    report and the SOAP notes?

(8)         A    No.

(9)         Q    The patient comes to you for an

(10)   adjustment, for example.  Is there any recorded

(11)   written documentation describing the services that

(12)   were performed or why it was performed?

(13)        A    It's on the SOAP note, yes.

(14)        Q    There is a SOAP note for each and every

(15)   visit for each and every patient?

(16)        A    Yes.

(17)        Q    Are all of those SOAP notes kept with the

(18)   patient's file?

(19)        A    Yes.

(20)        Q    Are those SOAP notes submitted to insurers

(21)   in general and Allstate in particular?

(22)        A    Yes.

(23)        Q    Do you know that for a fact?

(24)        A    I believe they are sent out.

(25)        Q    Do you, personally, send them out?

DR. RICHARD G. HARVEY

(1)

(2)     A     Typically, my girls will do the billing

(3)  and send them out when the insurance company

(4)  requests it.

(5)     Q     Do you ever look at the final package to

(6)  send to the insurers before it is sent out?

(7)     A     Typically, no.

(8)     Q     Do you have any firsthand knowledge of

(9)  whether or not SOAP notes and initial consultation

(10)  reports were actually sent to Allstate in connection

(11)  with these claimants which are the subject of this

(12)  EUO today?

(13)          MR. CHISARI:  I am going to object.  This

(14)     was asked and answered in the beginning.  He

(15)     already answered this question twice.

(16)     A     I believe they were sent out.

(17)     Q     Do you have any firsthand knowledge of

(18)  whether or not they were sent out?

(19)     A     I don't watch them being sent out.

(20)     Q     Is the answer no?

(21)     A     No.

(22)     Q     Can you describe under what circumstances

(23)  you would refer or suggest a patient to receive

(24)  acupuncture?

(25)     A     When a patient comes to see me, I let them

(1)                    DR. RICHARD G. HARVEY

(2)    know of the services available in the clinic.  If

(3)    they are interested in it, I have them do a

(4)    consultation with the acupuncturist.

(5)         Q    How many acupuncturists currently work for

(6)    Harvey Family?

(7)         A    Just one.

(8)         Q    Is that Mr. Jin?

(9)         A    Yes.

(10)        Q    Did any other acupuncturists ever work for

(11)   Harvey Family, other than the three managers that we

(12)   just discussed?

(13)        A    No.

(14)        Q    So it is fair to say that all acupuncture

(15)   services that are performed through Harvey Family

(16)   were either given through Mr. Woong, Mr. Shieh, or

(17)   Mr. Jin?

(18)        A    There was one other acupuncturist, Sun

(19)   Lee.

(20)        Q    When did Sun Lee work for Harvey Family?

(21)        A    Last year.

(22)        Q    For how long a period of time?

(23)        A    Approximately six months or so.

(24)        Q    Did you hire her?

(25)        A    Yes.

DR. RICHARD G. HARVEY

(1)

(2)     Q     Why did you hire an additional

(3)  acupuncturist?

(4)     A     Because we needed one in the practice.

(5)     Q     Is it because the practice was very busy?

(6)     A     Yes.

(7)     Q     How did you go about hiring a new

(8)  acupuncturist?  What did you do?

(9)     A     I don't recall how we hired her.

(10)    Q     Did you place an ad somewhere?

(11)    A     I don't think so.  I don't remember.

(12)    Q     Was she referred to you?

(13)    A     Possibly.  I don't recall.

(14)    Q     Do you recall meeting with her to discuss

(15)  the circumstances of her employment?

(16)    A     Yes.

(17)    Q     Can you describe that meeting?

(18)    A     I told her about the practice and what the

(19)  salary would be, and she was interested and chose to

(20)  work with me.

(21)    Q     Do you recall what her salary was?

(22)    A     I believe it was $700.

(23)    Q     Is that $700 per week?

(24)    A     Correct.

(25)    Q     Do you know why she left?

DR. RICHARD G. HARVEY

(2)     A     She needed more hours.

(3)     Q     Did Mr. Shieh meet with Ms. Lee prior to

(4)  her being hired?

(5)     A     I don't recall.

(6)     Q     Did you recall discussing the hiring of

(7)  Ms. Lee with Mr. Shieh prior to her being hired?

(8)     A     I don't recall.

(9)     Q     Was it your decision to hire her?

(10)    A     Yes.

(11)    Q     Could you briefly tell me the benefits of

(12) acupuncture?

(13)         MR. CHISARI:  I am going to object.  He is

(14)         a chiropractor.  There is no establishment he

(15)         knows anything about acupuncture to testify to

(16)         its benefits.

(17)    Q     For what benefit would you refer or

(18) suggest a patient of yours to receive acupuncture

(19) treatment?

(20)    A     I believe it can help them with pain, help

(21) reduce pain, and help promote the healing process.

(22)    Q     How long does a typical acupuncture

(23) treatment last on a patient?

(24)    A     I don't know.  I couldn't tell you.  I

(25) would think somewhere between 20 minutes to a half

DR. RICHARD G. HARVEY

(1)

(2) hour.

(3)      Q   Are any notes taken by the acupuncturist

(4) with regard to performing acupuncture treatments on

(5) patients?

(6)      A   Yes.

(7)      Q   What type of notes are kept?

(8)      A   They have a form.  They have their own

(9) acupuncture SOAP notes.

(10)     Q   Where are those documents kept?

(11)     A   In the patient's acupuncture file.

(12)     Q   Do you know if any of those notes were

(13) submitted to Allstate in connection with the claims

(14) for reimbursement which are the subject of today's

(15) EUO?

(16)     A   I believe they have been.  I didn't see

(17) them go out.

(18)     Q   Is it the general practice of Harvey

(19) Family to send out the acupuncturist notes together

(20) with claims for reimbursement?

(21)     A   I don't know if we send them with the

(22) bill.  There are times they will call us and say,

(23) "We need the records," so we will send the records

(24) over.  Sometimes, we'll send it initially.

(25)     Q   You do not have any firsthand knowledge

DR. RICHARD G. HARVEY

(2) that the acupuncture notes in connection with the

(3) claims for reimbursement, which are the subject of

(4) today's EUO, were actually sent to Allstate?

(5)     A    Correct.

(6)         MR. MARVIN:  At this time, we are going to

(7)     call for the production of all acupuncture

(8)     notes relating to the claimants which are the

(9)     subject of this EUO in connection with the

(10)    verification of the claims in addition to all

(11)    other medical records, which relate to the

(12)    claimants which are the subject of this EUO.

(13)        MR. CHISARI:  Again, put it in writing.

(14)    We will take it under advisement.  We will

(15)    object on the grounds of HIPAA, and we believe

(16)    they have already been provided.

(17)        MR. MARVIN:  Counsel, first of all, I do

(18)    not think they have been provided.  Second,

(19)    there is not a HIPAA violation.  They are

(20)    Assignment of Benefits.

(21)        MR. CHISARI:  You keep asking for the

(22)    entire medical file.  There you go.  HIPAA,

(23)    right there.  I will repeat it constantly.

(24) BY MR. MARVIN:

(25)    Q    Dr. Harvey, tell me what is in a

LH REPORTING SERVICES, INC.        (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)    claimant's entire medical file, what types of

(3)    documents.

(4)        A    It could be MRI, if they had any other

(5)    care from other doctors, plus my notes that I keep

(6)    in my office.

(7)        Q    With respect to the claimants we are

(8)    talking about today and the bills submitted, are all

(9)    of the notes and other documents in connection with

(10)   those notes kept in the files?

(11)       A    Yes.

(12)            MR. MARVIN:  We are going to call for the

(13)       production of all of those documents in

(14)       furtherance of the verification of these

(15)       claims.

(16)            MR. CHISARI:  Put it in writing.  We will

(17)       take it under advisement.

(18)   BY MR. MARVIN:

(19)       Q    With regard to physical therapy,

(20)   typically, on average, how long does a physical

(21)   therapy session last?

(22)       A    I think, approximately, a half hour.

(23)       Q    Are contemporaneous notes taken by the

(24)   physical therapist with regard to the patient's

(25)   physical therapy treatment?

(1)                    DR. RICHARD G. HARVEY

(2)        A     Yes.

(3)        Q     Do you know what is in those notes?

(4)        A     Their findings on each particular visit.

(5)        Q     Are those notes also kept within the files

(6)   of Harvey Family?

(7)        A     Yes.

(8)              MR. MARVIN:  We call for their production.

(9)              MR. CHISARI:  Note my objections as

(10)       previously laid out.

(11)  BY MR. MARVIN:

(12)       Q     What type of physical therapy is performed

(13)  through Harvey Family?

(14)       A     I don't know what type of physical

(15)  therapy.

(16)       Q     In connection with the claimants which are

(17)  the subject of this EUO, did you meet with the

(18)  physical therapist and acupuncturist that provided

(19)  services during the course of the claimants'

(20)  treatment in order to discuss their progress?

(21)       A     There are times we will discuss it if

(22)  there's a flare-up or if something is not going

(23)  well.

(24)       Q     Do you ever have set meetings with them

(25)  once a week or on a periodic basis and discuss the

                    DR. RICHARD G. HARVEY

(1)

(2)    treatment of patients?

(3)         A    No.

(4)         Q    Did Harvey Family ever enter into any

(5)    agreements with any other providers regarding the

(6)    referrals of patients?

(7)         A    No.

(8)         Q    Does Harvey Family provide transportation

(9)    for patients to get to and from the facility?

(10)        A    Yes.

(11)        Q    How so?

(12)        A    I have a driver that works for me that

(13)   picks up patients that are unable to get to the

(14)   office.

(15)        Q    What is the driver's name?

(16)        A    His name is Alan Cruise.

(17)        Q    Is he a W2 employee?

(18)        A    I'm not sure.

(19)        Q    What is his salary?

(20)        A    I believe it's $400 a week.

(21)        Q    Does he drive a personal car or company

(22)   car?

(23)        A    It's my vehicle.

(24)        Q    It is your personal vehicle?

(25)        A    I bought it for the practice.

(1)                    DR. RICHARD G. HARVEY

(2)       Q    Is it a van or a car?

(3)       A    It's a van.

(4)       Q    Do you know what kind?

(5)       A    I believe it's a Dodge.

(6)            MR. CHISARI:   We will provide you with a

(7)       copy of the registration.

(8)            MR. MARVIN:   Thank you.

(9)    BY MR. MARVIN:

(10)      Q    Is your company name on the side of the

(11)   van?

(12)      A    No.

(13)      Q    Do you only have that one vehicle and one

(14)   driver that provides transportation?

(15)      A    Correct.

(16)      Q    How are the pickups and drop-offs

(17)   arranged?

(18)      A    He has a cell phone.  If the patient can't

(19)   get there on their own, they call the office and

(20)   they will give them his number.

(21)      Q    Does he ever do pickups of one or more

(22)   patient at a time?

(23)      A    Yes.

(24)      Q    Is that something that is arranged so that

(25)   he does not have to make a lot of trips?

DR. RICHARD G. HARVEY

(1)

(2)      A      He will work that out.

(3)      Q      How many employees does Harvey Family

(4)  have?

(5)      A      Are you talking about doctors, including

(6)  physical therapists and everybody?

(7)      Q      Yes.

(8)      A      Approximately nine, I believe.

(9)      Q      Are you counting yourself as well?

(10)     A      Okay.

(11)     Q      So you and Mr. Goldsmith perform

(12)  chiropractic services?

(13)     A      Correct.

(14)     Q      You have one acupuncturist, which is

(15)  Mr. Jin?

(16)     A      Correct.

(17)     Q      You have one physical therapist,

(18)  Mr. Brual?

(19)     A      Yes, and a PT assistant.

(20)     Q      What is the PT assistant's name?

(21)     A      His name is Marlin.

(22)     Q      Do you know his last name?

(23)     A      Millares, M-I-L-L-A-R-E-S.

(24)     Q      How long has he been with Harvey Family?

(25)     A      A couple of years, I believe.

DR. RICHARD G. HARVEY

(1)

(2)     Q     Would that be since the beginning?

(3)     A     Almost.

(4)     Q     Did you hire him?

(5)     A     Yes.

(6)     Q     I know it was a couple of years ago, but

(7) do you remember the circumstances surrounding you

(8) hiring him?

(9)     A     What do you mean?

(10)    Q     Did you put an ad out?

(11)    A     I don't recall.

(12)    Q     Did you discuss the salary with him?

(13)    A     Yes.

(14)    Q     How much does he receive?

(15)    A     It is automatically deposited to his

(16) account.  I think it's somewhere between $700 and

(17) $800 a week.

(18)    Q     That is the amount that you negotiated

(19) with him?

(20)    A     Yes.

(21)    Q     That is five employees so far.  The

(22) driver, Mr. Cruise, is six.

(23)          Who else is employed at Harvey Family?

(24)    A     Sabrina Rosario, who is a receptionist.

(25)    Q     Sabrina Rosario?

DR. RICHARD G. HARVEY

(1)

(2)    A    Yes.  My wife is a receptionist.  Her name

(3)  is Stacey.

(4)    Q    Does she have the same last name as you?

(5)    A    Yes.  Kelly Curry.

(6)    Q    Is she also a receptionist?

(7)    A    Yes.  There is one other.  His name is

(8)  Dae, D-A-E, King.

(9)    Q    What does he do?

(10)   A    He's a receptionist, and he helps out with

(11)  the billing.

(12)   Q    With regard to Ms. Rosario, Ms. Curry,

(13)  your wife, and Mr. King, did you hire those people

(14)  yourself?

(15)   A    Yes.

(16)   Q    Did you discuss their hiring with any

(17)  other general managers at the time they were hired?

(18)   A    Not that I recall.

(19)   Q    Did you negotiate the salaries with all

(20)  four of those individuals?

(21)   A    Yes.

(22)   Q    Did you negotiate the terms of employment

(23)  with all of those individuals?

(24)   A    Yes.

(25)   Q    With regard to all of the employees of

DR. RICHARD G. HARVEY

(1)

(2)     Harvey Family, if there were any issues involved

(3)     with employment, is it fair to say that you are the

(4)     person to go to, to try to resolve those problems?

(5)         A     Yes.

(6)         Q     We did get to nine individuals.

(7)               Are those all of the people that currently

(8)     work for Harvey Family?

(9)         A     Yes.

(10)        Q     With the exception of the people that we

(11)    already discussed today who are no longer with

(12)    Harvey Family, is there anyone else that has worked

(13)    at Harvey Family since its inception?

(14)        A     Since its inception?

(15)        Q     I am talking about two years ago.

(16)        A     Not that I know of.

(17)        Q     Do any independent contractors work for

(18)    Harvey Family?

(19)        A     No.

(20)        Q     We briefly touched into it before.

(21)              Can you just describe Harvey Family's

(22)    billing procedure?

(23)        A     What do you mean?

(24)        Q     In other words, after you provide services

(25)    to a patient and you want to assemble the documents

(1)                    DR. RICHARD G. HARVEY

(2)    and send them off to insurers for reimbursement,

(3)    describe that procedure.

(4)         A    I have a girl that does billing.  She puts

(5)    into the computer what services were done and sends

(6)    the bill out.

(7)         Q    Who is that girl?

(8)         A    Kelly Curry.

(9)         Q    She does all of the billing for Harvey

(10)   Family?

(11)        A    Dae does the billing also.

(12)        Q    Who is responsible for the payroll for all

(13)   of these people?

(14)        A    I have a payroll company.

(15)        Q    What is the company?

(16)        A    I'm not sure of the name.  My accountant

(17)   set it up for me.

(18)        Q    Does your signature appear on the payroll

(19)   checks?

(20)        A    I believe so.  A lot of them are direct

(21)   deposit.

(22)        Q    Does Harvey Family lease any of the

(23)   equipment it uses to provide treatment to patients?

(24)        A    I think any leases I've had have been paid

(25)   off.  I believe I own everything outright at this

DR. RICHARD G. HARVEY

(1)

(2)     point.

(3)         Q     Can you describe what equipment you would

(4)     be talking about?

(5)         A     I have a DRX9000 machine, which is a

(6)     spinal decompression machine.  I have an x-ray

(7)     machine, an x-ray processor, electrical stimulation

(8)     muscle units; we have bicycles, and we have weights.

(9)         Q     You own all of this equipment?

(10)        A     Yes.

(11)        Q     We discussed your lease at the premises

(12)    for Harvey Family.

(13)              You have a five-year lease?

(14)        A     Yes.

(15)        Q     Do you know the owner that your lease is

(16)    with of the management company?

(17)        A     It is 984 Associates.

(18)        Q     Do you do any marketing for Harvey Family?

(19)        A     Not really.

(20)        Q     Most of your new patients come from

(21)    referrals, as you stated earlier?

(22)        A     Correct.

(23)        Q     There are occasions where you prescribe

(24)    durable medical equipment to patients if you feel

(25)    that it would help in their treatment, correct?

(1)                    DR. RICHARD G. HARVEY

(2)        A    Yes.

(3)        Q    Under what circumstances do you prescribe

(4)    durable medical equipment, other than the general

(5)    statement that I just said?

(6)        A    I will prescribe them based on what the

(7)    conditions are and if these particular supplies will

(8)    benefit them.

(9)        Q    What type of supplies do you prescribe?

(10)       A    Typically, I will recommend ice packs,

(11)   cervical pillows, car seats, lumbar braces, heating

(12)   pads, sometimes a whirlpool or a cane, and

(13)   occasionally a knee brace.

(14)       Q    How are these supplies given to the

(15)   patients?

(16)       A    I typically stock the supplies in my

(17)   office.  I have a company that gives me supplies.

(18)   Patients will typically sign for them, and we will

(19)   send the statements to the company, and then they do

(20)   their own billing.

(21)       Q    What company is that?

(22)       A    Clinton Surgical, I believe.

(23)       Q    How much of an inventory do you keep on

(24)   hand?

(25)       A    Typically, on hand, I will have 20 car

DR. RICHARD G. HARVEY

(1)

(2)     seats, 500 ice packs, and 20 pillows.  All of the

(3)     supplies I have, I have at least 20 of them.

(4)          Q     Do you keep the stock on hand

(5)     notwithstanding that it has not yet been assigned to

(6)     patients?

(7)          A     Yes, to make it easier.  We used to wait,

(8)     and they would ship it to the patient.  That was a

(9)     company I used in the past.  They prefer me to keep

(10)    it in the office now; so I keep it in the office.

(11)         Q     Do you show the patients how to use the

(12)    various pieces of equipment?

(13)         A     Yes.

(14)         Q     Does that go for all of the equipment, the

(15)    car seats, the braces, and everything you mentioned?

(16)         A     Yes.

(17)         Q     Do you write prescriptions for these

(18)    items?

(19)         A     I have a form that I use, which I'll check

(20)    off what I want the patients to have, and the girls

(21)    will dispense it to the patient.

(22)         Q     Do you consider that form as a

(23)    prescription?

(24)         A     Yes.

(25)         Q     Do you know if a prescription is needed to

DR. RICHARD G. HARVEY

(1)
(2)    give durable medical equipment to patients?

(3)        A    No.   I'm not aware of that.

(4)        Q    The form you fill out where you check off

(5)    the equipment, and I think I have some in the claim

(6)    files --

(7)        MR. CHISARI:   I am going to object at this

(8)        point because I don't think Dr. Harvey bills

(9)        for any durable medical equipment.  The line of

(10)        questioning you are going into right now about

(11)        durable medical equipment is really irrelevant.

(12)        He's not billing for it.  He is prescribing it,

(13)        if anything, but he is not billing for it.  He

(14)        is not asking for reimbursement for it.

(15)        It is a service that he provides to his

(16)        clients.  It does not relate to any of his

(17)        treatment.  If you want to bring the durable

(18)        medical company in here and do an EUO of them,

(19)        absolutely.  At this point, I am going to

(20)        object because he did not bill for it.

(21)        MR. MARVIN:   He prescribes the equipment

(22)        for his treatment of patients.

(23)        MR. CHISARI:   To a certain extent, he does

(24)        prescribe it.  Going through how much he keeps

(25)        in the closet is getting well off course.

(1)                    DR. RICHARD G. HARVEY

(2)      BY MR. MARVIN:

(3)          Q    How did you develop your relationship with

(4)      Clinton?

(5)          A    The representative I had known years ago,

(6)      and then he called me about a year ago and told me

(7)      he was doing it again.  I said I would use him.

(8)          Q    Do you ever have any contact with

(9)      representatives from Clinton?

(10)         A    One.

(11)         Q    Who is that?

(12)         A    Steve Haines is his name, H-A-I-N-E-S.

(13)         Q    Do you ever give prescriptions for DME

(14)     directly to the claimants so they can fill it on

(15)     their own?

(16)         A    No.

(17)         Q    Is all of the DME that you dispense the

(18)     DME that is provided through Clinton?

(19)         A    Yes.

(20)         Q    Does Clinton maintain an office in your

(21)     space, other than wherever you keep the equipment?

(22)         A    No.

(23)         Q    Some claimants you refer to Dr. Dynof; is

(24)     that correct?

(25)         A    Yes.

DR. RICHARD G. HARVEY

(1)

(2)   Q   Can you describe how you know Dr. Dynof?

(3)   A   When I used to be at 944 North Broadway,

(4)   he was in the same office, in the same building as

(5)   me.  I knew him through that.

(6)   Q   Currently, what is the nature of your

(7)   relationship with him?

(8)   A   I use him to refer patients to pain

(9)   management.

(10)  Q   Where is his office currently located?

(11)  A   He is located at 984 North Broadway.

(12)  Q   Is he on the same floor as you?

(13)  A   Yes.

(14)  Q   What percentage of patients do you refer

(15)  to Dr. Dynof for pain management?

(16)  A   I really couldn't give you a figure.  I

(17)  don't know offhand.

(18)  Q   Has Dr. Dynof or his company, DRD Medical,

(19)  P.C., ever paid you money for any reason?

(20)  A   When I was at 944 North Broadway, I had my

(21)  office, and the other office was mine also.  I used

(22)  to rent it out to a physical therapist and Dr. Dynof

(23)  then.

(24)  Q   You had a sublease agreement with him?

(25)  A   Yes.

DR. RICHARD G. HARVEY

(1)

(2)     Q     When you moved to 984 North Broadway, he

(3)     moved with you?

(4)     A     Later on he moved, not right away.

(5)     Q     How much later?

(6)     A     Approximately a year.  It was around that

(7)     time.

(8)     Q     Do you ever discuss the treatment of

(9)     patients with Dr. Dynof?

(10)    A     Yes.

(11)    Q     Could you describe the circumstances of

(12)    how you would discuss a patient's treatment?  Is

(13)    there a set time that you would meet or something

(14)    like that?

(15)    A     There is no set time.  I would send a

(16)    patient to him, and he would tell me things like

(17)    they're getting too much medication or let me know

(18)    other things about the case to get my input also.

(19)    Q     Just to go back to Clinton for one minute,

(20)    have you ever paid money to Clinton Surgical for any

(21)    reason?

(22)    A     No.

(23)    Q     Have they ever paid you money for any

(24)    reason?

(25)    A     No.

DR. RICHARD G. HARVEY

(1)

(2)     Q     Does Dr. Dynof ever refer patients to you

(3) for physical therapy or prescribe physical therapy

(4) on patients that treat with Harvey Family?

(5)     A     Yes.

(6)     Q     Do you ever suggest that patients go meet

(7) with Dr. Dynof, not only for pain management, but

(8) for the purpose of assessing whether or not they

(9) need physical therapy?

(10)    A     Yes.

(11)    Q     Do you recall if you ever referred a

(12) patient to Dr. Dynof for him to evaluate whether or

(13) not they needed physical therapy --

(14)          MR. CHISARI:  I am going to object.  He

(15)      answered the question.

(16)          MR. MARVIN:  I did not finish my question.

(17) BY MR. MARVIN:

(18)    Q     Do you recall any instances where you felt

(19) the patient would benefit from physical therapy, and

(20) you sent that patient to Dr. Dynof, and he did not

(21) prescribe physical therapy?

(22)    A     I'm sure it has happened.  I can't tell

(23) you a specific incident.

(24)    Q     Is it fair to say that in most instances,

(25) he does prescribe physical therapy when you send him

LH REPORTING SERVICES, INC.     (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)    a patient for evaluation?

(3)              MR. CHISARI:  I am going to object.  You

(4)        are asking him to testify on what Dr. Dynof

(5)        does.  That is Dr. Dynof's purview, not his.

(6)        Q    Does Harvey Family make any notations in

(7)    its file who makes the recommendation for physical

(8)    therapy?

(9)        A    I have the provider's name on the

(10)   referral.

(11)       Q    Is the referral the prescription?

(12)       A    Correct.

(13)       Q    Do you maintain the prescriptions within

(14)   the file of Harvey Family?

(15)       A    Yes.

(16)              MR. MARVIN:  We are going to call for the

(17)        production of those documents.

(18)              MR. CHISARI:  We will take it under

(19)        advisement.  My same objection continues.

(20)   BY MR. MARVIN:

(21)       Q    Let's talk about the specific claimants

(22)   now.

(23)       A    Okay.

(24)       Q    With respect to the claimants that

(25)   received physical therapy at Harvey Family which are

(1)                    DR. RICHARD G. HARVEY

(2)     the subject of today's EUO, do you have any personal

(3)     knowledge regarding their physical therapy

(4)     treatment?

(5)          A    I don't know what you mean by personal

(6)     knowledge.

(7)          Q    You did not provide the physical therapy

(8)     treatments, did you?

(9)          A    No.

(10)         Q    Did you review the treatment notes or

(11)    progress notes?

(12)         A    No.

(13)         Q    To the extent that I would have questions

(14)    regarding a patient's diagnosis, a claimant that is

(15)    the subject of this EUO, regarding their diagnosis,

(16)    their treatment, whether or not they are getting

(17)    better, and so forth at Harvey Family, is it fair to

(18)    say that you, personally, do not have firsthand

(19)    knowledge of those facts?

(20)         A    It will be in the record.

(21)         Q    Do you have the records with you today?

(22)         A    No.

(23)              MR. MARVIN:  We are going to call for the

(24)         production of the medical records or a witness

(25)         that can actually testify and verify the bills

DR. RICHARD G. HARVEY

(1)

(2)    and the medical treatments which were the

(3)    subject of the physical therapy bills that were

(4)    submitted to Allstate in connection with these

(5)    claimants.

(6)         MR. CHISARI:  Put it in writing, and we

(7)    will take it under advisement.

(8)  BY MR. MARVIN:

(9)       Q    With respect to the acupuncture treatments

(10)  also, I am going to ask the same questions.

(11)        Do you have any firsthand knowledge of any

(12)  acupuncture treatments that were provided to the

(13)  claimants which are the subject of the EUO?

(14)       A    Just what would be in the record.

(15)       Q    Have you reviewed any of the records?

(16)       A    No.

(17)         MR. CHISARI:  I would also like it noted

(18)    in the record that my letter and response to

(19)    your October 12th letter, it asked specifically

(20)    for what you are looking for, and you refused

(21)    to tell me.

(22)        I said that to provide the proper witness.

(23)    Your office decided to tell me that you don't

(24)    have to tell me.  I asked what you were looking

(25)    for to provide the correct medical witness.  I

LH REPORTING SERVICES, INC.        (516) 484-2325

(1)                     DR. RICHARD G. HARVEY

(2)      didn't get an answer from Mr. Stern with regard

(3)      to the medical services rendered.  That is why

(4)      Dr. Harvey was produced today.

(5)          MR. MARVIN:  Counsel, the bills that are

(6)      the subject of this claim are for acupuncture

(7)      services, which Dr. Harvey is not licensed to

(8)      give, nor to give any firsthand knowledge

(9)      about, the physical therapy services, which

(10)     Dr. Harvey is not licensed in, nor does he have

(11)     personal knowledge about.  We requested all of

(12)     the medical records relating to these claims

(13)     back in October.

(14)         MR. CHISARI:  Again --

(15)         MR. MARVIN:  Let me finish.

(16)         What has been done today is, a witness has

(17)     been produced with no personal knowledge

(18)     regarding at least two-thirds of the types of

(19)     treatments that are the subject of today's EUO.

(20)         MR. CHISARI:  I specifically asked this

(21)     office to narrow down the medical treatment.

(22)     Your office said, we just want all of the

(23)     medicals and we want to do all of the medical

(24)     treatment.  I don't know if you are talking

(25)     about chiropractic, physical therapy, or

DR. RICHARD G. HARVEY

(1)

(2)     acupuncture.

(3)          I am sure that some of those people that

(4)     were for acupuncture still submitted

(5)     chiropractic bills and also submitted physical

(6)     therapy bills.  I asked this office to narrow

(7)     it, and you did not.  That is why you have Dr.

(8)     Harvey, who is the majority shareholder of the

(9)     company and the chiropractor.

(10)          MR. MARVIN:  If Harvey Family provides

(11)     three disciplines of service and to the extent

(12)     it is true, which I do not know, and we ask for

(13)     a witness to testify as to all medical

(14)     treatments given, and there are three types, we

(15)     expect a witness or witnesses who can testify

(16)     to those three --

(17)          MR. CHISARI:  Obviously, you do not have a

(18)     copy of my letters so you would not know what I

(19)     was talking about.

(20)          THE WITNESS:  All of the records can be

(21)     produced.

(22)          MR. MARVIN:  Are you agreeing to produce

(23)     all medical records that are subject to today's

(24)     EUO?

(25)          THE WITNESS:  Of course.  Whatever it

LH REPORTING SERVICES, INC.     (516) 484-2325

(1)                   DR. RICHARD G. HARVEY

(2)        takes.

(3)              MR. MARVIN:  Again, the witness has

(4)        consented, and we are going to call for the

(5)        production of all of the medical records that

(6)        are necessary to verify the claims and the

(7)        bills which are the subject of this EUO.

(8)              THE WITNESS:  When I got it, I couldn't

(9)        bring 50 files with me.  I need a truck to

(10)       bring it all here.

(11)  BY MR. MARVIN:

(12)       Q    To the extent you can testify about

(13)  certain treatments, would it be fair to say that it

(14)  is limited to the chiropractic treatments given to

(15)  the claimants that are the subject of this EUO?

(16)       A    Yes.

(17)       Q    I want to first turn to the claim file,

(18)  the claimant, Franklin Sanchez.

(19)       A    Okay.

(20)       Q    His claim number is 0245313549.

(21)            Do you have any independent recollection

(22)  of Mr. Sanchez as a patient?

(23)       A    I actually have two Franklin Sanchez's as

(24)  patients.  I'm not sure which one you are talking

(25)  about.

DR. RICHARD G. HARVEY

(2)   Q   Describe the two that you are aware of.

(3)   A   One is a child, and one is an adult.

(4)   Q   The records I have here are for a child.

(5)   A   Okay.

(6)   Q   Can you describe the circumstances leading

(7)   to Franklin Sanchez, the child, presenting to Harvey

(8)   Family for chiropractic treatment?

(9)   A   He was in an accident with, I believe, his

(10)  grandmother, the grandmother's husband, and his

(11)  sister or cousin.  As a result of the accident, they

(12)  brought him in for treatment.

(13)  Q   Now, when Mr. Sanchez came in for

(14)  treatment, with respect to all claimants that come

(15)  in for treatment, who is the initial person that

(16)  will do an evaluation on the claimant?

(17)  A   Typically, my associate and myself will go

(18)  into the room; I'll go over certain aspects, and my

(19)  associate will typically do the exam.

(20)  Q   Was that the case with Mr. Sanchez?

(21)  A   I can't say 100 percent, but I believe so.

(22)  Q   Would the initial consultation report

(23)  confirm who did the initial exam?

(24)  A   No.

(25)  Q   So there is no indication on those forms

DR. RICHARD G. HARVEY

(2) of who the treating chiropractor is?

(3)     A   Again, when it comes to treatment, I am

(4) the treating chiropractor. I do most of the

(5) treating.

(6)     Q   If you were to look at an initial

(7) consultation report, how would you know if you did

(8) the initial exam or if it was Mr. Goldsmith?

(9)     A   Again, I couldn't say 100 percent who did

(10) the initial exam.

(11)     Q   You were in the room during the initial

(12) examination of Mr. Sanchez?

(13)     A   I believe so.

(14)     Q   What percentage of your client base are

(15) children?

(16)     A   Maybe 5 percent.

(17)     Q   Do you recall how old Mr. Sanchez is?

(18)     A   Four years old, maybe.

(19)     Q   Would you agree that a four-year-old is

(20) considered a preschooler?

(21)     A   Yes.

(22)     Q   What percentage of your client base are

(23) preschoolers?

(24)     A   Approximately 5 percent.

(25)     Q   To the extent that you remember or know,

DR. RICHARD G. HARVEY

(1)
(2) what did Mr. Sanchez's initial evaluation consist
(3) of?
(4)      A    Examination.
(5)      Q    What did the examination consist of?
(6)      A    The examination would be palpation; we do
(7) something called a leg check to see if there is an
(8) imbalance in the pelvis.  We try to put the patient
(9) through ranges of motion, and we do certain
(10) orthopedic tests to determine exactly where the
(11) nerve is being irritated.
(12)      Q    Anything else?
(13)      A    Those are the main things that are done.
(14)      Q    Do you remember if Mr. Sanchez was able to
(15) communicate what was bothering him to you?
(16)      A    Yes.
(17)      Q    What did he say?
(18)      A    When we palpated him, I remember he was
(19) having neck and back pain.
(20)      Q    Is that what he said?
(21)      A    Yes.
(22)      Q    Do you know exactly what he said?
(23)      A    I would touch on areas, and he would say,
(24) "Ouch."
(25)      Q    Do you remember what areas you palpated?

DR. RICHARD G. HARVEY

(1)

(2)       A    Neck and back.

(3)       Q    Who brought him to his treatment, if you

(4)  remember?

(5)       A    I believe it was his grandmother.

(6)       Q    Do you know if he was in a car seat during

(7)  his accident?

(8)       A    I don't know offhand.

(9)       Q    Do you know if he went to a hospital after

(10)  the accident?

(11)      A    I don't know offhand.

(12)      Q    Do you recall what his diagnosis was?

(13)      A    I believe he was suffering with lumbar and

(14)  cervical subluxations and myositis.

(15)      Q    In non-chiropractic terms, can you

(16)  describe what that is?

(17)      A    Subluxation would be the vertebrae not in

(18)  its normal alignment, not moving properly.  Myositis

(19)  would be a muscle spasm or a muscle pain.

(20)      Q    Aside from the neck and back pain, did he

(21)  have any other symptoms?

(22)      A    Not that I recall.

(23)      Q    Did you take any x-rays?

(24)      A    No.

(25)      Q    Do you typically take x-rays of patients?

DR. RICHARD G. HARVEY

(1)

(2)     A     Yes.

(3)     Q     Is there a reason you did not take an

(4)  x-ray of Mr. Sanchez?

(5)     A     I prefer not taking x-rays on someone who

(6)  is still in the growing process.

(7)     Q     What is the purpose of taking x-rays on

(8)  claimants, generally?

(9)     A     To rule out pathology, help determine

(10)  alignment of the spine, and to make sure there are

(11)  no fractures.

(12)     Q     To the extent that Mr. Sanchez had a

(13)  fracture, how would you know?

(14)     A     Based on my examination and clinical

(15)  experience, it was my opinion that he did not have a

(16)  fracture.

(17)     Q     What, exactly, led you to that belief?

(18)     A     From palpation, from examination, and from

(19)  findings with him.

(20)     Q     Is it possible for a patient to have a

(21)  slight fracture or a hairline fracture, which

(22)  wouldn't necessarily be visible to you in a physical

(23)  examination, but what an x-ray would pick up?

(24)     A     It is a possibility, yes.

(25)     Q     If a patient had such a fracture, would

DR. RICHARD G. HARVEY

(1)
(2) that have affected the chiropractic treatment plan?

(3)     A     As a chiropractor, we do not treat

(4) fractures.

(5)     Q     In the case of Mr. Sanchez or any other

(6) children that you treat, what do you do to determine

(7) there is no underlying hairline fracture or anything

(8) else that could be dangerous to the child prior to

(9) giving them chiropractor adjustments and treatments?

(10)     A     Most of the time, I will not take an x-ray

(11) of a child.  If something happened and there is

(12) severe trauma to a certain body part, if I suspect a

(13) possible fracture, I'll do an x-ray.  In his case, I

(14) did not suspect a fracture.

(15)     Q     Is that based on your physical exam?

(16)     A     Yes.

(17)     Q     A hairline fracture would not be visible

(18) on a physical exam; is that correct?

(19)     A     Correct.

(20)     Q     How would you determine there is no

(21) hairline fracture if you did not do an x-ray?

(22)     A     It goes with three years of clinical

(23) experience.  It's very rare to have a fracture,

(24) especially in a child, to the spine.  I did not

(25) suspect a spinal fracture.

(1)                    DR. RICHARD G. HARVEY

(2)        Q    Do you know the severity of the accident

(3)   that Mr. Sanchez was in?

(4)        A    Not offhand, no.

(5)        Q    Would that be something you would use in

(6)   determining your treatment plan?

(7)        A    What determines my treatment plan is my

(8)   findings.

(9)        Q    Did you consult with any other medical

(10)  professional prior to giving Mr. Sanchez any other

(11)  treatment?

(12)       A    No.

(13)       Q    Such as a pediatrician?

(14)       A    No.

(15)       Q    Do you have any special certifications to

(16)  provide chiropractic treatment to children?

(17)       A    It's part of our course of learning as a

(18)  chiropractor.

(19)       Q    From chiropractic school?

(20)       A    Yes.

(21)       Q    Are you aware if there are any additional

(22)  certifications that you can receive from any

(23)  professional organization certifying you to perform

(24)  chiropractics on children?

(25)       A    You can become -- I believe there's a

program in chiropractic pediatrics.

Q Do you know what that program consists of?

A I don't know the exact teaching tools that are in that program.

Q But you are not certified through that program?

A No.

Q Or any other program to provide specialized chiropractic treatment to children?

A Just as my education as a chiropractor.

Q Are your diagnostics and treatment considerations different for children than for adults?

A Not unless there is certain extenuating factors.

Q For example, because the child is still growing and the bones are still growing, are there any special considerations in terms of duration of treatment, length of treatment, types of treatment, etc.?

A No.

Q So you would treat a child the same way as you would treat an adult in terms of chiropractic treatment?

DR. RICHARD G. HARVEY

(1)

(2)     A     Until they get well, yes.

(3)     Q     Do you know if there are any generally

(4) accepted chiropractic or medical standards for the

(5) amount of chiropractic adjustments or treatment that

(6) should be given to a child during any particular

(7) time period?

(8)     A     No.

(9)     Q     You are not aware?

(10)    A     I'm not aware if there is a specific

(11) treatment protocol, no.

(12)    Q     Can you describe what types of treatment

(13) Mr. Sanchez received?

(14)    A     He would undergo spinal adjustments.

(15)    Q     Can you describe what a spinal adjustment

(16) is?

(17)    A     With my hands, I will palpate the spine

(18) and the areas that I find where the spine is not

(19) moving properly or I feel that it's not in its

(20) normal position.  With my hands, I will give a

(21) gentle force to the spine to get the spine moving.

(22) The goal is to get it to go to its normal position.

(23)    Q     How long does that take?

(24)    A     A few minutes.

(25)    Q     What other services did you perform on

(1)                    DR. RICHARD G. HARVEY

(2)    Mr. Sanchez?

(3)           A     Mechanical traction.

(4)           Q     What is that?

(5)           A     When he's lying down, we'll stretch the

(6)    back out with a table that we call a flexion

(7)    distraction table.  When he's lying on his back,

(8)    we'll do a mechanical traction on his neck to open

(9)    up the space.  We will also do trigger point

(10)   therapy.

(11)          Q     Was the child cooperative during these

(12)   treatments?

(13)          A     Yes.

(14)          Q     Did he lay still and not complain?

(15)          A     He was very good, yes.

(16)          Q     Are there any other services that you

(17)   performed on him other than what you just described?

(18)          A     Not that I recall.

(19)          Q     For the second procedure that you

(20)   mentioned, which I think was on the table --

(21)          A     Mechanical traction.

(22)          Q     How long does that procedure take?

(23)          A     A few minutes.

(24)          Q     By a few minutes, how many do you mean?

(25)          A     No more than two minutes.

                    DR. RICHARD G. HARVEY

(2)      Q    Again, the manipulation was two to three

(3)  minutes?

(4)      A    Yes.

(5)      Q    And the third procedure?

(6)      A    The trigger point.

(7)      Q    How long does that take, generally?

(8)      A    Approximately the same.

(9)      Q    Two to three minutes?

(10)     A    Yes.

(11)     Q    You were with Mr. Sanchez, approximately,

(12) a total of ten minutes each time you treated him,

(13) with the exception of the initial consultation?

(14)     A    Yes.

(15)          MR. CHISARI:  Just before you ask another

(16)      question, I would like to take a break.

(17)          MR. MARVIN:  Okay.

(18)                    (Whereupon, a recess was taken.)

(19) BY MR. MARVIN:

(20)     Q    Did you explain the purpose of the

(21) adjustment or the manipulation?

(22)     A    It's called a chiropractic adjustment.

(23)     Q    The purpose of the adjustment is what?

(24)     A    To restore the normal mechanics to the

(25) spine, help increase range of motion of the spine,

(1)                    DR. RICHARD G. HARVEY

(2)    and reduce nerve irritation.

(3)         Q    Does it vary from patient to patient as

(4)    far as how long a course of treatment would be in

(5)    order to restore that normal range of motion?

(6)         A    It can, depending on what those injuries

(7)    are.

(8)         Q    For the type of injuries that Mr. Sanchez

(9)    suffered, do you remember what his course of

(10)   treatment was?

(11)        A    No.  I can't remember exactly how long I

(12)   saw him for.  I probably saw him four to six months,

(13)   I think.

(14)             MR. CHISARI:  Are you talking about one

(15)        particular session or over the course of his

(16)        entire treatment?

(17)             MR. MARVIN:  Over the course of his

(18)        treatment.

(19)             Please mark this as Exhibit G.

(20)                            (Whereupon, Exhibit G, bills for

(21)                            Franklin Sanchez, was marked for

(22)                            Identification.)

(23)   BY MR. MARVIN:

(24)        Q    I am going to show you the bills that were

(25)   submitted for Franklin Sanchez that has been marked

LH REPORTING SERVICES, INC.          (516) 484-2325

                    DR. RICHARD G. HARVEY

(1)

(2)   as Exhibit G, which reflect the dates and billing

(3)   codes that were used.

(4)           Can you take a look at that document?

(5)       A    Yes.

(6)       Q    Of the three types of treatments that

(7)   Mr. Sanchez received, are they generally given

(8)   together for a patient?

(9)       A    Yes.

(10)      Q    Are there any circumstances in which you

(11)  would not perform one of the services on a claimant

(12)  in conjunction with the other two?

(13)      A    There's no specific reason.  This is just

(14)  my typical course of treatment, which I find the

(15)  most successful.

(16)      Q    Typically, and in particular for all of

(17)  the claimants that are the subject of this EUO, you

(18)  generally give an adjustment, trigger point therapy,

(19)  and the mechanical traction?

(20)      A    Yes, and occasionally I do muscle

(21)  stimulation and exercise therapy depending upon what

(22)  I find.

(23)      Q    How do you determine how often a patient

(24)  should see you for this typical course of treatment?

(25)      A    It will be based on my findings, how badly

DR. RICHARD G. HARVEY

(2)   they are subluxated.  If they are responding to the

(3)   treatment very well, I will reduce it.  If they are

(4)   not responding to the treatment well, I continue to

(5)   see them frequently.

(6)        Q    With respect to Mr. Sanchez, would you

(7)   consider his course of treatment conservative,

(8)   aggressive, or somewhere in between?

(9)        A    Conservative.

(10)        Q    Describe what you mean by conservative.

(11)        A    It means noninvasive.

(12)        Q    In terms of the frequency of the

(13)   treatment, do you consider it conservative,

(14)   aggressive, or something else?

(15)        A    I consider what was appropriate for him --

(16)   I can't give it a name.

(17)        Q    Let me run down a few of the dates.

(18)        A    Okay.

(19)        Q    Based upon the bills, he initially was

(20)   treated by you on May 30, 2012, and then he was back

(21)   on the 31st.  He skipped a day, and he was back on

(22)   June 2nd.  You were closed on June 3rd.  He was seen

(23)   every day of the next week, which was June 4th

(24)   through June 9th.  You were closed on the 10th, and

(25)   on the 11th, he was not treated.

(1)             DR. RICHARD G. HARVEY

(2)             Again, he was there for the next five

(3)     days.  You were closed on the 17th.  By five days, I

(4)     mean the 12th through the 16th.  He was there on

(5)     June 18th, 19th, 20th, 21st, and the 22nd.

(6)             Would you agree with all of that so far?

(7)     A     Yes.

(8)     Q     You saw him again on the 26th through the

(9)     29th?

(10)    A     Yes.

(11)    Q     Over that period of time, Harvey Family

(12)    was open for visits on 26 days, and he received

(13)    treatment on 23 of those days.

(14)            Do you consider that conservative

(15)    treatment or something else?

(16)    A     Conservative treatment.  It was the

(17)    treatment that I found was necessary to get him

(18)    well.

(19)    Q     What is your understanding of what

(20)    aggressive treatment would be?

(21)            MR. CHISARI:  Counsel, I think he

(22)        answered.  He cannot put a label on the

(23)        treatment styles.  He uses what he feels is

(24)        appropriate for the client.

(25)    Q     Considering Mr. Sanchez's injuries, what

DR. RICHARD G. HARVEY

(1)
(2) he was complaining of notwithstanding he did not

(3) have any x-rays, can you briefly describe why you

(4) felt it was necessary for him to receive treatment

(5) every day during the course of the that month Harvey

(6) Family was open?

(7)     A     Due to the subluxation and the pain in his

(8) back, he needed the adjustments to regulate -- to

(9) get the spine back in alignment, to get the

(10) inflammation off of the nerve, and to give the body

(11) a chance to heal.  As a result of the care, he was

(12) discharged, I believe, in October.  He basically had

(13) a full recovery.

(14)     Q     When Mr. Sanchez came for each session,

(15) did you give him any sort of exam prior to

(16) performing the services?

(17)     A     I palpate the spine.

(18)     Q     What do you mean?

(19)     A     With my hands, I put my hands on the spine

(20) to feel where he needs to be adjusted.

(21)     Q     Was he communicating with you and

(22) describing what his pain levels were?

(23)     A     Sometimes, he would.  When I do a

(24) palpation, I do not need him to communicate.  I go

(25) by what I feel.

(1)                    DR. RICHARD G. HARVEY

(2)        Q    What exactly do you feel when you do that?

(3)        A    I feel taut and tender muscles.  As I

(4)   palpate, I feel if the spine is moving the way that

(5)   I feel it should.  Based on that palpation, it

(6)   determines where I am going to adjust the spine.

(7)        Q    Does the pain of the patient, in this

(8)   case, Mr. Sanchez, play a role in the determination

(9)   of the treatment?

(10)        A    It's one of the factors that determines

(11)   what is wrong with him.

(12)        Q    Was he able to communicate with you his

(13)   pain threshold during his treatments?

(14)        A    Yes.

(15)        Q    Do you remember what he told you?

(16)        A    It would be in the record.  I would ask

(17)   him that day where his pain was at.

(18)        Q    Was he able to describe to you a different

(19)   threshold or levels of pain?

(20)        A    I do a scale of one to ten to make it

(21)   easy.

(22)        Q    Was he able to verbalize and tell you his

(23)   pain level?

(24)        A    Yes.

(25)        Q    What was his pain threshold during his

DR. RICHARD G. HARVEY

(1)

(2)     course of treatment?

(3)         A     I don't recall.  I don't have the record

(4)     in front of me.

(5)         Q     Do you recall who brought him to his

(6)     treatments?

(7)             MR. CHISARI:  Objection.  Asked and

(8)         answered.

(9)         A     Most of the time it was his grandmother, I

(10)    believe.  Sometimes his mother would bring him.

(11)        Q     Did you ever discuss his treatment with

(12)    them?

(13)        A     Yes.

(14)        Q     What was the nature of those discussions?

(15)        A     I would let them know what I found, what I

(16)    thought he needed to get well, and they were all in

(17)    agreement.

(18)        Q     I just want to talk about all of the codes

(19)    used in all of these bills.

(20)        A     Okay.

(21)        Q     Did you select these codes?

(22)        A     Yes.

(23)        Q     Let's take Mr. Sanchez as an example.

(24)            This first bill on Exhibit G was code

(25)    99203 with modifier 25.

(1)                    DR. RICHARD G. HARVEY

(2)              Can you describe what that code means?

(3)       A    I know it is an exam code.  That's all I

(4)   know.

(5)       Q    Do you know what modifier 25 is for?

(6)       A    No.

(7)       Q    Did you select that code or do you have

(8)   someone that does the billing select the codes that

(9)   are used?

(10)      A    I have consulted with people in the past

(11)  who recommended what codes to use for the services I

(12)  provide.

(13)      Q    Who have you consulted with?

(14)      A    I don't know the exact name offhand.

(15)      Q    Have you taken any courses or seminars in

(16)  the proper procedures of billing CPT codes?

(17)      A    My biller has in the past.

(18)      Q    Your biller is --

(19)      A    Kelly Curry.

(20)      Q    The next code is 98940.

(21)           Do you know what that code is for?

(22)      A    That's a spinal adjustment.

(23)      Q    Did you select that code?

(24)      A    Yes.

(25)      Q    Is that the only code that you typically

DR. RICHARD G. HARVEY

(1)

(2) bill for spinal adjustments?

(3)     A   Or 98941.

(4)     Q   What is the difference between 98940 and

(5) 98941?

(6)     A   The number of levels.  In other words, I

(7) think 98940 is for two levels, and 98941 is for

(8) three levels.

(9)     Q   What do you mean by levels?

(10)    A   Levels of the spine, neck, middle back,

(11) and lower back.  It's three levels.  The pelvis is

(12) another level.  In his case, it was two levels we

(13) billed for.

(14)    Q   Does it generally take the same amount of

(15) time for an adjustment?

(16)    A   Yes.

(17)    Q   That is typically two to three minutes?

(18)    A   Yes.

(19)    Q   What about code 97110, which next appears

(20) on the bill; do you know what that code is for?

(21)    A   I don't know.

(22)    Q   What about code 97124, modifier 59; do you

(23) know what that code is used for?

(24)    A   I don't know.

(25)    Q   Why don't I read you what I believe the

DR. RICHARD G. HARVEY

(1)

(2) description of the code is, and you can let me know

(3) which services you provided.

(4)     A    Okay.

(5)     Q    Code 97110, therapeutic procedure, one or

(6) more areas, each 15 minutes, therapeutic exercises,

(7) develop strength and endurance, range of motion, and

(8) flexibility.

(9)          Do you believe that code correlates to one

(10) of the services that you performed?

(11)    A    In this case, I would say it's the wrong

(12) code.

(13)    Q    Do you have an understanding of what the

(14) right code would be?

(15)    A    The code that should be used, I don't know

(16) the number code, but the code should be one for

(17) mechanical traction and one for trigger point.

(18)    Q    Do you know what the code for mechanical

(19) traction should be?

(20)    A    I don't know it offhand, no.

(21)    Q    The code 97124 is massage, including

(22) effleurage, petrissage and/or tapotement, which is

(23) stroking, compression, percussion.

(24)    A    That code is typically for the trigger

(25) points.

LH REPORTING SERVICES, INC.        (516) 484-2325

DR. RICHARD G. HARVEY

(2)    Q    So you believe that is the code you used

(3)  for trigger points in this case?

(4)    A    Yes.

(5)    Q    Again, you believe there is a code for

(6)  mechanical traction, you just do not know what it

(7)  is?

(8)    A    Correct.  There definitely is one.

(9)    Q    The code that I described as a therapeutic

(10)  procedure under 97110, described as therapeutic

(11)  procedure, one or more area, each 15 minutes,

(12)  therapeutic exercises to develop strength and

(13)  endurance, range of motion, and flexibility, did you

(14)  ever perform services on Mr. Sanchez that could be

(15)  billed under that code?

(16)    A    Yes, but on a few occasions.  The majority

(17)  of the occasions would have been, again, the

(18)  mechanical traction and the trigger point.

(19)    Q    Based upon Exhibit G, would you agree that

(20)  code 97110 was used to bill on each occasion that

(21)  Mr. Sanchez treated at Harvey Family?

(22)    A    Yes.

(23)    Q    Do you believe that was a mistake to use

(24)  that code?

(25)    A    Correct.

DR. RICHARD G. HARVEY

(1)

(2)      Q     Do you know who selected that particular

(3)   code to be used?

(4)      A     I couldn't say 100 percent, but I will

(5)   take the responsibility for it.

(6)      Q     Do you review the bills before they are

(7)   submitted to Allstate?

(8)      A     Yes.

(9)      Q     Is that on each and every occasion?

(10)     A     I believe so, yes.

(11)     Q     Was this something you dismissed when you

(12)  reviewed this bill?

(13)     A     Yes.

(14)     Q     How is it that Exhibit G is formed or

(15)  generated?

(16)     A     The computer.

(17)     Q     Do you have a particular computer program

(18)  that generates it?

(19)     A     Yes.

(20)     Q     Do you know the name of the program?

(21)     A     I don't know the system, no.

(22)     Q     As you are performing the services, are

(23)  you indicating on your exam notes or SOAP notes the

(24)  code that should be used or are you just indicating

(25)  the procedures you are performing and relying on

DR. RICHARD G. HARVEY

(1)

(2)     your biller to pick the right code?

(3)         A     If I check off what was done, then they'll

(4)     put it into the computer.  For a while, we were

(5)     using the wrong code.  She found that, and we

(6)     changed that code.

(7)         Q     Is this the code you are talking about?

(8)         A     Yes.

(9)         Q     What is the code you changed it to?

(10)        A     I don't have it in front of me, but it was

(11)    the correct code for the procedures that I did.

(12)        Q     Do you know what the modifier 59 next to

(13)    code 97124 is for?

(14)        A     No, I don't.

(15)        Q     Do you know who chose to put modifier 59

(16)    on the bill?

(17)        A     No.

(18)        Q     Before today, had you ever been aware that

(19)    modifier 59 was used on these bills?

(20)        A     I believe I was aware of it.

(21)        Q     Have you ever made an inquiry to see what

(22)    it means or what it is for?

(23)        A     I'm sure I have in the past.  I don't

(24)    recall, but I'm sure I have.

(25)        Q     When bills such as this are submitted to

LH REPORTING SERVICES, INC.          (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)     insurers for reimbursement, what are the procedures

(3)     as far as Harvey Family being paid and the money

(4)     being put into the account?  Who receives the money

(5)     and handles that matter?

(6)          A     The checks come in the mail.

(7)          Q     Do you deposit the checks personally?

(8)          A     I put them in the bank, yes.

(9)          Q     Do you ever have any discussions with the

(10)    -- Just to clarify, whenever I say physical

(11)    therapist or acupuncturist, I am talking about the

(12)    managing members, the ones that exist now or the

(13)    ones that had been with the business in the past and

(14)    have since left.

(15)         A     Okay.

(16)         Q     When the checks come in, do you ever have

(17)    any discussions with them as far as the amount of

(18)    income taken in by Harvey Family?

(19)         A     No.

(20)         Q     Have any of the managing members ever

(21)    asked about the amount of money taken in by Harvey

(22)    Family?

(23)         A     Not that I recall.

(24)         Q     When the various managing members, when

(25)    they came into Harvey Family, did any of them have

DR. RICHARD G. HARVEY

(1)
(2)    independent lawyers that consulted with you or your
(3)    counsel to bring them into the company?
(4)         A    They may have.   I don't recall.
(5)         Q    In addition to the bills we are
(6)    discussing, which deal with chiropractic treatment,
(7)    when payment is made for the acupuncture services
(8)    and physical therapy services to Harvey Family,
(9)    where do the bills go or where do the checks go in
(10)   that regard?
(11)        A    They come into the office, and one of the
(12)   girls charts them.
(13)        Q    It is the same process?
(14)        A    Yes.
(15)        Q    You, personally, deposit those into the
(16)   bank?
(17)        A    Yes.
(18)        Q    With respect to the payments that come up
(19)   for acupuncture, does the managing member, who is
(20)   the acupuncturist, has that person ever asked you
(21)   about the amount coming in for his discipline?
(22)        A    No.
(23)        Q    Is the answer the same for physical
(24)   therapy?
(25)        A    Yes.

DR. RICHARD G. HARVEY

(2)     Q     Generally speaking, what percentage of the

(3)   profits are derived from chiropractics?

(4)     A     I couldn't tell you the exact percentage.

(5)     Q     Could you estimate the exact percentage?

(6)     A     I don't know.

(7)     Q     What percentage are from acupuncture

(8)   services?

(9)     A     I couldn't tell you.

(10)     Q     Do you keep records of this information

(11)   anywhere?

(12)     A     No.

(13)     Q     Does anyone keep records of this

(14)   information?

(15)     A     No.

(16)     Q     What percentage comes from physical

(17)   therapy services?

(18)     A     I don't know.

(19)     Q     There are no records of that?

(20)     A     No.

(21)     Q     Just to be clear, there is no way for you

(22)   to determine what percentage of the profits of

(23)   Harvey Family are derived from physical therapy,

(24)   acupuncture, and chiropractics?

(25)     A     No.

DR. RICHARD G. HARVEY

(2)    Q    It all, essentially, gets put into the

(3) same pool?

(4)    A    Yes.

(5)    Q    In terms of that overall pool, what

(6) percentage of the money do you take, personally?

(7)    A    I don't know.

(8)    Q    Do you recall from your operating

(9) agreement what percentage of Harvey Family you,

(10) personally, are entitled to?

(11)    A    No.

(12)    Q    Does 97 percent ring a bell?

(13)        MR. CHISARI:   Counsel, we went through

(14)      this earlier today with whom gets what for

(15)      what.

(16)    Q    Is it fair to say that you receive

(17) 97 percent of the profits from Harvey Family?

(18)    A    If that's what it says in the agreement,

(19) yes.

(20)    Q    Are 97 percent of the profits derived from

(21) chiropractic treatments?

(22)    A    I don't know.

(23)    Q    Let's get back to what we were talking

(24) about before.

(25)    A    Okay.

(1)           DR. RICHARD G. HARVEY

(2)      Q    Franklin Sanchez eventually came to the

(3)  end of his treatment regimen, correct?

(4)      A    Yes.

(5)      Q    Can you describe the circumstances

(6)  describing how he left?

(7)      A    He was discharged because when I saw him

(8)  on his last visit, I thought he no longer suffered

(9)  from the injuries he sustained in the accident.

(10)     Q    Do you recall if you consulted with his

(11) parent or guardian concerning physical therapy or

(12) acupuncture?

(13)     A    No.  I don't recall that.

(14)     Q    Do you recall if he had physical therapy

(15) or acupuncture?

(16)     A    I don't believe he did.

(17)     Q    Let's move onto the next claimant.  We

(18) will review someone from the same accident to make

(19) it easier.

(20)          Do you recall Derrick Norman?

(21)     A    Yes.

(22)     Q    Do you have any independent recollection

(23) of him as a patient?

(24)     A    Yes.

(25)     Q    What do you recall of Mr. Norman?

(1)                DR. RICHARD G. HARVEY

(2)        A    He was in an accident, an automobile

(3)    accident.  As a result of the accident, he came to

(4)    the office for treatment.

(5)                MR. MARVIN:  I am going to mark Exhibit H,

(6)            which are documents pertaining to Mr. Norman,

(7)            Claim Number 0245313549.

(8)                        (Whereupon, Exhibit H was marked

(9)                            for Identification.)

(10)   BY MR. MARVIN:

(11)       Q    Just to refresh your recollection, please

(12)   look at that package of documents.  Before we get to

(13)   the bills, Dr. Harvey, I just want to go through the

(14)   other documents.  These types of documents were not

(15)   in Franklin Sanchez's file that was submitted to

(16)   Allstate.

(17)       A    Okay.

(18)       Q    The first document is an NF2 form.

(19)            Are you familiar with that document?

(20)       A    Yes.

(21)       Q    Can you describe what that is?

(22)       A    This is the application for no-fault

(23)   benefits.

(24)       Q    There is some handwritten writing on the

(25)   document.

(1)                    DR. RICHARD G. HARVEY

(2)          Do you know whose handwriting that is?

(3)     A    No.

(4)     Q    Typically, how is that document filled

(5) out?

(6)     A    (No verbal response.)

(7)          MR. CHISARI:  Do you know who filled it

(8)     out?

(9)     Q    When a patient first comes to Harvey

(10) Family, are they asked to fill out certain

(11) documents?

(12)    A    Sometimes, we'll fill out the application

(13) for them.  Sometimes, a patient will have an

(14) attorney with them, and the attorney will fill out

(15) the application for them.  Some of the times, the

(16) patient will fill out their own application.

(17)    Q    Typically, this is the type of application

(18) that is filled out at Harvey Family?

(19)    A    This is a typical no-fault application.

(20)    Q    The next three documents in the file are

(21) NF3 forms.  There is one for you, Dr. Harvey, Bervin

(22) Nelson Brual, and one for Sun H. Lee, acupuncturist.

(23)          Can you briefly describe Harvey Family's

(24) procedure for generating these documents, the NF3

(25)  forms?


LH REPORTING SERVICES, INC.        (516) 484-2325

DR. RICHARD G. HARVEY

(1)

(2)     A     The NF3s will be documented after a period

(3)     of time.   We send the first bill to the insurance

(4)     company.   We have a computer that prints out the

(5)     NF3s.

(6)     Q     One of your assistants does the computer

(7)     entry, correct?

(8)     A     Yes.

(9)     Q     That is your biller?

(10)    A     Yes.

(11)    Q     The NF3 relating to you, you will see on

(12)    the third page there is a signature for the

(13)    provider.

(14)          Is that your signature on that document?

(15)    A     Yes.

(16)    Q     Do you sign all of the NF3s personally?

(17)    Do you have a signature stamp?   Is it computer

(18)    generated?

(19)    A     I sign them.

(20)    Q     Taking a look at the NF3 for Brual on page

(21)    three, are you familiar with that signature?

(22)    A     I believe it is his signature.

(23)    Q     What is that belief based on?

(24)    A     I've seen his signature in the past.   It

(25)    looks like his signature to me.

DR. RICHARD G. HARVEY

(1)

(2)     Q    Finally, the NF3 for Sun H. Lee.

(3)          Can you tell me if you are familiar with

(4) that signature?

(5)     A    I'm not familiar with the signature, no.

(6)     Q    Do you know who puts this signature on

(7) this document?

(8)     A    I believe she did.

(9)     Q    Have you ever seen her signature?

(10)    A    I believe I have, I just don't recall what

(11) it looks like.

(12)    Q    The next document says Harvey Family

(13) Chiropractic, Physical Therapy & Acupuncture, PLLC

(14) on top.  It has various items of medical equipment

(15) listed with room to put check marks.

(16)         Do you agree with that, Dr. Harvey?

(17)    A    Yes.

(18)    Q    Is this the type of document we were

(19) talking about earlier in the EUO when you referenced

(20) the forms you fill out for durable medical

(21) equipment?

(22)    A    Yes.

(23)    Q    What DME did Mr. Norman receive?

(24)    A    On this form, it says that he received a

(25) cervical pillow, a car seat, and a cold pack.

DR. RICHARD G. HARVEY

(2)    Q   Did you provide him with those items?

(3)    A   Yes.

(4)    Q   Did you explain to him how to use them?

(5)    A   Yes.

(6)    Q   Just describe how those items help in the treatment of Mr. Norman.

(8)    A   I recommended a cold pack for inflammation.  I recommend the patient to put it on for 20 minutes and off for an hour.  When they put it on, they should use a paper towel so they don't get any kind of burn.

The cervical pillow is a pillow that can help with the normal curve in the neck and help support the neck.  The car seat helps support the lumbar muscle system.

(17)    Q   Are there different types of car seats that you use for patients depending on their weight or height or usefulness of the car seat?

(20)    A   There's a typical car seat that I use.

(21)    Q   What car seat is that?

(22)    A   I don't know.

(23)    Q   You do not know the make or the model?

(24)    A   No.

(25)    Q   Is that car seat provided by Clinton

DR. RICHARD G. HARVEY

(2)     surgical?

(3)         A    Yes.

(4)         Q    Did they show you any other types of car

(5)     seats or is that the only one they have?

(6)         A    They have two different car seats.  They

(7)     have one on hand.  There is one that I prefer more

(8)     than the other.

(9)         Q    Is there any particular reason you prefer

(10)    one more than you prefer the other?

(11)        A    I feel one gives a little bit better

(12)    support, but one has some heating and vibration to

(13)    help.  Most of the time, I prefer just the regular

(14)    car seat.

(15)        Q    This document is something Derrick Norman

(16)    signed in your office?

(17)        A    Yes.

(18)        Q    Once he signed it, a representative sent

(19)    it to Clinton surgical?

(20)        A    Yes.

(21)        Q    And then you provided these items from

(22)    your inventory?

(23)        A    Yes.  95 percent of the time, the

(24)    inventory is there.  Occasionally, he will have to

(25)    wait a couple of days.

DR. RICHARD G. HARVEY

(1)

(2)     Q     What is your incentive to have this

(3)   procedure where there is a clearinghouse almost --

(4)           MR. CHISARI:  I am going to object to your

(5)       characterization of clearinghouse.

(6)     Q     What is your incentive to keeping these

(7)   items on hand?

(8)     A     For the benefit of the patient's care.

(9)   That's the sole purpose.

(10)     Q     Through Harvey Family's business affairs,

(11)   do Mr. Brual or Mr. Jin or any of the other managing

(12)   members need to sign documents, other than bills?

(13)     A     Not typically.

(14)     Q     Any corporate documents or things of that

(15)   nature?

(16)     A     There are no corporate documents to sign.

(17)     Q     Does Harvey Family maintain signature

(18)   stamps for any of the providers?

(19)     A     No.

(20)     Q     Back to Mr. Norman, can you describe the

(21)   extent of his injuries?

(22)     A     Again, he was in the accident.  He

(23)   suffered with neck pain and back pain.  He had

(24)   pretty bad shoulder pain, which I believe he

(25)   eventually had surgery.  He had radiating pains.

(1)                    DR. RICHARD G. HARVEY

(2)         Q    Were you there when the initial evaluation

(3)    was performed on Mr. Norman?

(4)         A    Yes.

(5)         Q    And Mr. Goldsmith actually performed the

(6)    evaluation?

(7)         A    I believe so.

(8)         Q    Do you consult with Mr. Goldsmith during

(9)    the evaluation?

(10)        A    During and after, yes.

(11)        Q    Together, do you come to a consensus about

(12)   the proper treatment for the patient?

(13)        A    I use his input, yes.

(14)        Q    Ultimately, it is you that decides?

(15)        A    Yes.

(16)        Q    For Mr. Norman, what did you decide would

(17)   be the appropriate treatment protocol?

(18)        A    From my aspect, to undergo chiropractic

(19)   care.

(20)        Q    For his back and his neck?

(21)        A    Correct.

(22)        Q    What did the initial examination reveal?

(23)        A    Again, I don't have the record in front of

(24)   me, but just from memory I recall there being a lot

(25)   of pain and a lot of spasm, and reduction of range

DR. RICHARD G. HARVEY

(1)

(2)     of motion.  We did orthopedic testing, including

(3)     straight leg raise test, which was positive, and

(4)     Jackson's test was positive for neck and arm pain.

(5)          Q     What is Jackson's test?

(6)          A     You have the patient turn their head to

(7)     the side, and you push down on it to see if it

(8)     elicits any pain or spasm.

(9)          Q     Did Mr. Norman undergo any x-rays?

(10)         A     I don't recall.

(11)         Q     Did Mr. Norman undergo any MRIs?

(12)         A     Yes.

(13)         Q     How did that come about?

(14)         A     For his spine, I believe, I recommended he

(15)    have MRIs done.

(16)         Q     Did you send him someplace for an MRI?

(17)         A     Yes.

(18)         Q     Where did you send Mr. Norman for an MRI?

(19)         A     I don't know offhand.

(20)         Q     Do you have an MRI facility you typically

(21)    like to use for your patients?

(22)         A     There are three facilities I typically

(23)    will use.

(24)         Q     What facilities are those?

(25)         A     There's a place called Upright Imaging,

LH REPORTING SERVICES, INC.        (516) 484-2325

DR. RICHARD G. HARVEY

(1)

(2) which is right near my office.  There's a place

(3) called, I think, Medical Arts Radiology, and there

(4) is a place called Empire Imaging, which is on

(5) Central Avenue in Yonkers.

(6)      Q    You said Upright Imaging is near your

(7) office.

(8)           How nearby is it?

(9)      A    Walking distance.

(10)     Q    Do you have a good relationship with the

(11) owner of that company or the people there?

(12)     A    Yes.

(13)     Q    Do you know who the owner is of that

(14) company?

(15)     A    I know one of the owners is Anthony

(16) DiPietro.

(17)     Q    Do you have a relationship with him?

(18)     A    Through business, sending him business and

(19) getting good service.

(20)     Q    Do you know what the MRI of Mr. Norman

(21) revealed?

(22)     A    I don't have that in front of me.  I would

(23) need to see it.

(24)     Q    Would the result of the MRI alter the

(25) treatment plan?

LH REPORTING SERVICES, INC.        (516) 484-2325

                    DR. RICHARD G. HARVEY

(1)

(2)      A    It could.

(3)      Q    Do you remember when during the course of

(4)  treatment he received the MRI?

(5)      A    No.

(6)      Q    Dr. Harvey, if you look through the bills,

(7)  you will see that Mr. Norman received chiropractic

(8)  treatments beginning on May 18th; is that correct?

(9)      A    Correct.

(10)     Q    At least for the next 36 days that Harvey

(11) Family was open, through June 29th, he received

(12) chiropractic treatment on each of those days.

(13)     A    Yes.

(14)     Q    Do you consider that an aggressive

(15) treatment?

(16)     A    I consider that the treatment that was

(17) appropriate for his injuries.

(18)     Q    What exactly were the nature of his

(19) injuries that led you to the conclusion that it

(20) would be appropriate for you to treat him each one

(21) of those days?

(22)     A    There was spinal fixations and

(23) subluxations resulting in severe pain and spasms.

(24)     Q    Did you do a progress note on each and

(25) every one of the visits for Derrick Norman?

(1)                    DR. RICHARD G. HARVEY

(2)         A    We do SOAP notes when somebody comes in,

(3)    yes.

(4)         Q    Can you describe, for the record, what a

(5)    SOAP note is?

(6)         A    A form that we use to document what was

(7)    done on a particular day, what I found, and what the

(8)    patient complained of.

(9)         Q    Does the SOAP note describe the level of

(10)   pain the patient is experiencing?

(11)        A    It does.

(12)        Q    Was that the case with Mr. Norman, that

(13)   each one of the SOAP notes will describe whatever

(14)   pain he described to you?

(15)        A    Yes.

(16)        Q    Generally speaking, does there come a

(17)   point during chiropractic treatment where you

(18)   believe it is no longer working or not helping?

(19)        A    At times.

(20)        Q    At what point would that be?

(21)        A    If the patient is getting worse or seeing

(22)   no benefiting from care.

(23)        Q    Did Derrick Norman receive any benefits

(24)   from care?

(25)        A    Yes.

DR. RICHARD G. HARVEY

(2)     Q    How long did that take?

(3)     A    I can't tell you exactly how long.

(4)     Q    Just going by the dates he treated, like I
(5)  mentioned, he treated over the course of six weeks
(6)  almost every single day.

(7)          Did there come a point during the six
(8)  weeks where you believed that the chiropractic
(9)  treatment was not helping since he needed to come
(10) back every day?

(11)    A    No.

(12)    Q    Why is that?

(13)    A    There are times with injuries that you may
(14) not feel better physically, as far as your pain
(15) level goes, even your spasm.  With my experience,
(16) most times the pain and spasm will start to diminish
(17) once we bring back the spinal range of motion.  His
(18) range of motion was increasing.  Eventually, his
(19) pain and spasms did start to reduce.

(20)    Q    Generally, Derrick Norman treated as of
(21) May 18th through June, July, and August between four
(22) and six times a week.

(23)          Would you agree with that?

(24)    A    Yes.

(25)    Q    At what point did you believe you saw a

(1)              DR. RICHARD G. HARVEY

(2)    benefit to his treatment over those three months?

(3)         A    I don't know the exact time.  I couldn't

(4)    tell you the exact date.

(5)         Q    Do you remember when Mr. Norman stopped

(6)    treating for chiropractics?

(7)         A    He's still seeing me.

(8)         Q    How often does Mr. Norman receive

(9)    chiropractic treatment?

(10)        A    Approximately twice a week now.

(11)        Q    Have his symptoms improved?

(12)        A    Yes.  He is improving.

(13)        Q    How so?

(14)        A    Less pain, less spasm, and his range of

(15)   motion is not where it should be at, but it has

(16)   increased somewhat.

(17)        Q    Typically, with respect to the claimants

(18)   which are the subject of this EUO, and generally,

(19)   how long would you give chiropractic treatment to a

(20)   patient before, in your professional opinion, it

(21)   would no longer be working?

(22)        A    Up to 12 months, I would discharge a

(23)   patient depending on their injuries.  For example,

(24)   if they have a disc injury, it takes 8 to 12 months

(25)   to rehabilitate their injuries.

DR. RICHARD G. HARVEY

(1)

(2)    Q    Did there come a time you referred

(3)  Mr. Norman for acupuncture?

(4)    A    Yes.

(5)    Q    When was that?

(6)    A    I don't know exactly.

(7)    Q    What were the circumstances behind you

(8)  referring him for acupuncture?

(9)    A    Due to his pain, discomfort, and spasm, I

(10) recommended it might be something to look into it,

(11) and he consulted with the acupuncturist and felt

(12) that it could help him.

(13)    Q    Was the acupuncture treatment of any

(14) benefit to Mr. Norman?

(15)    A    I would have to consult the record, but I

(16) believe so.

(17)    Q    Did you ever consult with the

(18) acupuncturist that provided the treatments to

(19) Mr. Norman regarding his progress?

(20)    A    Yes.

(21)    Q    Do you remember who the acupuncturist was

(22) that provided the treatments?

(23)    A    No.

(24)    Q    At the time, there was one acupuncturist

(25) working for Harvey Family?

DR. RICHARD G. HARVEY

(1)

(2)     A    Correct.

(3)     Q    You do not know who that person was,

(4) correct?

(5)     A    It was probably Sun Lee.  I can't say

(6) 100 percent.  That's probably who it was.

(7)     Q    Would the benefits of acupuncture

(8) treatment change your treatment method for

(9) chiropractics for a given patient?

(10)    A    No.

(11)    Q    Why not?

(12)    A    I base my treatment on what I see with the

(13) patient and what I believe he needs

(14) chiropractically.

(15)    Q    Now, did there come a time where you

(16) believed Mr. Norman would benefit from physical

(17) therapy?

(18)    A    Yes.

(19)    Q    For what areas of his body did you believe

(20) he would benefit from in physical therapy?

(21)    A    I don't recall the exact part.  I believe

(22) it was his shoulder.  Since I'm a chiropractor, I

(23) don't work on that.  I believe he consulted with a

(24) physical therapist for his shoulder.

(25)    Q    Did you refer Mr. Norman to Dr. Dynof?

LH REPORTING SERVICES, INC.     (516) 484-2325

                          DR. RICHARD G. HARVEY

(1)

(2)     A     I believe I did.

(3)     Q     Subsequent to that, did Dr. Dynof

(4)  prescribe physical therapy?

(5)     A     I believe he did.

(6)     Q     Mr. Norman came back to Harvey Family for

(7)  physical therapy?

(8)     A     Yes.

(9)     Q     Did you ever discuss with Dr. Dynof the

(10)  physical therapy progress for Mr. Norman?

(11)     A     No.

(12)     Q     With respect to Mr. Norman, what types of

(13)  treatments did you give him on the days that he

(14)  presented?

(15)     A     Typically, I would give him the spinal

(16)  adjustment, I would give him the mechanical

(17)  traction, and the trigger point therapy.

(18)     Q     The same treatments as Mr. Sanchez,

(19)  correct?

(20)     A     Similarly, correct.

(21)     Q     To the extent these bills, which are in

(22)  Exhibit G, contain the same code that we discussed

(23)  earlier, 97110, for that treatment of Mr. Norman, is

(24)  it fair to say that is, in your opinion, a mistake

(25)  or misuse of the code?

(1)              DR. RICHARD G. HARVEY

(2)       A    Correct.

(3)       Q    Would that be the same with every claimant

(4)  we are going to discuss today?

(5)       A    If they have that code, yes.

(6)       Q    To make it clear for the record, for every

(7)  bill submitted on behalf of any of the claimants

(8)  which are the subject of the EUO, with the code

(9)  97110, the service of the code was not performed?

(10)          MR. CHISARI:  That was not what was said.

(11)      It was a mistake in coding.

(12)      A    I performed a different service, correct.

(13)      Q    The service which that code reflects was

(14)  not performed?

(15)          MR. CHISARI:  That was a mistake.

(16)      A    It was performed on occasion, but not on

(17)  every visit.

(18)      Q    Based upon the claimant list, are you able

(19)  to determine which patients you may have performed

(20)  the service which reflects code 97110?

(21)      A    Again, that code was done on many patients

(22)  occasionally.  The code that was done every time was

(23)  the mechanical traction and the trigger point

(24)  therapy.

(25)      Q    As with Mr. Sanchez, you do not have any

(1)                  DR. RICHARD G. HARVEY

(2)    firsthand knowledge of the physical therapy

(3)    treatments that Mr. Norman received at Harvey

(4)    Family?

(5)         A    No.

(6)         Q    And you do not have any firsthand

(7)    knowledge of the acupuncture treatments that

(8)    Mr. Norman received?

(9)         A    No.

(10)             MR. MARVIN:  Counsel, I will reiterate my

(11)        request from earlier to produce a witness who

(12)        can testify as to those treatments that were

(13)        billed for the subject of this EUO.

(14)             MR. CHISARI:  I stated before in my

(15)        letter, dated November 7th, I asked for it to

(16)        be narrowed down.  It never was.

(17)             MR. MARVIN:  May I see the letter?

(18)             MR. CHISARI:  Sure.  It should also be

(19)        noted that you specifically requested Dr.

(20)        Harvey.  You addressed the EUOs to Dr. Harvey,

(21)        and you requested Dr. Harvey.  The heading on

(22)        your letter is Dr. Harvey/Harvey Chiropractic.

(23)        It says Examination Under Oath of Dr. Richard

(24)        G. Harvey/Harvey Family Chiropractic, Physical

(25)        Therapy & Acupuncture, PLLC.

(1)                          DR. RICHARD G. HARVEY

(2)          MR. MARVIN:  Off the record.

(3)                          (Whereupon, a discussion was

(4)                          held off the record.)

(5)          MR. MARVIN:  Dr. Harvey has agreed to

(6)     provide us with all of the medical records and

(7)     documents that we do not yet have which are the

(8)     subject of the EUO and identified in the

(9)     schedule of claimants in Exhibit C.

(10)         We have agreed to adjourn the EUO until

(11)    such time and until such records are produced.

(12)         MR. CHISARI:  Yes.  Until we get the

(13)    records, we cannot pick a date.

(14)         MR. MARVIN:  Dr. Harvey, when do you think

(15)    you will be able to provide the records to us?

(16)         THE WITNESS:  I will try in the next week

(17)    or so.

(18)         MR. MARVIN:  We will agree to continue the

(19)    EUO in February at some point?

(20)         MR. CHISARI:  Yes.

(21)         MR. MARVIN:  Thank you.

(22)                         (Whereupon, the Examination

(23)                         Under Oath was concluded at 4:56

(24)                         p.m.)

(25)

LH REPORTING SERVICES, INC.          (516) 484-2325

(1)                     DR. RICHARD G. HARVEY

(2)

(3)              A C K N O W L E D G M E N T

(4)

(5)       STATE OF NEW YORK)
                              :SS
(6)       COUNTY OF NEW YORK)

(7)

(8)            I, DR. RICHARD G. HARVEY, hereby certify that

(9)    I have read the transcript of my testimony taken under

(10)   oath on January 31, 2013; that the transcript is a

(11)   true, complete and correct record of what was asked,

(12)   answered and said during this deposition, and that the

(13)   answers on the record as given by me are true and

(14)   correct.

(15)

(16)                   --------------------------------

(17)                   DR. RICHARD G. HARVEY

(18)                   Executed copy Scan into

(19)   Signed and subscribed to   Computer 3/21/13 —

(20)   before me, this      day

(21)   of              , 2013

(22)

(23)   --------------------------

(24)   Notary Public

(25)

       LH REPORTING SERVICES, INC.      (516) 484-2325

(1)                    DR. RICHARD G. HARVEY

(2)

(3)                    C E R T I F I C A T E

(4)    STATE OF NEW YORK)
                               :SS
(5)    COUNTY OF NEW YORK)

(6)

(7)         I, REBECCA LALLA, a Notary Public within and

(8)    for the State of New York, do hereby certify:

(9)         That the witness whose examination is

(10)   hereinbefore set forth was duly sworn and that such an

(11)   examination is a true record of the testimony given by

(12)   such a witness.

(13)        I further certify that I am not related to

(14)   any of these parties to this action by blood or

(15)   marriage, and that I am not in any way interested in

(16)   the outcome of this matter.

(17)        IN WITNESS WHEREOF, I have hereunto set my

(18)   hand this 3rd day of February, 2013.

(19)

(20)

(21)   _____

(22)   REBECCA LALLA

(23)

(24)

(25)


LH REPORTING SERVICES, INC.      (516) 484-2325

(1)                  DR. RICHARD G. HARVEY

(2)                         INDEX
         EXAMINATION UNDER OATH OF DR. RICHARD G. HARVEY

(3)

(4)   EXAMINATION BY                              PAGE
      MR. MARVIN                                  4

(5)

(6)   INFORMATION/DOCUMENTS REQUESTED            PAGE

(7)   Request: Complete medical records          25
      Request: Third amended operating agreement 74
(8)   Request: Copies of three agreements        95
      Request: Acupuncture notes                 107
(9)   Request: All medical documents and notes   108
      Request: Physical therapy notes            109
(10)  Request: Prescription and/or referrals     125
      Request: Medical records or witness        126
(11)  Request: Medical records                   130

(12)

(13)                  E X H I B I T S
                  MARKED FOR IDENTIFICATION
(14)  DESCRIPTION                                 PAGE

(15)  A       New York State driver's license    12

(16)  B       EUO Notice, dated October 12, 2012  19

(17)  C       EUO Notice                          19

(18)  D       Articles of Organization            35

(19)  E       Amended operating agreement         48

(20)  F       Written consent form                88

(21)  G       Bills for Franklin Sanchez          142

(22)  H       Documents pertaining to Derrick Norman  160

(23)

(24)

(25)


         LH REPORTING SERVICES, INC.      (516) 484-2325